UNITED STATES of America, Plaintiff,

v.

**Jose Omar OROZCO, et al.,
Defendants.**

**No. 85–0252–JLI–Crim.**

United States District Court,
S.D. California.

Jan. 21, 1986.
As Corrected March 28, 1986.

See also, D.C., 108 F.R.D. 313.

Jan Ronis, San Diego, Cal., for Michael Sullivan.

Michael McCabe, San Diego, Cal., for John Kerr.

Inge Brauer, San Diego, Cal., for Sandra Zeck.

Michael Pancer, San Diego, Cal., for Tom Pool, Mary Pool.

Michael Stein, San Diego, Cal., for Michael Van Horn.

Joseph Milchen, San Diego, Cal., for Kenneth Clarke.

Roger Cossack, San Diego, Cal., for Mitch Couasnon.

Richard Barnett, San Diego, Cal., for Donald Takayama.

Carl Klein, San Diego, Cal., for Steve Krogstad.

Patrick Hall, San Diego, Cal., for Kathy Davis, Tina Sullivan.

John Wood, San Diego, Cal., for Gabriel Sencial.

Sheldon Sherman, San Diego, Cal., for Randolph Barsotti.

Thomas Corn, Sacramento, Cal., for Judith Crom.

Charles Goldberg, San Diego, Cal., for Patrick Houser.

Charles Adair, San Diego, Cal., for James Scott.

Eugene Iredale, San Diego, Cal., for Michael Diebert, Dudley Richard Whitney.

Patrick Hennesey, San Diego, Cal., for Karl Hartman.

Peter Hughes, San Diego, Cal., for Gregg Canada, Bob Watson.

Frank Ragen, San Diego, Cal., for Michael Scarlet, Frank Jackson.

Milton Silverman, San Diego, Cal., for David Cothran.

Frank Vecchione, San Diego, Cal., for James Knight, Charles Edmundo Jones.

Marvin Mizeur, San Diego, Cal., for Edward Kulbusauskas.

Mark Adams, San Diego, Cal., for John Slater, Gary Wooten.

Robert Grimes, San Diego, Cal., for Antinino Virgilio.

Robert Boyce, San Diego, Cal., for Richard Lyman Newman.

Terry Roden, Los Angeles, Cal., for Kevin Matouzzi.

Thomas Warwick, San Diego, Cal., for Robert Shine.

Floralynn Einesman, San Diego, Cal., for Rick Laskey.

Sandra Resnick, San Diego, Cal., for Dennis Elias.

Douglas Brown, San Diego, Cal., for John Rowles.

Thomas Penfield, San Diego, Cal., for Michael Dodson.

Charles McCutcheon, San Diego, Cal., for Wallace Bartlett.

Patrick Briggs, San Diego, Cal., for Carl Bettis.

Victor Sherman, Santa Monica, Cal., for Augustin Fernando Maurtua, Jorge Maurtua.

Robert Moore, Miami, Fla., for Jose Antonio Ledgard, Madonna Ledgard, Gonzalo Ledgard.

Juanita Brooks, San Diego, Cal., for Javier Laos.

James Pokorny, San Diego, Cal., for Raul Cabada.

Athena Shudde, San Diego, Cal., for Alexis Sarda-Lusich.

Lynn Ball, San Diego, Cal., for Miquel Quiroz.

Thomas Kelley, San Diego, Cal., for John Camacho.

Richard Williamson, San Diego, Cal., for Timothy Ditty.

Peter Giordano, San Diego, Cal., for Henry Jones-Balcazar.

George Hunt, San Diego, Cal., for Fred Samango.

## MEMORANDUM DECISION
## AND ORDER

IRVING, District Judge.

Defendants' numerous motions to suppress evidence derived from electronic surveillance came on for hearing November 6 and 7, 1985 before the Honorable J. Lawrence Irving. Counsel appearances are listed in the official court minutes. Given the complexity of the case and the breadth of the issues raised, the court elected to take the motions under submission and set forth in writing the bases for each of its rulings.

Having considered the pleadings, oral argument of counsel and material submitted *in camera,* the court issues the following memorandum decision.

## BACKGROUND

These are a series of motions by various defendants named in a 270-count, 402 page indictment filed March 21, 1985, charging them and others with conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846, possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), aiding and abetting in violation of 18 U.S.C. § 2, conspiracy to collect extensions of credit by extortionate means in violation of 18 U.S.C. §§ 371 and 894, unlawful use of communication facilities in violation of 21 U.S.C. § 843(b), interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(2), distribution of cocaine to a person under 21 years of age in violation of 21 U.S.C. §§ 845 and 841(a)(1) and continuing criminal enterprise in violation of 21 U.S.C. § 848. The charges center about an alleged large scale cocaine distribution organization headed by defendants Jose Omar Orozco, Augustin Fernando Maurtua and Jose Antonio Ledgard. The organization allegedly operates in San Diego and Los Angeles counties in California, Ket-

chum, Idaho and Miami, Florida. The indictment charges 98 defendants with conspiracy to possess cocaine with intent to distribute, and lists 517 overt acts occurring from December, 1983 through March 18, 1985 in support of the charge.

Evidence in this case derives from interceptions of defendants' wire and oral communications. Eleven court orders issued over a one-year period commencing February 21, 1984 authorized the interceptions. Defendants challenge the legality of the orders authorizing the interceptions, the sufficiency of the applications for the orders, and the procedures the government followed once interception had begun. To facilitate quick reference and to avoid confusion, the court will refer to each application and order by letter designation. The following lists the applications and orders challenged by defendants:

| Application and Order | Date | Issuing Judge | Phone and/or location Intercepted |
|---|---|---|---|
| A | 2/21/84 | Enright | Phone # (619)481–2673 (subscribed to by E. Kulbusauskas) and residence located at 13750 Ruette Le Parc, Apt. D, Del Mar, CA |
| B | 4/10/84 | Enright | Phone # (619)756–2807 (subscribed to by F. Jackson) and residence located at 804 Val Sereno, Encinitas, CA |
| C | 6/6/84 | Thompson | Phone #s (619)756–2807 and (619)756–2814 (subscribed to by F. Jackson) located at 804 Val Sereno, Encinitas, CA |
| | | | Phone # (619)436–6769 (subscribed to by J. Kerr) located at 641 Melba Rd., Encinitas, CA |
| | | | Phone # (619)481–8537 (subscribed to by B. Barnhill) located at 237 No. Granados Ave., Solana Beach, CA |
| D | 7/23/84 | Thompson | Phone #s (619)756–2807 and (619)756–2814 (subscribed to by F. Jackson) located at 804 Val Sereno, Encinitas, CA |
| | | | Phone # (619)436–6769 (subscribed to by J. Kerr) located at 641 Melba Rd., Encinitas, CA |
| | | | Phone # (619)481–0359 (subscribed to by M. Sullivan) located at 399 Bellaire, Del Mar, CA |
| | | | Phone #s (619)239–2350, (619)239–5842, (619)239–4737 and (619)239–4733 (subscribed to by Conceptual Artists) located at 808 Imperial Ave., San Diego, CA |
| E | 9/5/84 | Thompson | Phone # (619)438–8234 (subscribed to by D. Ledgard) located at 6827 Luciernaga Ct., Carlsbad, CA |
| | | | Phone # (619)436–6769 (subscribed to by J. Kerr) located at 641 Melba Rd., Encinitas, CA |
| | | | Phone # (619)481–0359 (subscribed to by M. Sullivan) located at 399 Bellaire, Del Mar, CA |
| | | | Phone # (619)753–7941 (subscribed to by T. Pool) located at 1856 Wilstone Ave., Encinitas, CA |
| | | | Phone #s (619)239–2350, (619)239–4733, (619)239–4737, (619)239–5835 and (619)239–6647 (subscribed to by Conceptual Artists) and business located at 808 Imperial Ave., San Diego, CA |

| Application and Order | Date | Issuing Judge | Phone and/or location Intercepted |
|---|---|---|---|
| F | 9/14/84 | Thompson | Phone # (619)226–1189 (subscribed to by T. Halley) located at 3374 Talbot, San Diego, CA |
| G | 10/16/84 | Thompson | Phone # (619)438–8234 (subscribed to by D. Ledgard) located at 6827 Luciernaga Ct., Carlsbad, CA |
| | | | Phone # (619)481–0359 (subscribed to by M. Sullivan) located at 399 Bellaire, Del Mar, CA |
| | | | Phone #s (619)239–4733, (619)239–2350, (619)239–4737, (619)239–5835 and (619)239–6647 (subscribed to by Conceptual Artists) and business located at 808 Imperial Ave., San Diego, CA |
| H | 11/11/84 | Thompson | Phone # (619)438–8234 (subscribed to by D. Ledgard) located at 6827 Luciernaga Ct., Carlsbad, CA |
| | | | Phone # (619)755–2872 (subscribed to by C. Jones) located at 1522 Camino Del Mar, #643, Del Mar, CA |
| I | 1/18/85 | Ryan | Phone # (208)726–7329 (subscribed to by G. Maurtua) located at 315 Sage Rd., Ketchum, Idaho |
| J | 2/15/85 | Thompson | Phone # (619)438–8234 (subscribed to by D. Ledgard) and residence located at 6827 Luciernaga Ct., Carlsbad, CA |
| | | | Phone # (619)481–5218 (subscribed to by C. Jones) located at 1552 Camino Del Mar, Del Mar, CA |
| | | | Phone # (619)438–3702 (subscribed to by D. Strauss) and residence located at 1935–C Estrella De Mar, Carlsbad, CA |
| K | 2/15/85 | Eaton | Phone # (305)854–8762 (subscribed to by J. Ledgard) located at 2131 Secoffee St., Miami, FL |

## FACTS

For purposes of these motions it is not necessary to review the entire factual history of the case. The motions require only a review of the facts as they are set forth in the wiretap applications. These are summarized below:

### Application A

Application A includes the affidavit of FBI Special Agent, Michael P. Smith. Agent Smith's affidavit sets forth the genesis of the investigation in this case. The affidavit presents information obtained from two informants, Claude Phillips and Fred Robertson, Agent Smith's own observations as an undercover agent, information derived from a pen register authorized by Judge Thompson on January 5, 1984, and the later involvement of Vicki Robertson in cocaine purchases from James Knight. The investigation began in December of 1983, when Claude Phillips and Fred Robertson first provided information to the Drug Enforcement Administration (hereinafter "DEA") and Federal Bureau

of Investigation (hereinafter "FBI") about a drug smuggling group operating out of Tijuana, Baja California, Mexico and San Diego, California.

On December 5, 1983, Fred Robertson decided to cooperate with the FBI and began providing information to Special Agent Charles B. Walker. Robertson employed James Knight as a computer salesman. Shortly after Knight began his employment in December of 1982, he introduced Robertson to the recreational use of cocaine. Thereafter, Robertson began purchasing cocaine from Knight. After Robertson became Knight's regular customer, Knight confided that he had been involved in the distribution of drugs for over 10 years and that he was part of an organization centered in Tijuana, Baja California and San Diego, California. Knight told Robertson that he had been arrested once in 1975 when narcotics were found in his car, but that he "beat the case" because his attorney successfully moved for suppression of the evidence recovered in the search. Knight advised Robertson that cocaine use was widespread in the computer industry and that his employment was a perfect cover for his narcotics activity. Based on the foregoing, the FBI checked the records of the San Diego County Sheriff's Office. These records reflected that Knight was arrested in 1975 for possession of marijuana but that the case was dismissed due to an insufficient search warrant.

Robertson also said that in early 1983 Knight took him to Tijuana and introduced him to Jesus Sanchez Rodriguez, aka "Jessie". Jessie operated out of an office in downtown Tijuana which fronted a shrimp exportation business. Knight told Robertson that Jessie was one of the principals in his drug smuggling organization. After the introductory visit with Jessie, Robertson began purchasing cocaine directly from him. Jessie provided him with a phone number in Tijuana which he could call to set up cocaine transactions. When Robertson phoned in an order to Jessie, Ricardo Beas would deliver it across the border in Chula Vista, where Robertson would be waiting. Over a six month period in 1983,

Robertson purchased about $13,000 worth of cocaine from Jessie. Robertson also attended several meetings at Jessie's office in Tijuana in which Knight and Jessie attempted to get Robertson to participate in the distribution of cocaine. Jessie told Robertson that he received cocaine directly from Peru via airplanes which landed in Mexico. Jessie said that his drug activities in Mexico were protected because he bribed Mexican government officials. Jessie also introduced Robertson to a person referred to as John Alessio, Jr. Knight told Robertson that Alessio, Jr. was the son of the former owner of the Caliente racetrack. Robertson's impression was that Alessio Jr. controlled Jessie. Robertson was also introduced to Alesandro Rodriguez, also referred to as "Allie". Robertson learned that Jessie rarely came into the United States because he believed that United States authorities were aware of his drug smuggling activities.

Knight introduced Robertson to Ed Kulbusauskas, describing him as being involved with Jessie in moving multi-kilos of cocaine every week. Knight told Robertson that when he locates a moneyed individual who is interested in purchasing cocaine, he serves as the middle man between Kulbusauskas and the purchaser. Knight also told Robertson that Kulbusauskas is very cautious and will only deal with him or another trusted member of the organization with whom he has dealt over the years. Knight explained that once he located a purchaser, he would call Kulbusauskas, who then arranged to have a kilo delivered to his home. Knight then took money to Kulbusauskas' residence and picked up the cocaine for transportation to the customer. Knight also told Robertson that Kulbusauskas uses several safehouses in which he stores up to 30 kilos of cocaine at any one time, warning Robertson that the main supply is never kept at Kulbusauskas' residence.

Robertson advised Agent Walker that he has not seen either Jessie or Alessio, Jr. since July, 1983, but that Knight contin-

ually contacts him to do drug deals. Even though Knight no longer works for Robertson, he used Robertson's business phone throughout 1983 to place calls to Kulbusauskas and to Jessie. During those phone calls Robertson would often hear references to "brown shrimp" and "white shrimp," code words for Mexican heroin and cocaine, respectively.

Following his confession to the FBI, Robertson agreed to cooperate with the FBI and to introduce an undercover agent to Knight. Thus when Knight approached him to do a drug transaction on December 6, 1983, Robertson said that he knew someone in San Diego who had "lots of money" and who would be interested in buying a pound of cocaine. On December 6, 1983, Knight also told Robertson that Allie had Mexican brown heroin available for sale. Knight agreed to meet with Robertson and his "friend" on December 7, 1983. Robertson agreed to consensually record his telephone conversations and his face to face conversations with Knight, wearing a body-recorder to do the latter.

Later on December 7, 1983, Robertson spoke with Knight and told him that his friend was having trouble raising the money and that they would not be ready until the following day. During that conversation, Knight stated that Kulbusauskas was "sitting on a large supply" of cocaine and was holding a pound for Knight. "Brown shrimp" and "white shrimp" were also discussed. On December 8, 1983, Agent Smith, acting as Robertson's cocaine-purchasing "friend," spoke on the telephone with Robertson and Knight. Agent Smith recharacterized his inability to deal with Knight on the preceding day as the product of negotiations between him and another party for a more favorable deal. Agent Smith told Knight that he was ready to move some "brown stuff." Knight advised Smith that "brown stuff" was not currently available because of the murder of someone in Mexico. They then discussed "white stuff," including profit margins, quantity and quality. One half hour later, they had another telephone conversation and Agent Smith requested samples from Knight.

During that phone conversation, Knight made reference to "oscars;" Agent Smith took that phrase to mean ounce quantities of cocaine. They then discussed the specifics of the transaction, and it was agreed that Robertson would act as Agent Smith's representative. Later that day, drug-related conversations occurred between Robertson and Knight, and Knight and Allie (via telephone), which were consensually recorded by Robertson.

Also on December 8, Robertson and Knight drove to Kulbusauskas' residence for a meeting. For safety reasons, Robertson did not wear a badge recorder. At the meeting, Kulbusauskas told them that he had received 30 kilos of cocaine two weeks earlier and that he still had some left to supply to customers. Kulbusauskas showed Robertson one kilo that he described as being "Grade B" quality, and quoted a price of $25,000. Kulbusauskas said that he did not want a new customer to get more than one pound on the first deal. Kulbusauskas also told them that when Knight had the $25,000 in his hand he should call him and they would follow the distribution arrangement they had developed. Knight and Robertson then traveled to Allie's residence in Solana Beach, where they discussed the interruption in the Mexican heroin supply.

On December 9, 1983, Robertson spoke with Knight and told him that Smith was ready to deal and a meeting place was established in Carlsbad for 1:00 p.m. that day. That morning, Agent Smith rented a room at Andersen's Pea Soup Hotel and concealed a tape recorder in the room. He also brought with him $132,000 in "show money" to use in negotiations.

At 1:15 p.m. Smith, Knight and Robertson met in Smith's room at the hotel. At the beginning of their meeting, Knight said that "his people" were cautious and he wondered aloud whether Smith was an FBI or DEA agent. Agent Smith denied being an agent and parried with an inquiry as to whether Knight was an agent. Smith then agreed that he would buy 3 kilos of cocaine

the following Monday and he agreed to buy an ounce at that time. The group then discussed the quality of the ounce. Knight agreed to retrieve an ounce for Smith. During the meeting, they also discussed Kulbusauskas' connections, Allie and Jessie's backgrounds, and the possibility of Smith's future investment in loads of cocaine flown in from Peru. Agent Smith then gave Knight $1,700 for the ounce, which Knight said would cost $1,650. Knight said it would take him an hour to get the ounce since he would have to call Kulbusauskas who would then send someone out to get the cocaine. Knight and Robertson left the hotel and were followed by FBI Special Agent Jim Batley. Agent Batley observed Knight making a phone call from a pay phone. At 3:05 p.m., Knight returned to Smith's room and told him that because he had been late in phoning Ed, the deal could not be consummated that day.

On December 10, 1983, Knight and Agent Smith met at the Ocean Terrace Bar of the Del Coronado Hotel. They then went to Smith's undercover vehicle where he was given an ounce of cocaine. They agreed to meet again on December 12 to complete a deal for a pound of cocaine. On December 12, Robertson called Knight to postpone that meeting to December 13.

On December 13, Agent Smith met Knight at Denny's Restaurant in Del Mar. At this meeting, Knight informed Smith that Kulbusauskas was working on another deal and that they would have to wait to consummate their deal. They then went to the Triton Restaurant and waited for two more hours. While at the Triton, Knight noticed two unknown males at a nearby table and told Smith that he thought they were cops. After Knight called Kulbusauskas and got the go-ahead, they left the restaurant and Knight noted that the two unknown men also left. He warned Smith to proceed with caution. They took separate cars and after a short while, Knight pulled over, got into Smith's car and told him that he was certain that they were being followed by at least three cars. Knight again inquired if Smith was a cop.

Smith suggested that they postpone the deal and Knight agreed that there was too much "heat" that day. Later, Knight went to Robertson's house and described the day's events, and told Robertson that he suspected Smith was a cop. Knight told Robertson that after he was certain he had lost the surveillance, he proceeded to Kulbusauskas' house and relayed the events to Kulbusauskas. Kulbusauskas opined that the surveillance was a DEA operation. He told Knight that he had the ability to verify license plate and telephone numbers and requested Knight to provide him with Smith's. Knight told Robertson that he was worried because his and Kulbusauskas' fingerprints might be on the bag that contained the ounce sold to Smith.

On December 14, 1983, Agent Smith and Knight had a consensually recorded telephone conversation. Knight told Smith that he appeared too cool when they were being followed. Smith countered that he was "cool" because he hadn't done anything wrong yet.

On December 20, 1983, Robertson received a call from Jessie who was trying to locate Knight. Jessie told Robertson that he was calling from San Francisco and he left a number where Knight could reach him. Robertson reported his compliance with Jessie's request to Agent Smith.

On December 16, 1983, Claude Phillips provided the following information to FBI Special Agents Charles Walker and Ellen K. Rollings. Phillips told them that he was contacted on November 7, 1983 by Greg Scott Jacomella concerning his possible participation in a proposed cocaine deal. Phillips had known Jacomella for over 10 years and knew that Jacomella was a multipound cocaine dealer residing in San Diego. Jacomella told Phillips that "Jessie," residing in Mexico, had a major distribution organization in the San Diego area for cocaine, heroin and marijuana. Jacomella related that Jessie uses a shrimp business in Mexico as a front for his cocaine dealings.

At the instruction of the DEA, Phillips arranged to travel to Mexico with Jacomel-

la to purchase 3 kilos of cocaine. On November 17, 1983, Phillips and Jacomella met with Jessie in Mexico. The parties consummated a deal and arrangements were made for Ricardo (later discovered to be Ricardo Beas) and Jacomella to transport the three kilos of cocaine to Ukiah, California, where Phillips would have to pay cash for the delivery. The FBI and DEA subsequently arrested Jacomella and Beas in Ukiah and seized the three kilos.

On December 20, 1983, Special Agent Bud Watkins interviewed Jacomella and Beas to determine whether they would be willing to cooperate. Jacomella told Watkins that he would under no circumstances cooperate because he feared for his life and the lives of his family members residing in San Diego. Beas also refused to cooperate out of fear for his life.

Agent Smith's affidavit also discusses evidence corroborating the events related below. Smith describes FBI verification of relevant phone numbers, as well as information regarding the extent of Kulbusauskas' trafficking provided to the FBI by a confidential informant in 1979. Agent Smith's affidavit also notes that Edward Kulbusauskas' fingerprint was positively identified on the envelope containing the ounce transferred to him on December 13 from James Knight.

On January 5, 1984, Judge Gordon Thompson ordered the installation of a pen register at Kulbusauskas' Ruette Le Parc home. Agent Smith's affidavit reviews the pen register information and notes that fifteen calls were made to the home of Greg Frazier. Smith's affidavit calls attention to the fact that some of the previously discussed phone calls involving Knight were corroborated by the pen register information. Agent Smith also reviews Knight's telephone toll records and notes that nineteen calls to Kulbusauskas' residence were made on Knight's telephone.

On February 3, 1984, Fred and Vicki Robertson told Agent Smith that Knight had proposed a cocaine transaction to them on the previous day. They were instructed to go along with the cocaine transaction; they agreed with Knight that on February 4, Vicki would follow Knight to the vicinity of Kulbusauskas' home. Knight would then pick up the cocaine and give it to Vicki, who would return to her residence. Fred Robertson also told Agent Smith that earlier on the morning of February 3, Knight had called and requested his assistance in finding a landing strip for a load of marijuana and cocaine that was to be flown into the United States. On February 3, Agent Smith gave Vicki Robertson $550 to use to purchase cocaine from Knight.

On February 4, 1984, FBI agents surveilled the above-described transaction involving Vicki Robertson and Knight. They positively identified Knight. The agents monitored Vicki Robertson's car, but felt that surveillance of Kulbusauskas' residence might be detected. Once Vicki received the cocaine from Knight, she turned it over to FBI agents.

Agent Smith's affidavit offers many reasons why normal investigative procedures will not work in this case and why electronic surveillance is necessary. First, Smith notes that with only the information existing to date, the FBI does not have a prosecutable case against any of the targets. Smith iterates the fact that Jacomella and Beas will not cooperate with authorities. He asserts that even if they would cooperate, Jessie and Alessio, Jr.'s location in Mexico would make it difficult to prosecute them. In order to apprehend them, prior information regarding their anticipated entry into the United States is required, and that information could be obtained through electronic surveillance. Agent Smith opines that there is no direct evidence against Jessie, Allie, or John Alessio, Jr. In order to obtain direct evidence against the hierarchy of the conspiracy, Smith hypothesizes that the government would have to spend thousands of dollars, which it is not in the position to do, through Fred Robertson for the purchase of narcotics.

With respect to the investigation of Kulbusauskas' trafficking activities, Agent Smith asserts that Knight and Kulbusauskas have become increasingly suspicious of

him in his capacity as an undercover agent. Agent Smith highlights the fact that Kulbusauskas told Knight that he has the capacity to check out and confirm if someone is a cop. Furthermore, Agent Smith contends that conventional surveillance nearly compromised the investigation and endangered his life. Knight's refusal to let him deal directly with Kulbusauskas is another reason why Agent Smith believes electronic surveillance is necessary.

Agent Smith discusses, at length, the inefficacy of other investigative means. He states that pen register and toll record information will not actually identify individuals making and receiving telephonic communications. Agent Smith asserts that search warrants would not recover sufficient evidence to prosecute; Smith presupposes that Kulbusauskas, Knight, Jessie and Allie would not maintain sufficient records showing the extent or identification of all the individuals involved in the conspiracy. Agent Smith notes that without concomitant recorded conversations of the conspirators, large amounts of currency, if seized, would prove worthless in securing a prosecution. Phillips and Robertson remain unaware of the full extent and scope of Knight's, Kulbusaukas', Jessie's and Allie's illegal drug activities. Agent Smith notes that interviews of targets or others and issuance of grand jury subpoenas would compromise the investigation and possibly cause destruction of evidence. Agent Smith also suggests that because Knight is not aware of the location, the only way to learn the location of Kulbusauskas' stash house is through electronic surveillance. Agent Smith describes the procedure Kulbusauskas insists upon to place orders. On receipt of an order Kulbusauskas makes phone calls to other trusted persons who go to the stash house to pick up the drugs.

In Smith's opinion, interception of oral communications, via microphone surveillance, is also necessary. He believes it is likely that Kulbusauskas arranges meetings other than by phone. Microphone interception would clarify and supplement the meaning of wire interceptions, which may be in code. Prior informant information also demonstrates that Kulbusauskas uses his residence for meetings in which cocaine and money are discussed and exchanged.

Finally, Agent Smith relies on the frequency of the targets' cocaine transactions to justify his request for electronic surveillance. He notes that the sophistication and international scope of the conspiracy demonstrate that its members are career criminals. Agent Smith also relies on Knight's representation that Kulbusauskas moves large amounts of cocaine, and estimates that Kulbusauskas must use several other individuals for the sale and distribution of his product. Agent Smith notes that physical surveillance limits investigators to observation of people entering Kulbusauskas' home and may not identify other members of Kulbusauskas distribution hierarchy.

### Application B

In support of Application B, the government submits the affidavit of Agent Michael P. Smith, the affiant from Application A. Affidavit B begins with a summary of communications intercepted pursuant to Order A. Agent Smith's affidavit details drug-related conversations between Ed Kulbusauskas and Frank Jackson, between Ed Kulbusauskas and Jim Knight, and between Ed Kulbusauskas and Bernard Thompson. The following is a chronological summary of the calls reported in Smith's affidavit.

On February 24, 1984, at 2:57 p.m. Ed Kulbusauskas called Frank Jackson and asked him if anything was "happening." Jackson responded that something was happening and Kulbusauskas said that he would stop by and see Jackson a little later. Agent Smith characterizes this conversation as one in which Kulbusauskas was arranging a meeting at Jackson's residence for the purpose of discussing and engaging in the sale of cocaine. Later that afternoon, Kulbusauskas received a call from an unknown male who asked if Kulbusauskas was still waiting. Kulbusauskas answered that he was just about to go and take care

of "it" and would be ready in an hour or two. The unknown male said he would call back later. Smith characterizes this conversation as an inquiry as to whether Kulbusauskas had received his supply of cocaine. At 5:50 p.m. that afternoon, Kulbusauskas received a call from Bernard Thompson, who asked him if he "had anything in and if it was real nice." Kulbusauskas answered that it was nice, and Thompson inquired if there was a "didge" on it. Kulbusauskas responded affirmatively and Thompson then asked him if the "didge" was a nice one. Thompson also told Kulbusauskas that he had some friends who wanted "some small things" and asked if Kulbusauskas had the time for Thompson to grab "a small piece." Agent Smith characterizes these as drug related comments.

On February 25, 1984, FBI agents surveilled a drug transaction and calls involving that transaction were intercepted. At 11:33 a.m. Knight called Kulbusauskas and told him that he could get to his house in about an hour or an hour and fifteen minutes. At 12:05 p.m. FBI Special Agent Robert R. Leight observed a meeting between Vicki Robertson and James Knight in the parking lot at Del Monico's Restaurant. Vicki Robertson later related the conversation between her and Knight to Agent Leight. Knight told her that in order to receive $1,000 worth of cocaine, she would have to get $1,100 from her friend. Knight told her that he wanted to make $100 on the deal. If he was given only $1,000, he said he would cut one gram of cocaine from what he received. Knight also informed her that she would have to wait in her car while he went in and got the cocaine from his source. Vicki Robertson then went to undercover Agent Leight, who gave her ten $100 dollar bills. She presumably gave this money to Jim Knight. At 12:46 p.m. that afternoon, Knight called Kulbusauskas and told him that he was across the street and that he would be "right over."

At 1:55 p.m. Vicki Robertson and Knight returned from Kulbusauskas' residence to Del Monico's Restaurant. Knight re-

mained in the car while Robertson went inside the restaurant to deliver to Agent Leight the plastic bag containing the cocaine which Knight had gotten from Kulbusauskas. Robertson then described to Leight the events which occurred at Kulbusauskas' residence. Robertson said that Knight instructed her to remain in the car while he went inside the residence to get the cocaine. One half hour later, Knight returned to Robertson's car with the cocaine and they immediately drove back to Del Monico's Restaurant. While driving back, Knight told Robertson that the cocaine was 98% pure and that he could sell a pound of it for $29,000; he would net a profit of $6,000 since he could purchase it for $23,000. At 7:32 p.m. Knight called Kulbusauskas and told him that "it went real good." At 9:12 p.m. Kulbusauskas called Frank Jackson and told Jackson that he had "nine" for him. Jackson told Kulbusauskas that he would pick it up the following day. Agent Smith characterizes this last interchange as an indication by Kulbusauskas that he had $900 for Jackson, which represents the amount Kulbusauskas owed Jackson for the cocaine provided to Knight earlier that day.

On February 28, 1984, at 1:52 p.m. Frank Jackson called Kulbusauskas. Kulbusauskas told Jackson that he had some "dose" for him. Jackson told Kulbusauskas to "come over to his place" before 4:00 p.m. At 3:07 p.m. Kulbusauskas called Jackson and told him that he was "going to come over." Jackson told him that he would have to wait, explaining that he didn't think he was going to leave that day because he had too much work to do. Jackson asked Kulbusauskas if he was going "to need anything" the next day, to which Kulbusauskas responded that he would need "it" Thursday. Agent Smith surmises Kulbusauskas' reference to "needing something Thursday" results from the proposed sale of one pound of cocaine between Jim Knight and Agent Leight.

On March 1, 1984, at 8:15 p.m. Jackson called Kulbusauskas and told him that "it would be tomorrow." Agent Smith inter-

preted this conversation to mean that Jackson would not be ready to do the pound deal until the following day. On March 2, 1984, at 5:09 p.m. Frank Jackson called Kulbusauskas and stated that he would be "right over." On March 3, 1984, Frank Jackson called Kulbusauskas and told him that he needed to "pick up that thing." Jackson inquired whether Kulbusauskas wanted to know how much he owed Jackson. Kulbusauskas said that he did and Jackson said he would check the figure. After giving a figure to him, Jackson told Kulbusauskas that he could come over if he "needed anything." Kulbusauskas said that he would come over. Later that evening, Kulbusauskas received a call from Jim Knight in which they discussed the timing for the anticipated sale of one pound of cocaine.

On March 6, 1984, at 12:17 p.m., Bernard Thompson called Kulbusauskas. Kulbusauskas asked Thompson where the computer was. Thompson responded that he was picking it up then because he was unable to do so the previous day. Thompson assured Kulbusauskas that he would get the computer to him around 4:00 or 5:00 p.m. Two minutes later, Kulbusauskas called Jackson and told him that he had just spoken with the computer guy who would be at Kulbusauskas' residence between 5:00 and 6:00 p.m.

On March 15, 1984, a second transaction involving Vicki Robertson and Agent Leight occurred. At 9:40 that morning, Kulbusauskas received a call from Jackson and told Jackson that the "big thing" was supposed to happen that day. At 11:00 a.m. Vicki Robertson arrived at Del Monico's Restaurant where she met Agent Leight. Leight gave Robertson $27,000 to be used for the purchase of cocaine from Knight. At 11:24 a.m., Knight called Kulbusauskas and told him that he had the "papers" and would be there in one half hour. At 11:48 a.m. Jackson called Kulbusauskas. Kulbusauskas reported that everything was in order. Jackson asked "when?"; Kulbusauskas said "right now" and mentioned the number "448." Jackson asked if that was what they wanted and

Kulbusauskas responded that it was. Jackson asked if "they" were there and if Kulbusauskas had "the cash." Jackson told Kulbusauskas that he could come to see him but that he would first have to get "it." Jackson told Kulbusauskas that he would call him back to give him an address as to where they would meet. Two minutes later, Jackson called Kulbusauskas and told him to meet at his old house in one half hour. Kulbusauskas inquired what the "ticket" was. Jackson told him that he could have them for "47" and then reduced this price to "46." Agent Smith opined that both these conversations established the amount of cocaine involved and the price per gram of cocaine.

Agents surveilled the transaction and observed that at 12:04 p.m. Knight left Kulbusauskas' apartment. He then entered his vehicle in which Vicki Robertson was waiting, and proceeded to a shopping center a short distance away. Fifteen minutes later, Kulbusauskas entered his automobile and left his apartment complex. At 12:29 p.m. Kulbusauskas entered Frank Jackson's former residence at 261 26th Street in Del Mar, California. Two minutes later, Kulbusauskas alone, left Jackson's residence. Six minutes later, Kulbusauskas arrived at the shopping center and entered Knight's automobile briefly. Kulbusauskas then exited the car and both he, Knight and Robertson left the shopping center. At 1:06 p.m., agents again observed Kulbusauskas entering Jackson's former residence at 26th Street. Eight minutes later, Kulbusauskas and Jackson left. Forty five minutes later, Vicki Robertson arrived at Del Monico's Restaurant and gave Agent Leight one pound of cocaine, which subsequent laboratory analysis revealed to be 93% pure. At 2:19 p.m. Knight called Kulbusauskas and told him that the deal went well. Knight also said that his customers were talking about doing another deal the following week.

Through the intercepted conversations, the FBI learned that Frank Jackson moved to a new residence. On March 16, 1984, Kulbusauskas called Jackson and told him

that he had some things for him and would bring them to Jackson the following day. On March 17, Kulbusauskas called Jackson and inquired to see if he was going to be home because he wanted to drop something off and pick something up. Jackson said Kulbusauskas could "come by" in an hour and that he had just gotten something new. At approximately 8:32 p.m., FBI Agents Robert W. Addeo and William A. Perez observed Kulbusauskas entering Frank Jackson's new residence at 804 Val Sereno Drive, Encinitas, California. Kulbusauskas left approximately one half hour later.

On March 19, 1984, Jim Knight called Kulbusauskas and discussed a potential deal for "tennis" for later in the week. The following day, at approximately 4:04 p.m., Kulbusauskas called Jackson and told him that his "big friend" had called and wanted to do something at the end of the week.

Agent Smith's affidavit further noted that the FBI identified a latent fingerprint found on the envelope handed to Vicki Robertson on March 15 from James Knight, as belonging to Frank Jackson.

Agent Smith offers the following reasons in support of his conclusion that interception of wire and oral communications is necessary and that other investigative means will not be effective. With respect to the need to intercept oral communications in Jackson's home, i.e. the need to place a microphone or "bug" within the home, Smith notes that the interceptions authorized by Order A demonstrate that Jackson uses his residence to conduct meetings during which cocaine and money are exchanged and discussed. Smith submits that physical surveillance of Jackson's residence would not provide details of the meetings held there. Furthermore, he surmises that it is likely that Jackson arranges meetings by means other than the telephone. Finally, interception of oral communications is necessary to clarify the meaning of wire interceptions, which may be in code. Smith believes that the parties will speak more freely, and not in code, when they are not on the telephone. With respect to the need for interception of wire communications, Smith notes that other investigative techniques would be insufficient to make prosecutable cases against Jackson's co-conspirators. Smith opines that further infiltration of an undercover agent seems unlikely. Knight is reluctant to meet Agent Leight, acting undercover, and there is no reasonable basis to believe that Knight would be willing to introduce Agent Leight to Kulbusauskas or to Jackson. Furthermore, there is no indication that Knight personally knows Jackson. Smith surmises that Kulbusauskas has access to multi-kilo quantities of cocaine and that therefore, Jackson must utilize at least several other individuals in the sale and distribution of multi-kilo quantities of cocaine since he is Kulbusauskas' source. Even if physical surveillance is highly successful, it rarely leads to conclusive evidence. Smith advises that physical surveillance at Jackson's residence is particularly difficult because there is very little vehicular traffic in Jackson's neighborhood and because there are no suitable observation points from which the FBI can conduct undetected surveillance. Smith also remarks on the inefficacy of search warrants and interviews with suspects and grand jury subpoenas. He notes that interviews or subpoenas would definitely alert the persons under investigation and compromise the investigation. Similarly, Smith notes that execution of a search warrant would jeopardize the entire investigation. A search would not be likely to yield evidence enlightening the FBI as to the full scope of the criminal activities and the methods used by Jackson and Kulbusauskas because they do not maintain sufficient records.

*Application C*

Application C, requesting interception of wire communications from two telephone lines subscribed to by Frank Jackson, a phone subscribed to by John S. Kerr and a phone subscribed to by Barney Barnhill, includes an affidavit authored by FBI Special Agent Robert Leight. Agent Leight's affidavit focuses primarily on information

derived from phone calls intercepted pursuant to Order B. Because of the extensive number of calls described in the affidavit, only those calls relevant to probable cause and necessity findings will be discussed in this summary.

On April 11, 1984, at 11:42 a.m. John Kerr called Jackson and asked if Jackson had heard anything from "his people." Jackson told Kerr that he had not and Kerr suggested that Jackson call these people because Kerr had a very good looking "product." Jackson ensured that he would get in touch with his people.

On April 11, 1984, at approximately 12:47 p.m. Jackson received a call from an individual known as John, last name unknown (hereinafter "LNU"). John told Jackson that he was with Bob Shine and "Red Dog" the previous evening. John said that Nino had not yet called him back. Jackson suggested that John should "get ahold of Nino because there's something real, real pretty available." Jackson stated that he was waiting for some more cash and told John that he did not know what the price on this is, but that it would be around "45" and that it's the best he has ever seen. Later that day, Kulbusauskas called Jackson and asked what the price on "a thousand" would be. Jackson said that something new is happening and it's "the prettiest he has seen for awhile," but Jackson has to wait because something else is happening. Jackson said that he could not do "a thousand," but that he could do "500" at a time. Kulbusauskas then told Jackson that that's what they wanted—"500" at a time. Jackson also told Kulbusauskas that he "still has the stuff that they have right now and he can still get that" and that it would "probably be about 38, no 39." Jackson said that "39 is as low as they could go and that was only giving them two cents a piece." Jackson stated that "he was not going to do it unless he can make two grand on that." Also on that day, within twenty minutes of each other, Jackson received two phone calls, one from John (LNU) and one from John Kerr. Both conversations in coded language referred to

doing narcotics transactions the following day.

On April 12, 1984, eight conversations between Frank Jackson and others, were included in Agent Leight's affidavit. Jackson spoke three times with John (LNU). The last of these conversations included a statement by Jackson to John that "it's done." John said in response he would "come right over for a little bit." At 1:36 p.m. that day, John Kerr called Jackson and told him to bring "what he has and come on over." In Agent Leight's opinion, Kerr's statement to Jackson was an instruction to bring him $10,000 owed for cocaine. At 4:41 p.m. Kerr called Jackson and asked him how everything went. Jackson responded positively. Kerr then asked Jackson if Sandra was at home. Jackson replied to Kerr that he didn't know because he hadn't called her yet. Kerr instructed Jackson to call Sandra to see if she was still at home. They agreed to meet later that evening at 10:00 p.m., and Jackson told Kerr that he needed to do another "500." At 5:08 p.m., Jackson called Kerr's phone number and spoke with Sandra Zeck. Jackson wanted to come and see her. Zeck responded that she would be leaving for work in 20 minutes. Jackson agreed to come within that time. At 10:04 p.m., Kerr called Jackson. They arranged a narcotics transaction for the next day which would involve "at least 280." Kerr told Jackson that he needed to see Jackson that evening on the "other thing" which they had done that day. Jackson told Kerr that he had already taken care of it and that he had given it to Kerr's "old lady," Sandra. Jackson told Kerr that he had written it all down, put it in one of Jackson's envelopes, dropped it all by to Sandra, and subtracted the 49 and gave her 13,600. One minute later, Jackson called Kulbusauskas, who advised Jackson that he had a conference that day with a friend concerning "the big one." During the conversation, Jackson told Kulbusauskas that something new was happening and it looked good. When Kulbusauskas had a need for "one of those tomorrow in the afternoon," Jackson asked if Kulbusauskas wanted the "new." Kul-

busauskas responded that either one would do.

Agent Leight's affidavit describes six calls on April 13, 1984. In one conversation at 4:07 p.m., an unknown male called Jackson and told him that he was waiting for a call concerning something "real nice and new." The unknown male said that was great because he could use something. Jackson told the man that he would have it in an hour or two. At 4:50 p.m. Kulbusauskas called Jackson to advise that he was on his way back from the airport and to check to see if everything went well. Jackson said that everything had gone well and that he was waiting right now. At 5:28 p.m. John Kerr called Frank Jackson. Jackson wanted to know if Kerr was going to come over to his house. Kerr told Jackson that Mike called and that Kerr had to see Mike first. Kerr stated that the reason he was calling was to let Jackson know that "Mike was the hangup." At 7:02 p.m. Kulbusauskas called Jackson and told him that he was ready and was going to Jackson's house. Jackson asked if Kulbusauskas had cash. Kulbusauskas said that he did and that he would be right over.

Agent Leight related five conversations from April 17, 1984. In one conversation at 12:02 p.m., Kerr and Jackson made arrangements to do "500" or "a thousand." Kerr stated at that time that his mother was visiting with him and that he was going to be busy with her for a while. At 3:16 p.m., Jackson called a phone number that a later FBI investigation disclosed as registered to an R. Lee in Carlsbad, California. Jackson told this person (who he referred to as Bob) that he wanted him to "pay for some stuff" that he had previously received. Bob asked Jackson if there was "any new material around" and Jackson told him that there was "something real nice" but that Bob had to first clear up the previous deal. Bob told Jackson "it was moving real slow" so that he still had some left. Jackson then told Bob that he would not do anything further until Bob cleaned up the past deal because he was getting "too strung out." Jackson also conversed twice with Kulbusauskas. Kulbusauskas told Jackson that he had received a cashier's check from one of his customers and that he had to run it through his bank. Jackson said that Kulbusauskas would be "giving him 15" and Kulbusaukas said that Jackson would get "the 15" tomorrow. At 7:49 p.m., an unknown male called Jackson to report his suspicions that he had been followed that day. The unknown male stated that he wanted to meet Jackson and that he "had 7" for him. They agreed to meet at Noodles Restaurant. Jackson asked the man if he wanted him to take him to his house. The unknown man stated that he was too afraid to go to his car or to his house right now. Jackson assured the unknown male that he may be overreacting and that "the heat" doesn't always act that way. They agreed to meet at 9:30 p.m. that evening.

Agent Leight's affidavit describes eight conversations on April 18, 1984. Two of those conversations involve Jackson and a man referred to as Nino (LNU). At 10:40 a.m. Nino called Jackson and stated that he needed "8" today and that he would need more on Saturday. Jackson told Nino to call back a little later. When Nino called back at 1:11 p.m., Jackson told him that it was now available. They agreed to meet at Jackson's residence between 4:00 and 5:00 p.m. Jackson and Kerr also had a few conversations in which they attempted to set up an exchange of "500." Kerr told Jackson that he would leave "it" with Sandra at Kerr's house. Kerr also told Jackson that Sandra would be leaving the house at 4:00 p.m. to go to work. A short while later, Kerr told Jackson that Sandra would deliver "it" to Jackson at his home. At 6:02 p.m. that day, Jackson called a telephone number subscribed to by Barney Barnhill and left a message on the answering machine for Rick to call Jackson because Jackson needed to talk to him. Also on that day, Kulbusauskas called Jackson. Jackson told Kulbusauskas that he had gotten some stuff that day, but because he didn't like it, he was going to send it back. Kulbusauskas told Jackson that he still had the guy's cashier's check. In response

Jackson told Kulbusauskas that he didn't need any cash until tomorrow.

On April 19, 1984 at 10:48 p.m., Jackson told Kerr that with respect to the "500" which Jackson had received from him on the previous day, his people "didn't like it, it was too shake." Jackson also stated that it didn't look the same and it didn't smell the same. Kerr told Jackson that "stuff like the previous load" would not be available until May. Kerr also assured that "there would be no problem," and that Jackson could bring it back if he was dissatisfied. Agent Leight supplements this conversation, stating that it has been his experience that "shake" is a reference to cocaine that appears in powder rather than in rock form. At 10:57 a.m. on April 19, someone identified only as Neil called Jackson. Jackson told Neil that he had just spoken with the guy and that the stuff was definitely not the same as before. Neil agreed. Jackson then said that one of his guys went on a scouting trip and came up with another supplier who has a product which is "very pretty" and "kind." The new stuff was "46," which was "a tad expensive," but it was looking like "a very nice product." Neil told Jackson to "go ahead and grab some." At 12:30 p.m. Jackson called Rick, believed to be Dudley Richards Whitney, and told him that Jackson had $8,000 and that he would have the rest of the money that evening. Jackson told Rick that he would "be right over." At 4:08 p.m. Neil called Jackson. Jackson told Neil to come right over to his house and that he would "love this, it's worth every nickel."

Agent Leight describes a number of conversations intercepted on April 21, 1984. In a conversation between Jackson and Bob Anderson, Jackson told Bob that if David got there by 6:00 o'clock, he or Rodney Jackson (Frank Jackson's son) would come over and get the money because Jackson really needed it. At 4:42 p.m. when Jackson called John, John told him that he and Nino would be coming over to Jackson's house around 6:00 p.m. At 5:23 p.m. Jackson called Rick. Rick said that he was waiting and Jackson told Rick that "his guys were coming over at 6:00 p.m." Rick said that he would get in touch with Jackson as soon as he talked to "his guy." Sixteen minutes later Jackson called Rick to tell him to come to Jackson's house. Rick said he could not because he and Becky had a dinner date at 6:00 p.m. Rick told Jackson that once Rick grabs "it," Jackson could meet Rick and Becky wherever they were and pick "it" up. Jackson stated that he was worried about missing them but Rick assured him that he would call when he gets "it."

On April 22, 1984, at 9:50 p.m. John Kerr called Frank Jackson. They discussed a meeting which Jackson was to have the following morning with "those guys." Jackson told Kerr that his "other people" had something "real pretty" and Jackson was "going to do that." Jackson also said that he was interested in seeing what Kerr had. Kerr told Jackson that his stuff was "38" and it was the same stuff they had around Christmas. Jackson said that the stuff they "got around Christmas was very nice" and asked if Kerr's product "was chunky." At 9:41 a.m. on April 23, 1984, Jackson received a call from an unknown male. They set up a sale of one kilo of cocaine for $44,000 in code language. Later that day two FBI agents observed two unknown white males arriving at Jackson's residence at 804 Val Sereno. The two individuals were driving a 1961 silver over black Corvette. About 10 minutes later the agents observed the two men leaving the residence carrying a beach bag.

On April 25, 1984, Jackson received a number of calls from John (LNU). In the last conversation between them, John asked if Frank Jackson was "ready to go yet." John told Jackson that he was waiting for "one more guy to call" and that as soon as he did, he would call Frank Jackson and be ready to go. Jackson then told John that he had "to put his guy off three different times that day."

On April 27, 1984 at 8:04 p.m. Kulbusauskas called Jackson to ask if Jackson was "working this evening." Jackson told Kulbusauskas that he needed "money to resupply" and that he wouldn't have it until tomorrow. Jackson also told him that since Rodney's mother was staying at Jackson's residence until Monday, Jackson had to be careful and could not be working around her.

On April 29, 1984, at approximately 12:02 p.m. John called Jackson and said he was phoning from Hawaii. John told him that "Red Dog was going to be needing 6 or 7 tomorrow." Jackson told John that Red Dog had already called and ordered 9. John requested that Frank Jackson give Red Dog the same quality stuff that Jackson had given John. Sixteen minutes later, Jackson received a call from Red Dog. They discussed how much Red Dog's man needed. Red Dog said that he liked "the stuff" that Jackson got them the last time. Jackson assured Red Dog that "the stuff" would be the same.

At 3:52 p.m. on April 30, 1984, Rick phoned Jackson. Rick advised that he had been attempting to call him on his other telephone number but that this line had been busy. Jackson said that he had also been trying to reach Rick for the last couple of days as well. Jackson told Rick that he needed "500 for tomorrow." Rick said that would be no problem and that he would be ready. Jackson stated that he would be seeing Rick later that evening "to clear up that other." Rick then told Jackson that Jackson could just go ahead and pick up what he needed for tomorrow and that way he wouldn't have to make two trips.

Agent Leight's affidavit describes five calls that occurred on May 1, 1984. During one conversation, Jackson and Red Dog agreed to meet at the Brigantine Restaurant for lunch and Jackson told Red Dog to bring the $12,000. At 4:20 p.m. Jackson called telephone number 756–2807. An unknown female answered and Jackson asked

to speak to Rick. Since Jackson was told that Rick was unavailable, he asked the woman to have Rick call him right away. At 5:09 p.m. Jackson called a phone number subscribed to by "Conceptual Artists" at 808 Imperial Avenue, San Diego. Jackson spoke to an individual believed to be Michael J. Sullivan and advised that he had not heard from his man. Mike said that he had paged his man and that his man should be calling soon. Mike inquired to see if Jackson would prefer to deal directly with him in the future. Jackson said he would and Mike told Jackson that he was getting something "set up down here at the office." On days Jackson wishes to do something, Jackson could now deal directly with Mike to save time. Jackson told Mike that he had $13,500 out of a total of $16,000 that he owed. Jackson told Mike that "on one of 'them' he's got it all written down what they both weighed." Jackson stated that somebody "screwed up" because they did not weigh what they were supposed to weigh. Mike said he knew about the difference.

On May 3, 1984, John Kerr called Jackson's residence and spoke with Jackson's son, Rodney. Rodney told him that his father was out of town and had not yet returned. Kerr told Rodney that he himself had been out of town for over a week on a trip to the Virgin Islands. At 5:27 p.m. on May 3, 1984, Red Dog called Frank Jackson and advised him that a bartender at the Brigantine Restaurant named Mike O'Connor had an envelope containing money for Jackson. Jackson said that he would send his son Rod to get the envelope. Jackson also told Red Dog that he was getting ready "to reload" in a couple of days so that Red Dog should figure how much he needed. Seven minutes later Red Dog called Jackson again. They discussed the quality of cocaine available to Jackson. Once again, Jackson reaffirmed that he was going to "redo" on Saturday.

At 10:02 a.m. on May 5, 1984, Michael (believed to be Michael J. Sullivan) called

Jackson and told him "I need to get some things today, so I need to get that balance from you." Jackson said that he would attempt to get it and told Michael that he needed to resupply and said "I might need a big one." Michael told Jackson that it would be possible to get a "big one that day." Jackson stated that he had not known that Michael was back and that Jackson had been considering going another way on the "big one." At 11:10 a.m. that morning Jackson called Bob Anderson and told him that he needed money to pay someone else.

At 12:07 p.m. on May 6, Jackson called John (LNU). John had just gotten back from vacation in Hawaii and while he was gone Red Dog did a "little deal" for him. They discussed the quality of "that stuff" and that it was funny looking. Jackson told John not to worry about it, that "we've got something else happening now." Jackson wanted to know when Nino would be back. Jackson told John that when Nino returned they would do a "couple of big ones." Jackson told John that he had heard that the prices were going "to go way back up." Jackson did not believe this, but acknowledged "that's all my people have been saying." Jackson explained that "his people" said the price was going back up because "they had been losing so much down south." Jackson told John, "the factories and stuff."

Agent Leight's affidavit describes six phone calls that occurred on May 7, 1984. In one, Kulbusauskas told Jackson that he had some money for him. In another John called Jackson and asked him if they could "do 5 tonight." John also told Jackson that Nino would be back tomorrow and would need some. At 5:08 p.m. that date, Jackson called Rick's residence. Becky answered the phone and advised Jackson that Rick was not there. Jackson left a message with Becky to have Rick call him right away. At 5:48 p.m. John (LNU) called Jackson and placed an order for "6." John stated that he may come over to Jackson's

house around 8:00 p.m. to pick up his order. At 7:36 p.m., Michael (believed to be Michael J. Sullivan) called Jackson. Jackson asked where he's been and indicated that he has been waiting for Michael to call. Michael explained that he had to go to Los Angeles that evening and would not be back until the following day. Michael told Jackson that he had a "great one" for him and that "it will be 35 to you." Michael explained to Jackson that he was still doing "quick turn situations." Jackson told Michael that "my people are back now from Europe, today, so it's perfect timing." In response Michael promised Jackson that he would save this "whole one" for him. Michael said that if Jackson could not wait, Michael could have it brought over to Jackson earlier. In reviewing this phone call, Agent Leight characterized the reference to a "great one" as a reference to a kilo of cocaine.

On May 7, 1984, at 8:09 p.m. John (LNU) called Jackson. They discussed a deal to be done the following day and the fact that John has a customer who "really needed some" that evening. At 11:00 a.m. on May 8, 1984, Bob Anderson called Frank Jackson and they discussed the time Anderson could come and pick up "the stuff."

Agent Leight's affidavit also analyzes information derived from a pen register placed on one of Frank Jackson's residential phones. Agent Leight broke down the number of calls: Jackson utilized the phone twenty-two times to call the number subscribed to by Kulbusauskas, seven times to call the number subscribed to by Bob Lee, nine times to call the number subscribed to by John Kerr, six times to call the number subscribed to by John (Last Name Unknown), and thirteen times to call the number subscribed to by Barney Barnhill (believed to be used by Rick (Last Name Unknown)). The pen register also detected four phone calls to "Conceptual Artists" (believed to be utilized by Mike (LNU)). Agent Leight's affidavit also states that a pen register was placed on the

telephone subscribed to by Barney Barnhill and utilized by Rick (believed to be Dudley Richards Whitney). He noted that a second telephone at Jackson's residence had been called four times from that number.

Agent Leight's affidavit notes that the intercepted conversations have revealed that Frank Jackson is able to obtain cocaine from three distinct sources. Leight believes that Jackson functions as a source of supply to many cocaine dealers and these dealers have negotiated and purchased kilogram quantities of cocaine from Jackson. Agent Leight identifies these cocaine sources as 1) John Kerr; 2) Rick, believed to be Dudley Richards Whitney; and 3) Mike, believed to be Michael J. Sullivan. In Agent Leight's opinion, continued interception of Jackson's wire communications is the sole method by which to fully explore and document the identities of the individuals who are supplied cocaine by Frank Jackson, the identities of sources of cocaine Jackson may develop in the future, and the manner in which Jackson utilizes what are undoubtedly substantial and illegally derived profits. Agent Leight notes that apart from the telephone line that was wiretapped pursuant to Order B, Jackson uses a second residential telephone. Agent Leight states that it has now been established that Jackson uses this phone as well to place calls to and receive calls from co-conspirators.

Agent Leight portrays Kerr as one of the individuals supplying cocaine to Jackson. The conversations between Kerr and Jackson establish that Kerr supplies Jackson with kilogram quantities of cocaine. The interceptions have also revealed that Kerr receives cocaine he sells to Jackson from an unidentified individual. Although admissible evidence has been developed against John Kerr, Agent Leight suggests that interceptions over Jackson's telephone have not yet identified other cocaine dealers supplied by Kerr nor have they identified Kerr's cocaine supplier. Therefore, Agent Leight opines that it is necessary to intercept wire communications on John Kerr's telephone to reveal those identities, to document the volume of the cocaine business, and to discern the manner in which Kerr utilizes his illegally derived profits.

Agent Leight supplements the earlier description of phone calls between Rick, believed to be Dudley Richards Whitney, and Frank Jackson, and identifies Rick as one of Frank Jackson's suppliers. The conversations between Rick and Jackson have established that Rick has supplied Jackson with kilogram quantities of cocaine and that Rick receives the cocaine he sells to Jackson from an unidentified individual. Agent Leight notes that admissible evidence has been developed against Rick in the interceptions pursuant to Order B, but that those interceptions have not identified other cocaine dealers supplied by Rick nor have they identified Rick's cocaine source. Conventional investigative techniques have succeeded in establishing probable cause for electronic surveillance of Rick's phone. Such techniques, however, would not be successful in identifying Rick's source of supply or the identities of his other customers. Therefore, Agent Leight opines that electronic surveillance of Rick's phone is necessary to identify the people to whom Rick supplies cocaine, Rick's cocaine source, the volume of his cocaine business, and the manner in which Rick utilizes his illegally derived profits.

Agent Leight further surmises that physical surveillances have not yet provided the identities of all the criminal associates of Jackson, Kerr, and Rick. Agent Leight then postulates, as do the affiants in the other affidavits, that physical surveillance, even if highly successful, rarely succeeds in gathering conclusive evidence of criminal activities. One of the shortcomings of physical surveillance as an investigative technique is that while meetings between alleged conspirators can be confirmed, physical surveillance does not provide investigators the details as to the pur-

pose of those meetings. Agent Leight informs that the physical surveillance of Jackson's residence is particularly difficult due to the fact that there is very little vehicular traffic in Jackson's neighborhood. To date, surveillance of Jackson's home from a fixed surveillance site nearby has not been productive in identifying Jackson's co-conspirators. Agent Leight states that the execution of search warrants would not provide sufficient evidence to determine the full scope of the criminal activities and methods used by Jackson, Kulbusauskas, Rodney Jackson, John Kerr, Sandra Zeck, Bob Anderson, Bob (LNU), Rick (believed to be Dudley Richards Whitney), Mike (believed to be Michael J. Sullivan), Nino (LNU), John (LNU), Neil (LNU), and "Red Dog." Agent Leight believes that these conspirators do not maintain sufficient records which would elucidate the scope of the conspiracy or identify all the individuals involved in the criminal enterprise. He notes that even if such documents were retrieved, without evidence of conversations between conspirators, these documents could prove to be worthless. Finally, he notes that execution of a search warrant would likely jeopardize the entire investigation and prosecution of many persons. Agent Leight feels that subpoenaing witnesses to testify before the grand jury would undermine the objectives of the investigation.

### Application D

Application D is supported by the affidavit of FBI Special Agent Charles B. Walker. In order to establish probable cause, and a necessity for wiretaps of Frank Jackson, John Kerr, and Michael Sullivan's business and residential phones, Walker relies primarily on information provided in communications intercepted pursuant to Order C. Walker highlights some of the phone calls intercepted pursuant to that order and presents some statistical information about the volume of the calls intercepted. Walker begins with a summary of information received through interceptions and de-scribes what appears to be an intricate cocaine distribution hierarchy. Interceptions reveal that Jackson supplies large amounts of cocaine to numerous individuals located in the San Diego County area, including Kulbusauskas, Anderson, Lee, John Slater, Kevin Matuozzi, J.R. Rowles, Scott Susalla, Nino (LNU), Robert Lyman Newman, believed to be "Red Dog," Wally (LNU), Ellie, believed to be Elizabeth Herley, Jim (LNU), and other individuals who have not yet been identified. They have also disclosed that Robert Lewis Shine serves as an employee for Frank Jackson and that Shine delivers cocaine and picks up money for Jackson's operation. It is Walker's opinion that John Kerr supplies large amounts of cocaine to numerous individuals in the San Diego County area, including John Brunner, Steve Vecco (sic), John Freeze, Steve (LNU), Judy (LNU), and Brad (LNU). Walker notes that Kerr resides with Sandra Zeck and that she knows about Kerr's cocaine activities and participates in the operation as a carrier for him. Walker believes that both Jackson and Kerr are part of an organization headed by Michael J. Sullivan, the president and owner of a business known as "Conceptual Artists," located at 808 Imperial Avenue, San Diego, California. Walker surmises that Sullivan is assisted by Timothy Halley and Thomas Pool. Walker notes that interceptions have revealed that Jackson purchases kilogram quantities of cocaine from Michael Sullivan and has a sophisticated operation which utilizes pagers and pay telephones in order to circumvent electronic surveillance. Walker refers to Agent Leight's characterization, in Application C, of John Kerr as one of Jackson's cocaine sources, distinct from the Sullivan source. Walker advises that subsequently intercepted conversations have more clearly defined Kerr's role as that of a trusted associate of Michael J. Sullivan. Kerr assists Sullivan in moving multi-kilogram quantities of cocaine. Conversations intercepted pursuant to Order C demonstrate that Michael Sullivan's supply of cocaine had been

temporarily disrupted but that Sullivan anticipates a large shipment of the drug from an undisclosed source. In response to Sullivan's disrupted service, Frank Jackson and John Kerr sought out other small dealers in order to placate the demands of their customers. Specifically, Walker notes that Jackson had reached out to Dudley Richards Whitney, aka "Rick," who had provided Jackson with kilogram quantities of cocaine. Walker notes that Rick Whitney's intercepted conversations disclosed that Whitney was a significant trafficker who has supplied Frank Jackson with cocaine when Michael Sullivan cannot. Jackson and Whitney have also discussed the fact that Whitney's cocaine is inferior in quality and price to that of Jackson's primary source, Michael Sullivan. However, Walker does not request the continued interception of Whitney's phone because he believes that Whitney is not a part of a large organization but is merely an alternate source of cocaine for Frank Jackson.

Agent Walker also describes the FBI's endeavors to positively identify individuals intercepted in wire communications. He notes the parties sometimes identify themselves in full over the wire so that their voices can subsequently be identified. In addition, the FBI identified several individuals by tracing subscriber information on some outgoing calls. The FBI's extensive physical surveillance of meetings which were set up over the intercepted wires is another method used to identify individuals. Agents photographed individuals and their vehicles at these meetings. Vehicle registrations and driver's license photos were later compared to the surveillance photos to identify individuals at these meetings.

To establish probable cause for the interception of wire communications originating from the "Conceptual Artists" business, Agent Walker relies on the following information. Agent Walker includes the conversation on May 1, 1984, between Jackson and Michael J. Sullivan, previously described in this court's summary of Order C,

in which Sullivan and Jackson agree to deal directly with each other for future cocaine deals. Agent Walker emphasizes Sullivan's reference to waiting for a man that he had contacted via a pager. Agent Walker also notes that on May 1 at about 1:15 p.m. FBI special agents observed Jackson at the Brigantine Restaurant in Solana Beach, California, meeting an unknown individual who wore a pager on his belt. Agents watched this person take a golf bag out of the trunk of his car and give it to Jackson. Agents later traced the registration of this vehicle and discovered that it was registered to Thomas Pool of Leucadia, California. Photographs taken at this meeting were later compared to driver's license photographs of Thomas Pool.

On May 3, 1984, FBI agents checked the records of the San Diego County Clerk which revealed that a fictitious business name statement was filed by "Conceptual Artists" and that the document listed Michael Sullivan as its president/owner. Agent Walker also relies on the previously described May 7 conversation between Jackson and Sullivan in which Sullivan represents that he has "a great one" for Jackson and that "it will be 35 to you."

On May 16, 1984, FBI agents conducted a physical surveillance of "Conceptual Artists." They observed Dave Zimmer entering the business and leaving a short time later carrying what appeared to be a duffel bag. Agents noted that Zimmer was driving a 1979 Mercedes automobile registered to Michael J. Sullivan. Zimmer's criminal record was checked by Special Agent Jack D. Blair and Blair discovered that Zimmer had been convicted in 1982 of the sale and possession of controlled substances.

At 2:30 p.m. on June 6, 1984, Michael Sullivan called Frank Jackson and discussed the fact that he had been out of town for awhile and that during his absence, Jackson has been dealing with Tom. Sullivan told Jackson that he will now take over from Tom and that Jackson should now deal directly with Sullivan. At 5:51

p.m. that day, Tom, believed to be Tom Pool, called Jackson. Jackson told Tom that he had Tom "cleared up." Jackson told Tom that he had spoken with Michael and that Jackson was going to talk to Michael again that evening to find out "what's happening." Jackson said that he could give "it" to Michael tonight. Tom said that he needed "to pick that up himself" and would do so the next day. At 7:41 p.m. Sullivan called Jackson to say that he was at the airport waiting for someone. Jackson told Sullivan that he needed to talk to Sullivan that evening about this "whole trip" and that it would be good for the both of them because Jackson was "working heavy." Sullivan called again at 8:06 p.m. and told Jackson that he had a lot of stuff to take care of and that he needed to talk to Jackson. Sullivan wanted to know who was at Jackson's house at that time and Jackson told Sullivan that Kevin Matuozzi, the bartender at Dini's Restaurant, was there. Kevin worked for Jackson. Jackson said that his partner Bob Shine was also there. Sullivan said that he did not want to be meeting a lot of people and Jackson assured him that his visitors were not aware of the happenings between Jackson and Sullivan. Jackson agreed to make these people leave and gave Sullivan instructions on how to get to his home. At 8:39 p.m. FBI agents observed the same 1979 Mercedes driven by Zimmer on May 16, 1984 arrive at Jackson's house, driven by an unknown male, accompanied by an unknown female. Agents submitted the license number of that automobile to the California Department of Motor Vehicles and were informed that it was registered to Michael J. Sullivan of Del Mar, California. At 9:03 p.m. Michael Sullivan placed a call over Jackson's telephone to a number subscribed to by Donna Ledgard at 6827 Luciernaga Court, Carlsbad, California. While dialing this number, Sullivan was overheard telling Jackson, "If you want to do one tonight I'll fix you up." After Sullivan completed dialing the number, he spoke with an unknown male who had a Spanish accent and arranged a meeting at a pizza place near a movie theatre in fifteen minutes. Surveilling agents followed Sullivan from Jackson's house to the Wiegand Plaza in Encinitas, California. They watched Sullivan wait in front of a cinema and then be picked up by an unknown male in a red Toyota. The agents later compared a driver's license photograph of Michael Sullivan with the person they observed waiting in front of the movie theatre to positively identify Sullivan.

At approximately 9:59 p.m. on June 6, 1984, Jackson dialed a number (694–1873) which has been determined to be the pager for Michael Sullivan. After dialing this number, Jackson then dialed his home telephone number. By analyzing all the calls intercepted in this case, the FBI postulates that this is the system used by Frank Jackson to page Michael Sullivan to call Jackson at his home. At 10:01 p.m. that evening Jackson received a call from an unknown male. Jackson told this person that he would have "at least one" available tomorrow and that he had just called "the beeper" and that "as soon as the guy called back," Jackson would go see "the source." Jackson quoted a price of "31" and represented that the quality was the best because Jackson knows "the source." At 10:13 p.m. Jackson paged Michael Sullivan again. At 10:15 p.m. Michael Sullivan called Jackson and they arranged to meet in Del Mar, California. Jackson asked if Sullivan wanted to meet Jackson at Sullivan's house. Sullivan did not and instructed Jackson to go to Del Mar and to page him. At 10:56 p.m. Rodney Jackson received a call from Frank Jackson. Frank Jackson told Rodney Jackson that he needed a telephone number which he kept in a book in his room. He told Rodney to go in that room and look up "under S then Mike." Rodney then went to Frank Jackson's room and said, "694–1873, says Mike beep, other says Tom-290."

At 7:02 p.m. on June 7, 1984, Jackson phoned the number 694–1873 to page Michael Sullivan. Two minutes later Jackson

received a call from Sullivan and told Sullivan that his people didn't want to buy "5" at that price, but that Jackson had someone else or that Jackson would take them himself. Jackson said he needed at least "1" tomorrow. Sullivan told Jackson that he better take them tonight because they may all be gone and said "I've got to keep this thing rolling." Fifteen minutes later, Sullivan called Jackson who told him "I got another 11 for you." Sullivan said, "I need the whole thing cleared up." Jackson said he was aware of the total price and that he was trying to raise the rest. When Jackson inquired whether Sullivan had someone else who would take half, Sullivan said it was too late for that because he had already put "other people on other things." Sullivan told Jackson that he didn't want to talk over "that" phone about it. At 9:48 p.m. when Sullivan called Jackson, he stated that he had "18" now and was close to raising the entire amount. Sullivan warned Jackson "not to talk like that over the telephone" and told Jackson to say as little as possible.

On June 8, 1984, Jackson told Sullivan by phone that he could not make it over to Sullivan's house and inquired whether Sullivan could send someone over to pick up the money. Sullivan asked if Jackson had all the money and Jackson said he had $18,000, but "a guy was coming over soon with the rest." Sullivan promised to send someone to Jackson's to pick up the money. About a half hour later, Sullivan called Jackson and told him that he would send Tim, especially because Sullivan thought that "it was about time that Jackson met Tim." At 1:33 p.m. that day, FBI agents observed an unknown white male driving a brown Peugeot arrive at Jackson's residence. The man entered Jackson's residence and left five minutes later.

Following a phone call to "Conceptual Artists" during which he was provided with Tim's home phone number, John Kerr called Tim, at the number subscribed to by Tim Halley, and told him that he had some money for him. At 4:32 p.m. on January 8, Steve (LNU) called Sandra Zeck and asked to speak to John Kerr. Zeck told Steve that Kerr was not in and inquired whether Steve had money for John. Steve said that he did have money for John and that he was ready to "work." Steve told Sandra that he needed to "talk to Michael Sullivan," and left his brother's telephone number in Los Angeles where he could be reached.

Agent Walker's affidavit further describes the use of a pager by Tim Halley to receive and to return phone calls. On June 9, 1984 at 11:18 a.m., after Kerr contacted Halley by pager, Kerr had the following conversation with Halley. Halley told Kerr that he had been "hung in the middle again" because someone "bailed with 7 of them" and now he has to come up with the money. Tim said that the amount of money was "189." Kerr inquired "if the guy who bailed with 7 was Tom." When told that it was not Tom, Kerr asked if the guy was a friend of Mike's. Kerr said he had "10" for Tim, but Tim said "10" won't help very much since Tim needed "189." Tim said that his customers, unlike Mike's, were "cash and carrying." Tim said that he had "the things" set aside for Kerr. Kerr said he needed some for his people since he had been gone for two weeks. Kerr inquired how Frank was doing and Tim told him that Frank "welched on 3" and was short. Kerr stated that he had tried to warn Mike about Frank. Agent Walker opines that this conversation regards a cocaine customer who was fronted 7 kilograms of cocaine, but who had not come up with the $189,000 payment for the cocaine. At 2:42 p.m. on that day, Sullivan and Kerr had a conversation in which they discussed the problems of Sullivan's cocaine business. They also discussed Kerr's yacht recently purchased in the Virgin Islands.

On June 11, 1984, Jackson attempted to reach Sullivan at his business. Responding to Jackson's message, Sullivan returned the call and told Jackson not to call him from his home anymore, because Sullivan did not want to talk over that phone. Sullivan said that he wanted Jackson to get into the habit of talking from a pay phone.

John Kerr also tried to reach Sullivan at his business on that day, but was told that Sullivan was out.

On June 12, 1984, at 10:58 a.m. Jackson and Sullivan conversed by phone, discussing Sullivan's failure to use his pager, and setting up a meeting at which time Jackson could "settle his balance."

Agent Walker's affidavit further describes five phone calls on June 19, 1984. During these phone calls it is arranged that Steve Vecco (sic) was to stop by Kerr's house and grab "something" for Sullivan and bring it to Sullivan in San Diego. Arrangements were also made on that date, by phone, for Steve Vecco (sic) to pick something up for Sullivan at Kerr's house.

Walker also describes two conversations occurring on June 30, 1984. In the first conversation, Jackson and Kerr negotiated the price per kilo of some "work" and arranged to meet at Kerr's. In the second conversation, Kerr told Pool "that there's some B–12 in it again." Kerr acknowledged that he was "putting in a little alcohol" and that he just wanted to let Pool know.

On July 2, 1984, Kerr and Sullivan conversed by phone in guarded and coded language.

To support his conclusion that there is probable cause and a need to intercept the telephone line in Michael Sullivan's residence, Agent Walker includes in his affidavit eighteen phone conversations intercepted pursuant to Order C. These conversations include successful and unsuccessful attempts to reach Michael Sullivan at his home. John Kerr made calls on June 16, 17, 18, and 30, 1984, to Sullivan's residence. On those occasions, Kerr either reached Sullivan and discussed the availability of cocaine or he reached persons who agreed to take a message for Sullivan. These calls also include calls between Kerr and Tom Pool during which Kerr attempts, through Pool, to locate Sullivan.

To support his conclusion that probable cause and necessity have been established to continue to intercept Frank Jackson's home phone numbers, Agent Walker provides the following information, developed during interception authorized by Order C. Agent Walker states that on a daily basis, Jackson uses his telephone to direct the activities of Robert Lewis Shine, J.R. Rolles, Ken Matuozzi, John Slater, Nino (LNU), Bob Lee, Richard Lyman Newman, aka "Red Dog", Kulbusauskas, Wally (LNU), Jim (LNU), "Ellie", believed to be Elizabeth Hurley, all of whom Agent Walker believes to be Jackson's subordinates. Prior interceptions indicate that Jackson utilizes his home phones to discuss his assets and to raise money for future drug deals and to launder money derived from his cocaine distribution through Scott Susalla and Bob Anderson. Conversations intercepted on Jackson's home phones indicate that he is supplied by Michael Sullivan, John Kerr, Thomas Pool, Timothy Halley, Dudley Richards Whitney and others. Walker references conversations described earlier in the affidavit with respect to Michael Sullivan. Agent Walker also sets forth the frequency with which Jackson has spoken to Kulbusauskas, Robert Lewis Shine, John Slater, Richard Lyman Newman, Robert Lee and Rick Whitney over his home phones. Agent Walker summarizes those calls involving Jackson. He notes that Kulbusauskas' calls to Jackson usually contain an inquiry as to whether Jackson is "working." Conversations involving Shine demonstrate that Shine acts as a "runner" for Jackson. One of the distributors to whom Shine delivers is named Wally (LNU). On two occasions Shine utilized Jackson's home phone to call Wally (LNU). Agent Walker observes that Jackson's conversations with John Slater usually are initiated by Slater to order cocaine. Jackson has also made several outgoing calls to Slater to discuss previous orders and money. Agent Walker describes Richard Lyman Newman as a runner for Slater. Bob Lee is characterized as a distributor who is supplied cocaine by Jackson.

Agent Walker notes that Jackson has used his phone to obtain an alternate source for cocaine through Rick Whitney during the period that Michael Sullivan

lacked a supply. These conversations also involved Whitney ordering large amounts of cocaine from Jackson when Sullivan was unable to supply cocaine.

On June 15, 1984, Jackson received two drug related phone calls on his residence phone. The first, from a caller who identified himself as "Tim, Sullivan's friend," involved a request by Tim, who was calling on behalf of Mike, for the "10" that Jackson had mentioned at Mike's house. Jackson told Tim that the "10" was not available today because he had used it purchase a liquor license. Jackson told Tim that he needed "2." Tim told him that there may be something happening tomorrow and that he would let Jackson know. The second which occurred at 4:00 p.m. that day, was placed by John Slater. Slater inquired if Jackson had the "blue box." Jackson said "yes, it was the blue box." Jackson promised to get Slater the "big one."

At 3:41 p.m. on June 16, 1984, Nino called Frank Jackson to say that he hadn't spoken to John Slater that day. Jackson said that he speaks to Slater every two hours. Jackson told Nino that he had "lots of people on hold" because Jackson was waiting "for something to happen." Jackson told Nino, "I need 5 of them right now" to which Nino responded that he's "hip," but that they might only do two at a time. Later in the conversation, Nino said that he was going to need a "couple" real soon. Jackson said he would try, but that "those guys aren't answering their beepers."

Agent Walker relies on the following conversations to demonstrate probable cause for interception of Frank Jackson's second residence phone. Agent Walker refers to earlier paragraphs in his affidavit that summarize calls between Jackson and Sullivan and Jackson and Kerr. Agent Walker emphasizes the frequency with which Jackson uses his second residential phone to speak with Robert Lewis Shine. He makes a similar observation with respect to Jackson's use of that phone to call Kevin Matuozzi. Agent Walker believes that an analysis of Matuozzi's conversations with Jackson discloses that Matuozzi

is a distributor for Jackson. These calls concern orders for cocaine from Jackson or a request for money from Matuozzi. Interceptions have disclosed that Matuozzi is a bartender at "Dini's" Restaurant in Solana Beach, California, and that he deals cocaine out of that establishment. Agent Walker also reveals that Matuozzi has been positively identified by the FBI by comparing surveillance photographs with driver's license photos.

Agent Walker notes that Jackson has used his second residential phone to talk to J.R. Rowles on four occasions. Through intercepted conversations, the FBI has identified Rowles as the manager of Jakes Restaurant in Del Mar, California. Jackson has furnished Rowles with unspecified amounts of cocaine. Agent Walker suggests that Rowles' involvement is not yet clearly defined. Jackson has also used this phone on seven occasions to call a phone subscribed to by Eddie Susalla. The FBI has identified Susalla by comparing surveillance photographs with Susalla's driver's license photos. Jackson has been intercepted telling others that he is employed by Susalla. These interceptions have disclosed that Jackson provides Susalla with unspecified amounts of cocaine and that Susalla issues checks to Jackson drawn on Susalla's business accounts. These checks are carried on the books of those businesses as "salary" or "commissions" to Jackson. Agent Walker opines that these conversations evidence the fact that Jackson provides cocaine to Susalla, who in return provides Jackson with a means of laundering proceeds from the sale of cocaine and with phony employment to allow Jackson to show income.

Agent Walker also discusses Jackson's relationship with Bob Anderson and Jackson's use of his home phones to discuss narcotics transactions with Anderson. Anderson owns a business known as "Anderson Investments" in Rancho Santa Fe, California. Intercepted conversations show that Jackson supplies Anderson with unspecified amounts of cocaine. Conversations intercepted pursuant to Order C have

disclosed that Jackson uses his home to facilitate his role as supplier to "Ellie" and Jim (LNU) who then, in turn, distribute the cocaine.

Finally, Agent Walker notes that interceptions have disclosed that Jackson's son, Rodney, utilizes both of Jackson's residential phones and serves as a conduit of messages to Jackson from those who are involved in his trafficking operation. Frank Jackson also uses Rodney as a runner to pick up money from purchasers.

Agent Walker also concludes that there is probable cause to, and necessity to, intercept calls on Kerr's home telephone line. Interceptions authorized by Order C show that Kerr's phone has been used on a daily basis to move multi-kilogram quantities of cocaine. These conversations have disclosed that Kerr serves an important role in the cocaine distribution network headed by Michael Sullivan. Walker references conversations between Kerr and Sullivan discussed earlier in his affidavit. One phone call to Kerr's residence discloses narcotic related conversations with Steven (LNU). At 6:36 p.m. on January 8, 1984, Kerr and Steve began discussing the fact that Kerr had been gone for two weeks and Steve had some money for Kerr. Kerr told Steve that Michael was leaving town tonight and wouldn't be back for awhile. Steve said he needed Michael because he had "big money, big work." Kerr stated that he could get "it" even with Michael Sullivan gone. Steve noted that Michael had quoted him a price of "33." Kerr said he could probably do that and asked when Steve was ready to start. Steve said he wanted to do it every other day, "about 20 a week, 100 a month." Steve said he "wanted back in that market" and that he was tired of doing "little bullshit." Steve indicated that he had "big work" coming from Los Angeles from some "real nice guys, just like us, I've known these guys for awhile..." When Steve asked "are we still working?," Kerr replied that they would be able to do it because Michael would leave Kerr in charge. Six minutes later Steve called Kerr on his residential phone to clarify the terms discussed in the

previous call. Steve said he wanted Kerr to understand him perfectly that his discussion referred to "thousand unit stock options."

At 11:39 a.m. on June 12, 1984, Brad called John Kerr and asked if Kerr was "working." Brad admitted that he was working but the prices were "way up." Brad noted that he was getting "1" tomorrow and he was "going to do it for 40" and that the stuff was "beautiful." Kerr wanted to know if Brad had "any laying around that he could look at." Brad invited Kerr to visit his house. Agent Walker notes in his affidavit that during the period between June 6 and June 28, 1984, the FBI intercepted Kerr and Brad over Kerr's home phone a number of times, each time conversing in a similar fashion.

Agent Walker also reviews conversations intercepted between June 6 and June 28, 1984, between Kerr and the following persons: John Brunner, Steve Vecco (sic), John Freeze, Steve (LNU), Judy (LNU), Brad (LNU), and several other individuals who have not been identified. These conversations included in code the amount, quality and price of cocaine.

Agent Walker proposes that conversations intercepted in late June show that Sullivan, Pool, Halley, Kerr and Jackson, and all the distributors involved with them, await Sullivan's shipment of cocaine, referred to as "the blue box." While awaiting this shipment, the different individuals are reaching out to alternative sources to placate their cocaine customers. Walker also presents a conversation that occurred on June 27, 1984, at 9:26 p.m. on John Kerr's home phone between him and Tom Pool. Kerr inquired if they were still waiting around and Pool responded "yes, but not too much longer." Pool said that Mike was at Pool's house right now and Kerr asked if they knew "any numbers on that yet." Pool told him that the reason that he hadn't yet called was because Kerr and Mike hadn't left yet.

Agent Walker postulates that other normal investigative means would not be suc-

cessful in this investigation. First, he notes that the operation is sophisticated in that pagers and pay telephones are used to circumvent electronic surveillance. Nevertheless, Agent Walker notes that business and residential telephones are still necessary to the operation. Even with the guarded and coded language used, intercepting agents are able to discern the meaning of the communications. Second, Agent Walker notes the inefficacies of undercover narcotic buys. The amount of money that would be needed to "buy up" to the level of Michael Sullivan is simply prohibitive to any law enforcement agency. Third, Agent Walker notes that in past undercover work attempted in this case, the individuals involved were too selective and paranoid to deal with undercover agents. Moreover, since members of this organization are all cocaine users who sample the product, any buyer who doesn't do the same would be immediately detected. Fourth, Agent Walker discusses the limitations of search warrants as an investigative tool in this case. He hypothesizes that agents would be hard pressed to single out the places in which a major supply of cocaine could be seized. Searches of Kerr, Sullivan and Jackson at any given time could result in the seizure of small amounts of cocaine, cash and records, but such searches would not lead to evidence comprehensive enough to "take out an operation of this size." Fifth, Agent Walker notes that physical surveillances have been extensively used along with the electronic surveillance in the investigation. He notes, however, that physical surveillance as a singular tool is an unrealistic investigative approach to the problems posed by this sophisticated operation.

Agent Walker believes that interception of wire communications at the telephones registered to "Conceptual Artists" will assist in exploring and documenting 1) the identities of all those individuals supplied cocaine by Michael Sullivan; 2) the source from which Sullivan obtains his cocaine; and 3) the manner in which Sullivan utilizes his illegally derived profits. Agent Walker also opines there is probable cause to be-

lieve that Sullivan utilizes his residential telephone in furtherance of the cocaine distribution so that objectives similar to those listed above will be satisfied.

As objectives for the interception of Jackson's home phones, Agent Walker lists exploration and documentation of 1) identities of the individuals supplied cocaine by Jackson; 2) the method utilized by Sullivan's operation and the roles of Thomas Pool and Timothy Halley; and 3) information regarding Jackson's assets derived from cocaine trafficking and money laundering schemes which have not yet been fully developed. Agent Walker does admit that electronic surveillance to date has identified numerous individuals that Jackson supplies cocaine, and that Michael Sullivan is Jackson's source. Agent Walker notes, however, that some conspirators are still not identified are the methods utilized by Sullivan's operation. The continued interception of Kerr's residential telephone constitutes the only method to completely document 1) the identities of the individuals supplied by Kerr; 2) Kerr's role in the distribution network and the technique utilized by Sullivan to distribute cocaine; and 3) Kerr's burgeoning assets.

*Application E*

The affidavit of Special Agent Charles Walker presents the factual support for Application E. The affidavit reviews numerous conversations intercepted pursuant to Order D. Relying on the content of these conversations, Agent Walker labels Frank Jackson, John Kerr, and Thomas Richard Pool as integral members of the cocaine distribution organization headed by Michael Sullivan, the president and owner of the business known as "Conceptual Artists." Sullivan utilizes the business as a front for his narcotic activities and uses the Conceptual Artists' office as a secure place to conduct meetings with members of the cocaine distribution organization. Previous interceptions have disclosed that Sullivan's supplier is Fernando (LNU) who utilizes telephone number (619) 438–8234. Another individual of Latin extraction named Tony (LNU) assists Fernando. Both Tony and

Fernando speak English and Spanish fluently.

Interceptions made pursuant to Orders C and D disclose that a problem exists between Michael Sullivan and Fernando so that Fernando cut off temporarily Sullivan's supply of cocaine. Agent Walker repeats the conversation on June 9, 1984 between Kerr and Halley in which Sullivan's "problem" is discussed. Sullivan had fronted seven kilograms of cocaine to a customer who had not paid for them. Halley identified that customer as Ken.

Electronic surveillance of Sullivan's home telephone number revealed that he had been calling Ken Clarke in Miami, Florida concerning money owed. Sullivan also spoke frequently with Fernando about Ken Clarke and discussed attempts to get the $189,000 owed to Sullivan from Clarke. Throughout these conversations, Fernando maintained that he would not provide more cocaine until the account was settled. Agent Walker informs that since July 23, 1984, Clarke completed two trips to San Diego from Miami and paid an unspecified amount of money back to Sullivan. The money was in turn given to Fernando. In addition, Sullivan gave $80,000 collected from Frank Jackson to Fernando. Fernando assured Sullivan that when the account was settled, it would be "business as usual." Agent Walker notes that Sullivan used his home and business phones daily to discuss this "problem" with Clarke and Fernando, to explain the situation, and to apologize to his customers for the delay.

Agent Walker's affidavit recounts the following events on July 24, 1984. At 3:17 p.m. Michael Sullivan's secretary, Sandy, took a message for him from Javier (LNU). Javier stated that he had something that he needed to give Sullivan, and Sandy told him that Sullivan expected Javier to come by the office and "take care of things." Javier arranged to come by the office at 6:30 p.m. Tim Halley called the Conceptual Artists' office at 3:26 p.m. Sandy reported to Halley that Javier was coming by at 6:30 p.m. Halley said he knew what Javier looked like and that he would "handle it."

At 4:44 p.m. Michael Sullivan called into his office and asked Sandy if she had spoken with Ken Clarke's wife in Miami. Sandy said that she had and that Ken was coming to San Diego that day. FBI agents surveilling the "Conceptual Artists" business noted that at approximately 6:30 p.m. an unknown male in a truck attempted to enter the premises and then left. At 6:47 p.m. Tim Halley was next observed arriving at Conceptual Artists. He waited a short time and then left.

After being advised by Sullivan's secretary to try reaching Sullivan at home, Javier phoned Michael Sullivan at his home on July 25, 1984, at 8:28 a.m. Sullivan and Javier argued loudly concerning the money Javier owed Sullivan. At 11:00 a.m. FBI agents observed the individual who had arrived the previous afternoon at Conceptual Artists again arrive. This individual, assumed to be Javier, entered the office and remained a short time before leaving. Earlier that morning, at 7:35 a.m., Sullivan used his home phone to call Ken Clarke in Hollywood, Florida. Clarke told Sullivan that he would be flying to San Diego that evening. On July 26, 1984, Michael Sullivan called Ken Clarke at a pay phone at the San Diego Airport. Sullivan and Clarke got into a discussion about money that Clarke owed Sullivan and about the efforts that Clarke had made to collect this money while in San Diego. Clarke mentioned that he had spent the previous night at the San Diego Hilton Hotel. The following day, FBI agents checked the registration records of the Hilton Hotel on Mission Bay Drive in San Diego, California. They found that Kenneth Nelson Clarke was registered at the Hilton Hotel for July 25 and July 26, 1984. These records also disclosed Clarke's Florida driver's license number.

On July 28, 1984, FBI agents checked DEA records for information on Kenneth Nelson Clarke. Records indicated that Clarke was arrested in 1980 for a narcotics violation. DEA records refer to the same driver's license number as was provided by the Hilton Hotel two days earlier.

On August 6, 1984, at 2:37 p.m. Jackson phoned Sullivan and asked if anything was "happening." Sullivan stated that "there were things happening, but that he still had the problem with the one friend," and could "work" only if he could get that "caught up." Sullivan noted that his friend would probably "come out tomorrow" and that when he got here it will take him a couple of days to "clear me out, so that's where we're guaranteed ... but what's holding me up is him because he has, you know, all my funds." Sullivan told Jackson that he needed around 60 and if they had that, they could start tomorrow morning.

At 3:30 p.m. Steven Crogstad phoned Michael Sullivan. Sullivan told Crogstad that they were not yet ready to go to Los Angeles because "we are losing so much money." Towards the end of the conversation, Crogstad said, "we're not working, huh?" Sullivan cautioned Crogstad not to say that over the office telephone. Agent Walker parenthetically notes that on earlier occasions, Steven Crogstad had been intercepted over John Kerr's home telephone engaging in cocaine-related conversations with Kerr. Robert Furbush, also intercepted on previous occasions on John Kerr's phone, called Sullivan at 3:53 p.m. that day. Furbush asked Sullivan if Sullivan would be calling him anytime soon.

On August 9, 1984 at 4:42 p.m., Jackson and Sullivan telephonically discussed their respective difficulties in raising money. Later that day Jackson and Sullivan had another phone conversation in which Sullivan promised that "it will happen" by tomorrow. Nine minutes after that conversation, Jackson called Sullivan and asked Sullivan to meet him at the "Aspen Mine Company" on El Cajon Boulevard because that was where Jackson was going to meet "his people." Sullivan told Jackson that he did not want to meet the people Jackson was getting money from. Jackson didn't insist. Sullivan did agree to meet Jackson in the parking lot in fifteen minutes. FBI agents surveilling the Aspen Mine Company on El Cajon Boulevard observed at 5:58 p.m. that Jackson's maroon 1984 Maserati with dealer license plates was parked near the front entrance. They observed Jackson at the bar with Richard Lyman Newman. At 6:04 p.m. Sullivan drove up in his grey Mercedes. Sullivan went inside the bar and immediately stepped back outside with Jackson. Jackson and Sullivan stood by Jackson's Maserati. Jackson entered the trunk of his car and took a brown package out of the trunk. Jackson then gave this package to Sullivan who shook hands with him, hugged him and then left.

The following day at about 1:44 p.m. Fernando called Sullivan to report that he was not satisfied. At 2:07 p.m. Ken Clarke called Sullivan, explaining that he had tried to "beep" Sullivan. Sullivan explained that he had his beeper on silent. Clarke told Sullivan that he was located at the corner of India and Vine Streets and that "they're going to be here at 8:00 p.m." Sullivan, elated over the news, told Clarke to come by his office "real fast." At 2:30 p.m. FBI agents surveilling the "Conceptual Artists" business observed Ken Clarke arrive in a rental car. Clarke remained inside Sullivan's office for about ten minutes before leaving. Agents positively identified Clarke by using DEA arrest photographs.

Agent Walker's affidavit summarizes calls involving Sullivan on both his residential and business phones from August 10 through August 12, 1984. These calls concerned Clarke's attempts to collect the money he owed Sullivan. Sullivan used his phones to talk to Jackson who pitched in a large sum of money to help Sullivan square things with Fernando. Agent Walker also notes that Sullivan used his phones to talk to Fernando who was becoming increasingly more impatient with Sullivan and the delays in collecting money.

On August 13, 1984, at 9:51 a.m. Mike Lewis called Sullivan. Sullivan and Lewis engaged in a lengthy conversation concerning Sullivan's finances, and Sullivan explained that he had a temporary cash flow problem and he would therefore not be able to "get anything." Sullivan speculated that if he added up the times he lost money

on bad deals in the last four years, he would have lost over $1,400,000.

Because Sullivan has had many conversations with his accountant, Dee Casperson, the FBI has been successful in identifying several bank accounts controlled by Sullivan. These conversations have also disclosed important information about Sullivan's assets. Walker also presents a list of selected calls made from the "Conceptual Artists" business phones and recorded by a court-authorized pen register. The list includes calls to Kerr, Clarke, Fernando, Jackson, Kathy Davis, Tom Pool, and Dee Casperson.

Application E seeks installation of a microphone at the "Conceptual Artists" business. Agent Walker's affidavit summarizes calls which he feels demonstrate probable cause for such interception. Intercepted wire communications indicate that Sullivan is using his private office at Conceptual Artists as a place to meet other members of the conspiracy. Examples include meetings at "Conceptual Artists" with Javier, Halley, Ken Clarke, and Robert Furbush. Agent Walker also refers to the conversation intercepted pursuant to Order B in which Sullivan counsels Jackson to deal directly with him in future cocaine transactions. In that conversation Sullivan tells Jackson that he is "getting some set up down here at the office." Agent Walker describes once again the observations of FBI agents on May 16, 1984 at "Conceptual Artists." Dave Zimmer was observed entering the business and leaving a short time later carrying what appeared to be a duffel bag.

At 1:26 p.m. on August 1, 1984, Sullivan phoned Jackson. At the time of that call, FBI physical surveillance placed Sullivan at "Conceptual Artists." Sullivan told Jackson that he was trying to "put something together and I need to get the rest of what you owe me there." Sullivan told Jackson to come on down to his "factory."

At 12:22 p.m. on August 3, 1984, Fernando called Sullivan and told him "we are on the corner somewhere." Sullivan inquired whether they wanted to meet him. Fernando then turned from his telephone and shouted out, "Gary, do you want to meet him somewhere?" Sullivan then said, "Why don't you just come over first?" Fernando then said to Sullivan, "We will pick you up." Fernando asked Sullivan for the address. Sullivan told him 808 Imperial Avenue. Once again, Sullivan told Fernando to "come on by" because it is hard for him to leave while he is waiting for phone calls. Fernando assured him, "alright, don't worry then we will go to your office." Two minutes later FBI agents observed a red Dodge with a Hertz rental sticker on its rear bumper arrive at 808 Imperial Avenue. Agents observed two unknown males exiting the vehicle, being met by Michael Sullivan in front of the "Conceptual Artists" building, then entering the premises after a short period. At 12:47 p.m. the two unknown males left "Conceptual Artists." The red Dodge had earlier appeared at "Conceptual Artists" on August 3. FBI agents observed the same red Dodge at the residence of 6825 Luciernaga Court, Carlsbad, California, the location of the telephone number utilized by Fernando (LNU).

On August 3, 1984, Sullivan and Steve Crogstad spoke twice. At 3:00 p.m., Sullivan told Crogstad he wanted his money. Crogstad said that he knew Sullivan wanted money, but that he had been reluctant to call the office because he had been told not to call the office. Ten minutes later Crogstad called Sullivan and asked if he could come to Sullivan's office and bring the money. Sullivan told him to come over and that he would wait for him there until 3:30 p.m. At 3:50 p.m. on that same day FBI agents surveilling the "Conceptual Artists" office observed a yellow Toyota Celica driven by a white male and an unknown female. The car stopped at "Conceptual Artists." Both people entered the building. Seventeen minutes later, the two exited along with Sullivan, who was observed talking to the unknown male.

In response to a conversation they had half an hour earlier, Ken Clarke called Sullivan on August 10, 1984, and told him that

he would be meeting some people at 8:00 p.m. that evening. Sullivan told Clarke to come to his office before the meeting. That afternoon FBI agents observed Clarke entering the "Conceptual Artists" office.

On August 13, 1984, Sullivan telephonically arranged with Jackson to meet at his office the following morning. In response, Jackson phoned his partner Bob Shine to go to "Conceptual Artists" to meet Sullivan to pick up cocaine, which Sullivan had received from Fernando. On August 14, 1984 at 1:12 p.m., FBI agents observed Bob Shine arrive at "Conceptual Artists" and enter the premises. At one point, the agents observed Sullivan and Shine leaving the premises and walking to a 1984 Oldsmobile automobile, which was parked approximately one block west. Sullivan and Shine entered the car briefly. Sullivan exited the car carrying a gym bag. Sullivan gave this gym bag to Bob Shine, who then proceeded to his car and left the area. The FBI later checked California Department of Motor Vehicle records which disclosed that the 1984 Oldsmobile was owned by the Hertz Rental Car Company at the Los Angeles International Airport.

Explaining the need for interception of wire communications from Sullivan's residence, Agent Walker notes that pursuant to Order D, Sullivan has been intercepted on a daily basis utilizing his home phone to communicate with others in his cocaine distribution organization. Agent Walker states that Sullivan has used this residence phone to carry on numerous conversations concerning his cocaine operation with Tom Pool, Tim Halley, Frank Jackson, Fernando, Tony, Ken Clarke, Lorrie Clarke, Steven Crogstad, John Kerr, and Kathy Davis. Conversations referring to Sullivan's problem with Clarke and his debt to Fernando of $189,000 have been intercepted from this phone. Sullivan has also used his residence phone to have drug-related conversations with Frank Jackson, whom Sullivan supplies, and Tom Pool, whose role in the operation is not yet clear. Sullivan also has daily conversations with his girlfriend Kathy Davis in which he keeps Davis apprised of his situation with Ken Clarke and Fernando.

Agent Walker refers to eight conversations intercepted on Sullivan's residence phone which support his conclusion that Sullivan uses his home phone to carry on drug-related conversations. Three of these conversations between Ken Clarke and Sullivan concern the debt Clarke owes to Sullivan. On August 10, 1984, Kathy Davis called Sullivan at 7:45 a.m. Davis told Sullivan that she had given away all the "stuff" and that she needs some more. Sullivan said he didn't have any right now either, but that he soon would have some. Later that evening, Sullivan called Kathy Davis and told her that he was going to see Ken that evening to take care of the situation. On August 15, 1984, Halley and Sullivan had a conversation over Sullivan's residence phone during which Halley told Sullivan that he had just gotten out of the hospital and was told by the doctor to stay home for a few days. Sullivan told Halley to rest and to get "all the books straight." In response, Halley told Sullivan that "they're straight." Immediately following that call, Sullivan received a call from Gary Wooten. Sullivan told Wooten that he was "back working again" and Wooten told Sullivan that he needed "to come get some money" from him. Wooten also said that he had to go collect money from a guy that night. Sullivan asked him if he was going to "kick butt?" Wooten said that he was. Sullivan told Wooten that he had a guy in El Centro who owed him money, but that he wasn't worried about the money, but was worried because the guy had a "big mouth." Sullivan told Wooten that he would pay him $1,000 if Wooten and Jerome would "scare the shit out of" this guy in El Centro. Wooten assured Sullivan that he could "take care of him." Earlier in the conversation, Wooten told Sullivan that he was going to see a guy that owed him money and "crack a few ribs."

Agent Walker's affidavit also addresses the need to intercept communications on the phone registered to Donna Ledgard at 6827 Luciernaga Court and used by Fer-

nando. Agent Walker recounts that on July 27, 1984, the FBI conducted a utility check with San Diego Gas & Electric which disclosed that service records at that address were in the name of Fernando Jackson. The records disclosed that Fernando Jackson listed a previous address of 814 Val Sereno, Encinitas, California (Val Sereno is the street on which Frank Jackson lived at that time.) Agent Walker opines that Fernando Jackson is not the true name of the individual living at Luciernaga Court. Interceptions pursuant to Order D show that Michael Sullivan speaks to Fernando on a daily basis. The calls are usually attempts by Sullivan to placate Fernando by demonstrating that he is making an effort to raise money. These calls also demonstrate that a man named Tony associates with Fernando and answers this residence phone. Fernando sent Tony to Sullivan's house on one occasion. Agent Walker includes ten examples of conversations of this nature. On July 25 and August 4 and 5, 1984, Sullivan assured Fernando over Fernando's residence phone that he was coming up with some money. On August 4, 1984, at 1:51 p.m. Sullivan placed a call to Fernando at that residence phone. Sullivan spoke to an unknown male with an hispanic accent and asked the unknown male if his partner was there. The man told Sullivan that his partner was not there, but would be by shortly. Sullivan told the unknown male that Fernando was supposed to come to see Sullivan that afternoon and Sullivan left word that Fernando should not come by until 4:00 p.m. Sullivan invited the unknown male to accompany Fernando at that time. At approximately 3:00 p.m. on August 4, 1984, an FBI agent surveilling the Luciernaga Court residence observed a silver 1984 Chrysler leaving the residence. The Chrysler traveled to Michael Sullivan's residence and was observed at that residence driven by an hispanic looking male. The FBI contacted the California Department of Motor Vehicles and ascertained that the silver 1984 Chrysler was registered to the Hertz Agency located at the Los Angeles Airport.

At 9:13 a.m. on August 10, 1984, Sullivan called Fernando at the Luciernaga Court residence phone. Fernando told Sullivan that Tony was driving to Sullivan's house soon. Four minutes later, Tony used the telephone at Michael Sullivan's residence to call Fernando at Fernando's residence. Tony and Fernando then had a conversation in Spanish during which Tony asked Fernando if Tony's brother had called. Agent Walker's affidavit also analyzes information derived from pen register surveillance conducted on the "Conceptual Artists" phones discussed earlier in the affidavit. He notes that the pen registers disclose almost daily calls being made from "Conceptual Artists" to Fernando's residence phone. Agent Walker also notes that since July 23, 1984, physical surveillance has been conducted of the Luciernaga Court residence. FBI surveillance has spotted four different Hertz rental cars parked at the premises and these rental cars have all been found to be registered to the Hertz Corporation at the Los Angeles International Airpot. Lastly, Walker notes that on August 14, 1984, a court-authorized pen register was placed on Fernando's residence phone. According to this pen register, two calls were made to Peru and three calls were made to unknown numbers in Florida on that date.

Agent Walker's affidavit addresses the probable cause for interception of Thomas Pool's residence phone. Conversations intercepted over Jackson's home phone began to disclose for the first time that Tom Pool is a major participant in Sullivan's operation. Agent Walker believes that Pool's role in the operation is not yet clearly defined, but it is obvious that Pool ranks higher in the organization than does Frank Jackson or John Kerr. Pursuant to Orders C and D, conversations between John Kerr and Tom Pool were intercepted on an almost daily basis. Many of these conversations were calls to Pool's residence telephone and generally concerned efforts by Pool and Kerr to determine if Mike Sullivan had received any cocaine. Agent Walker references the May 1 conversation between Sullivan and Jackson set forth in Applica-

tion C and discussed in this decision *supra* at 30. He also refers to the May 1 meeting between Jackson and Pool at the Brigantine Restaurant. Agent Walker also refers to six conversations intercepted pursuant to Order C and described in Application D in which Tom is clearly identified as an associate of Sullivan's.

On July 27, 1984, Kerr placed a call to Tom Pool at Pool's residence. Pool told Kerr that he had been to Mike Sullivan's office but that "nothing was going on." On July 29, 1984, Sullivan called Pool at Pool's residence. They discussed Sullivan's problem with Ken Clarke and Sullivan complained to Pool that Clarke still owed him $140,000 and that Sullivan may have to "use some muscle" to get his money. On July 30, 1984, Kerr called Pool at his residence, and they discussed the fact that they were both waiting for "something to come in."

On August 3, 1984, Sullivan told Pool that "things were picking up." Pool told Sullivan that he had "them kind of things, too." Sullivan said he had "a couple of things to talk about" to Pool. Pool said "I got some of those little coupons." Sullivan then inquired if they were "just personal level?" Pool said they were and the two of them discussed the quality of the "personal coupons" and compared them to a fine wine. Pool told Sullivan he might drop by later and informed Sullivan that if he was not at his own home later, he would have his pager on.

At 8:22 a.m. on August 8, 1984, Sullivan called Pool at his residence and they agreed to meet later. They conversed a half an hour later and agreed to meet that morning at "Carlos and Annie's" Restaurant in Del Mar, California. FBI agents surveilled the restaurant and at 9:35 a.m. observed Pool and Sullivan meeting there. At 10:05 a.m., Pool and Sullivan left the restaurant and entered Pool's car where they remained briefly. After a short time, Sullivan left Pool's vehicle carrying something in his hand and returned to his own car.

On August 10, 1984, Sullivan called Pool at home and they discussed the situation with Ken and Fernando. At 1:58 p.m. on August 14, 1984, Pool called Sullivan who told him that he had already put a call in to Dave to let him know how things were going. Pool asked what "Lonnie was up to." Sullivan explained that Lonnie had helped get things rolling by coming up with the final $20,000 that Sullivan needed to settle things. Pool recommended that they keep more than they did the last time and Sullivan agreed that he would set "a whole bunch aside" for Pool when he gets back. Sullivan noted that Fernando "had upped the price a little." Pool inquired what kind they were talking about. Sullivan replied "box." Later in the conversation, Pool remarked that it looks like "we're up there in price again." Sullivan agreed, but counselled "at least we're busy." Sullivan asked Pool how things were going "back there" and said "you got us the Gulf yet ... you got us control of the Gulf yet?" Pool said "just about ... I'm taking over." Sullivan then said "well, just look at it this way, at least we got something to do all our own shit with." Pool then said that Lonnie was "part of my flow, there he's going to realize his place."

Application E also requests continued surveillance of John Kerr's residence phone. Agent Walker explains that the extension of the Kerr wire tap authorized in Order D provided interceptions and further clarified Kerr's role in the conspiracy as a multi-kilogram dealer who is supplied by Sullivan. Kerr has almost daily conversations with Tom Pool and these conversations have assisted in clarifying Pool's role in the operation. These conversations have disclosed that Pool is Sullivan's partner. Once Kerr is supplied cocaine by Sullivan, Kerr distributes this cocaine to several of his regular customers, including Robert Furbush, Judge Crom, John Brunner, Don Takayama, Steven Crogstad, John Freeze, Brad and Steve Vico. Agent Walker also discussed Sandra Zeck's involvement. He refers to fifteen conversations intercepted on Kerr's residence phone pursuant to Order D in which cocaine is discussed. Conversations intercepted on July 23, July 24,

July 27, July 30, August 3, and August 11, 1984, reference the price or availability of cocaine. Other conversations relate to Kerr's trip to the Virgin Islands. On August 5, 1984, at 9:03 p.m. Takayama called Kerr at home and discussed the corporation that Kerr is establishing in the Virgin Islands. They also discussed the $10,000 that Kerr is investing. Takayama wanted to know if Kerr would be "working" when he returned from the Virgin Islands. Kerr responded that he hoped to be working since he hadn't done much "work" over the last two weeks. John Kerr traveled to the Virgin Islands on August 6 through August 9, 1984. While he was gone, Sandra Zeck received numerous phone calls at his residence from Kerr's customers who inquired whether Kerr would have "any work" when he got back. During Kerr's absence, Sandra Zeck conveyed to him messages such as "things should break loose" after Kerr gets back. On August 13, 1984, Sullivan told Kerr that as soon as Sullivan "gets over 30 he can cut loose on the boxes." Kerr told Sullivan that he was willing to kick in and help but that he had all his money tied up in his boat in the Virgin Islands.

Discussing the need for interception and the exhaustion of investigative techniques, Agent Walker calls attention to the affidavit submitted in support of the application for Order A, attached as an exhibit. He directs attention to and incorporates by reference discussion of previously attempted investigative techniques and their lack of success. Agent Walker gives a brief history of the objectives of previous wire taps and notes that in the electronic surveillance authorized by Order D, Fernando had been identified as the ultimate source of cocaine being distributed by the Sullivan network. He notes that little is known of Fernando other than he is the source of cocaine known as the "blue boxes" or "the boxes." It is known that Fernando uses the telephone at Luciernaga Court in furtherance of this conspiracy. Walker opines that based on the volume of cocaine distributed to date and the quality and price of that cocaine, it is obvious that Fernando is part of a major international smuggling opera-

tion. The use of Hertz rental cars from various airports and pagers to avoid electronic surveillance demonstrates that the operation is very sophisticated. Walker states that physical surveillance of the individual believed to be Fernando has been conducted in an attempt to identify him. However, evasive driving tactics and use of rental cars have prevented positive identification. Agent Walker surmises that the only realistic way to identify Fernando is through electronic surveillance of his residence phone.

Conversations intercepted over the "Conceptual Artists'" telephone in the past indicate that Sullivan was conducting drug-related meetings in his office. Previous interceptions have also disclosed that "Conceptual Artists" is a business which is failing and is merely a front for Sullivan's cocaine operation. These interceptions have disclosed assets of the operation and have also given information about the bookkeeping system which may show that income from the sale of cocaine is being shown on the books of "Conceptual Artists." This information may never have been learned if agents merely used conventional investigative techniques. Agent Walker believes information concerning future loads of cocaine will be discussed in full in Sullivan's office since this topic has been discussed in the past. Microphone coverage of these conversations would disclose sufficient details concerning the movement of loads of cocaine which could lead to search warrant seizures of the next load. Microphone coverage of Sullivan's office is needed because interception of telephone conversations indicates that meetings are conducted there. Sullivan has repeatedly cautioned individuals not to say too much on the phone and to wait until they are in the privacy of his office to discuss fully details of the operation. Agent Walker believes that the conversations occurring in Sullivan's office are the only ones that will disclose the method by which drugs are being brought into the United States by Fernando and his organization. However, Sullivan and John Kerr continue to utilize

Sullivan's home telephone to set up meetings and to have coded conversations with members of the operation. Agent Walker believes that the coded conversations, no matter how guarded, are beginning to elucidate the overall conspiracy to distribute cocaine. Revelation of the scope of the operation depends on continued interception of home telephones. Agent Walker believes that electronic surveillance of Pool's residential phone is necessary to clarify Pool's role in the operation. It is not yet known if Pool deals with Fernando or if Pool depends on Sullivan to make this crucial connection. Walker notes that on one instance Pool told Sullivan that "Lonnie is in my flow" and that Sullivan has promised that he would set aside enough for Pool. Agent Walker is not yet certain if Sullivan and Pool are partners, but he is certain that Pool plays a key role in the operation. Electronic surveillance of Pool's phone is the only way to determine who else may be in Pool's "flow" of cocaine. Interception of communications on Pool's residence phone may also disclose other sources of cocaine Pool may have and may provide details of assets that Pool may have obtained as a result of his illegal activities.

Agent Walker asserts that conventional investigative techniques continue to be considered as a method of resolving this case, but that techniques such as interviews, search warrants, and grand jury investigations would offer no realistic alternative to electronic surveillance. He believes that conventional investigative techniques would not work with this sophisticated international organization. Agent Walker also incorporates earlier remarks throughout his application and his opinion of the success of other investigative techniques set forth in all earlier wire tap applications.

*Application F*

Application F seeks electronic surveillance of Timothy Halley's home phone. The Affidavit of Special Agent Charles Walker supplements Application F. His affidavit incorporates by reference previous affidavits filed in this case.

Walker believes that Timothy Halley, Jackson, Kerr, and Tom Pool are part of a cocaine distribution organization headed by Michael Sullivan, president and owner of "Conceptual Artists." Past interceptions have shown that Sullivan's organization is supplied cocaine by Fernando. The DEA has documented that Fernando has used his residential phone to call numbers associated with known cocaine trafficking families in Lima, Peru. Authorized by Order D, interceptions during the final days of that order which commenced on July 23, 1984, disclose that Michael Sullivan uses Halley to keep the records and books for Sullivan's cocaine distribution. Sullivan uses Halley to inventory the cocaine and also to distribute the cocaine to individuals such as John Kerr and Frank Jackson. Walker refers to the conversations previously discussed in Application D. Among those is a June 8 conversation between Jackson and Sullivan, in which Sullivan states that it is time that Jackson meet Tim. Also on June 8, 1984, FBI agents observed an unknown male arrive at Jackson's house approximately an hour after the previously-discussed phone call. The same automobile which the unknown white male drove was subsequently surveilled at Halley's residence in San Diego, California. Other conversations occurring on June 8, June 9, and June 15, 1984, evidence Halley's close association with Jackson and Sullivan and are set forth in Walker's affidavit. The affidavit also includes the July 24 and July 27 conversations noted in earlier applications which indicate that Halley is a trusted associate of Sullivan's.

During most of the thirty day interception period commencing on July 23, 1984, Tim Halley was in Hawaii. After returning from Hawaii, Halley went into the hospital with an ear infection. Between August 14 and 15, 1984, intercepted conversations disclosed that Mike Sullivan settled his problem with Fernando and that Sullivan received a load of cocaine from Fernando. Around this time, Sullivan was planning to take a trip back to the East. He told his distributors to contact Tim Halley when they needed to resupply. On August

16, 1984, Sullivan had several conversations with Fernando concerning Sullivan's partial payment to Fernando for the load of cocaine Sullivan received. During these conversations, arrangements were made for a meeting to occur between Fernando and either Sullivan or Halley. On August 16, 1984, FBI agents observed Halley meeting with Fernando at the "Paddock" Restaurant in Encinitas, California. At 2:49 p.m. on August 16, 1984, Fernando called Sullivan at "Conceptual Artists." Sullivan asked where Tim was and Fernando said that he had met with him ten minutes ago. Sullivan and Fernando then engaged in a coded conversation concerning a "black case of tennis balls" that Sullivan had sent, via Halley, to Fernando. At 5:15 p.m. Sullivan called Halley at Halley's residence and told him that he was preparing to leave town and needed a "case with about 5."

At 8:09 a.m. on August 17, 1984, a conversation between Sullivan and Kerr was intercepted in which Sullivan instructed Kerr to return some of the cocaine to him because he wanted to keep it all in one spot. Sullivan assured Kerr that "you can get it easily, no problem, just give Tim a call, but I have to show what kind of inventory I have on hand." At 8:20 a.m. Sullivan called Dave and discussed the fact that Dave would have "those two covered by the end of the day." Sullivan told Dave that if Kerr should call him, Dave should tell Kerr that Sullivan needn't pick up the other kilogram from Dave. Sullivan instructed Dave to communicate with Tim Halley while Sullivan was out of town. At 8:58 a.m., Sullivan called Halley at his home and asked if Halley would be able to "work" while Sullivan was out of town for a few days. Halley said he could "work" and the two made arrangements to meet later. At 9:38 a.m., Sullivan called Fernando and they made arrangements to meet at the airport. Sullivan said "I'll have a complete breakdown and stuff like that, some people are running a little behind on me, so I may have to depend on Halley...."

At 6:31 p.m. on August 18, 1984, Halley called Kerr to see if Kerr had any money for Halley. Kerr said that he had "10 bucks." Halley then stated that when Kerr needed "another," Halley would bring it to him. At approximately 9:45 p.m. that evening, Bob Shine called Frank Jackson. Jackson told Shine that Tim Halley had just left and that Jackson would be hearing from Tim a little later. Jackson told Shine that Tim was going to be coming back over to his house. Shine asked if he was going to get "that other two together?" Jackson said they would "definitely get it together" now that Jackson had spoken to Tim. Jackson said that he would have the other two by tomorrow morning. Jackson explained that Mike Sullivan screwed up and now it looks like Tim may be taking over and things might change a lot. Jackson said that Tim was "a good man with a heart" and that Michael Sullivan "doesn't have a heart." Jackson told Shine that Tim Halley had known Michael Sullivan since they were 13 years old. Jackson said that the reason they had problems was because Michael had problems with "his boys" and that they were really upset with him because "they" told Tim Halley that Jackson could "keep working."

Agent Walker summarizes one weeks' worth of pen register information obtained pursuant to the August 21, 1984 court order to place a pen register on Tim Halley's residential phone. During a one week period, Halley called Kerr eight times, called Fernando four times and called Sullivan a total of four times, though on two different phone lines. Halley called Robert Furbush sixteen times and Dee Casperson, Mike Sullivan's accountant, two times.

Agent Walker seeks interception of Halley's residential phone to explore fully and document the identities of individuals supplied cocaine by Fernando and Sullivan's operation and the manner in which Timothy Lee Halley utilizes his illegally-derived profits. Agent Walker iterates the assessment contained in the preceding application that Sullivan's organization is sophisticated and uses pagers and pay telephones to circumvent electronic surveillance. Agent Walker also notes that conversations intercepted to date have disclosed Halley's role

as "comptroller" in the Fernando/Sullivan operation. Agent Walker suspects that Halley plays a key role ensuring that the cocaine is properly inventoried and that adequate records are kept. Halley is trusted to the extent that, other than Michael Sullivan, he is the only subject of the investigation who is in personal contact with Fernando. Halley not only knows Fernando but he also knows the identities of all the other distributors associated with Sullivan. Walker characterizes Halley as the "lynchpin of the conspiracy." Walker notes that physical surveillance to date has been extensively utilized in this case, but that attempts to follow Halley have met with limited success. Halley has used several vehicles during the course of the investigation. Electronic surveillance indicates that Halley has no legitimate means of employment so that he is therefore free to conduct his activities at any time. There is not enough FBI manpower to cover all the meetings Halley and other members of the multi-faceted operation attend. However, Agent Walker does believe that physical surveillance could be used in conjunction with electronic surveillance to provide a clearer picture of the overall operation.

Finally, Agent Walker notes that it is anticipated that searches will culminate this investigation. He praises searches as a conventional investigative technique, but notes that without information as to exact location of the cocaine, currency and/or assets, searches would be fruitless. It is obvious due to the volume of the cocaine involved that the residences of the conspirators would not be used to hide the cocaine. The exact location of the cocaine is a jealously guarded secret by members of the conspiracy. Even after extensive electronic surveillance, the whereabouts of the stash are still undisclosed. It is apparent that Hertz rental cars are utilized extensively by the operation and may be used to conceal various loads of cocaine. Halley is in a trusted position and apparently has access to, if not control over, these vehicles during certain periods. Agent Walker believes that electronic surveillance and physical surveillance of Halley may be the only way to determine the exact location of the cocaine load which could lead to successful execution of search warrants to conclude the case.

*Application G*

Through the affidavit of FBI Special Agent Charles Walker, the factual basis for the government's application to tap the phone subscribed to by Donna Ledgard and the business and residential phones of Michael Sullivan is presented. Walker's affidavit incorporates by reference all affidavits previously filed in support of the government's applications for wire taps. Agent Walker summarizes the information presently known to the FBI regarding the cocaine distribution network. Agent Walker opines that the Maurtua family, a group of Peruvians, supplies Sullivan's organization with cocaine. The Maurtua family has long been known to the DEA and the United States Customs Service (hereinafter "Customs") as being one of the major cocaine smuggling organizations responsible for smuggling cocaine from Peru into the United States. The Maurtua family is known to have members located throughout the United States who are actively involved in smuggling cocaine into the United States. Agent Walker notes that prior to September 5, 1984, Fernando Maurtua used the telephone subscribed to by Donna Ledgard to make drug-related communications. After September 5, the telephone was taken over by Jose Antonio Ledgard, and it is not clear to the FBI why Fernando no longer used that phone. The FBI's investigation has established that Sullivan continues to use his business "Conceptual Artists" as a front for narcotics activities and that Sullivan uses all the telephones at the business in furtherance of the distribution of cocaine. Conversations intercepted pursuant to previous court order have disclosed that Sullivan has incorporated his business and attempts with the assistance of a brokerage house in New York to take the corporation public on the New York Stock Exchange. Sullivan has been intercepted stating that when "Conceptual Artists" goes public he will receive a substan-

tial amount of cash. Sullivan has requested that Tony Ledgard arrange for Sullivan to receive a loan against Sullivan's equity in the business, and intends that the proceeds of this loan go to Tony Ledgard and the Maurtua family to finance a load of cocaine to be distributed by Sullivan. Tony Ledgard has been intercepted calling his "partner" in Miami, Florida, Hernando Carrillo, and discussing the proposed loan to Sullivan. Ledgard has told Sullivan that his partner in Miami will arrange the loan to Sullivan through a bank "they own."

In addition to information about money laundering, Walker's affidavit focuses on Sullivan's use of his business and residential telephones to discuss a narcotics-related homicide with Nick (LNU). Sullivan has also used these phones to discuss with Carlos (LNU) an airplane and the four people in it which disappeared. Carlos has told Sullivan that he had 1.5 million dollars on the airplane and that the money was to finance a drug deal. In addition to these calls, Sullivan has been intercepted on several occasions attempting to collect money from Mike Devers (later identified as Michael Diebert). An investigation of Diebert's background reveals that he is currently a federal fugitive from Ohio, indicted by Customs for participation in a narcotics smuggling case.

Previous interception of the lines subscribed to by Donna Ledgard has disclosed that Sullivan received a load of cocaine on August 14–15, 1984 from Fernando, and that a Hertz rental car registered to Jose Antonio Ledgard contained this load. Subsequent physical and electronic surveillance disclosed to the FBI that Jose Antonio Ledgard is, in fact, the Tony who resides at Luciernaga Court and who is married to Donna Ledgard. Additional physical and electronic surveillance eventually disclosed the identity of Fernando as Augustin Fernando Maurtua, who resides at Luciernaga Court and uses the residential phone there. FBI agents observed Fernando at Los Angeles International Airport using a Hertz rental car registered to Augustin Fernando · Maurtua. Maurtua was positively identified when a copy of his driver's license

photograph furnished by the Department of Motor Vehicles was compared to a surveillance photograph of Fernando.

The FBI has conducted background checks of both Maurtua and Ledgard. The DEA advised the FBI that Augustin Fernando Maurtua is a member of the Maurtua family which has long been involved in cocaine trafficking in Peru. Several members have been arrested for cocaine trafficking. The DEA also advised the FBI of information regarding Jose Antonio Ledgard. On January 27, 1982, Peruvian fugitive Jorge Augustin Maurtua and Patricia Maurtua, nee Jackson, were interviewed at Los Angeles International Airport when they met Jose Antonio Ledgard arriving from Peru. During this interview, Maurtua and Ledgard advised that they were starting a check cashing service in Los Angeles and Miami. DEA agents also determined that Patricia Maurtua is the wife of Augustin Fernando Maurtua. The DEA and Customs have advised the FBI that a blood relative of the Maurtua family, Carlos Alberto Maurtua, is currently the Peruvian Consul assigned to the Peruvian Consulate in San Francisco, California.

On August 14, 1984, the FBI placed a pen register on the phone subscribed to by Donna Ledgard. Walker's affidavit catalogues calls made from that phone to relatives of both Maurtua and Ledgard. They include Jorge Miguel Maurtua in Ketchum, Idaho, Patricia Maurtua in Rancho Palos Verdes, California, Miguel Vicente Maurtua in Tyrone, New Mexico, Jorge Miguel Maurtua and Maria Theresa Maurtua in Lima, Peru and Jorge Miguel Maurtua in Haleiwa, Hawaii. The FBI also identified calls to phones subscribed to by Jose Antonio Ledgard in Coconut Grove, Florida and Antonio Ledgard in Miami, Florida, and Carlos Jose Ledgard in Miami, Florida.

Agent Walker's affidavit notes that when monitoring authorized by Order E commenced, it became clear that Fernando was no longer utilizing the telephone subscribed to by Donna Ledgard. However, conversations were intercepted which dis-

closed that Fernando Maurtua may have been residing in Guam. In Fernando's absence, Jose Antonio Ledgard, aka Tony, began actively using the telephone subscribed to by his wife. He had daily conversations with Sullivan. The intercepted conversations between Ledgard and Sullivan have disclosed that Ledgard assumed Fernando Maurtua's place as the Maurtua family representative in San Diego. Ledgard still refused to front Sullivan cocaine and Sullivan still owed the Maurtua family an unspecified amount of money. Intercepted conversations have shown that Tony Ledgard and the Maurtuas were growing impatient with Sullivan.

Beginning on September 6, 1984, three Spanish speaking males phoned Ledgard several times advising that they were staying at the La Jolla Shores Hotel in La Jolla, California in Room No. 23. The men identified themselves as Roberto, Carlos, and Raul. They conversed with Tony in Spanish and their calls concerned "doing a deal" over the weekend. At 7:22 p.m. on September 6, 1984, Tony called the La Jolla Shores Motor Hotel and asked for Room 23. An individual identifying himself as Roberto answered and told Tony that he had not been able to advance the deal they had talked about and that everything "was still dry." Roberto told Tony that "they promised me for tomorrow but I'm not sure." Roberto also informed Tony that the other guys were arriving on Saturday and that "the numbers are going up right now." Tony and Roberto agreed to talk to each other the next day. On September 7, 1984, DEA agents contacted the manager of the La Jolla Shores Motor Hotel. The manager advised that a Roberto Cordero from Lima, Peru, was registered in Room 23. He also advised that Roberto Cordero had rented this room on August 30, 1984 and paid for the room using a foreign Diner's Club credit card. The manager remembered that Roberto Cordero had received a call from the Hertz rental car corporation in Los Angeles, California. Hertz complained that one of its vehicles leased by the occupants of Room 23 was overdue and should have been returned per contractual agreement.

On September 7, 1984, Tony Ledgard called an unknown male at a number in Los Angeles. Ledgard told the unknown male that he was hanging around "waiting for something to happen." The unknown male asked when he could get together with Ledgard. Ledgard replied that it would have to be Monday or Tuesday because he was "not feeling well yet." (Agent Walker believes the reference to not feeling well is coded language, meaning that Tony does not have cocaine at the moment.) Tony Ledgard told the unknown male that Bill would be by to see him on Saturday. The unknown male said that he would also be seeing Bill on Saturday. On September 7, 1984, Donna Ledgard took a message for Tony from a Roberto Cordero who told her to have Tony call him at a telephone number that was later traced to the Lido Shores Hotel in Newport Beach, California. That evening, Ledgard called Room 23 at the La Jolla Shores Motor Hotel and was advised that Roberto was not there. Ledgard told the person who answered the phone, believed to be either Raul or Carlos, that he was waiting for Bill to call him. At 7:59 p.m. that evening Ledgard received a call at his residence from an unknown male inquiring whether Ledgard had heard from his friends. Ledgard said that he thought Roberto had "the bag," that he was awaiting a call from Bill, and that he would have "the bag" tomorrow. On September 8, 1984, at 10:59 a.m. Bill attempted unsuccessfully to reach Tony over the Ledgard residence phone. He called back at 11:36 a.m. and spoke with Tony in English. Bill asked if Tony had heard from "those other guys." Tony told Bill that he had been in contact with these guys and that they were "driving [him] crazy." Tony told Bill that those guys "really want you badly." In response, Bill told Tony "they want my money." Bill explained that the hangup was caused by George not being there until the afternoon. He asked if Tony could "call those guys" and make the appointment for the next morning. Tony explained to Bill that that would be a problem

because one of the guys went up to Newport Beach and the other was there in La Jolla. At 12:37 a.m. an unknown male called Tony. Tony told him that Raul had not arrived yet, but would return later that night or tomorrow. The unknown male told Tony that he had to leave the next day and that "the bag" was coming from over there and that "the bag" speaks English well. At 1:49 p.m. Tony conversed with Cordero over Tony's residence phone and explained to Cordero that Bill was delayed and that "the deal could not go down until the next day." At 8:24 p.m. an unknown male called Ledgard and told him that the two of them would meet the next morning at 9:00 a.m. at the Rusty Pelican Restaurant in Newport Beach, California and that they would also meet some other men at 9:30 that morning at Sears in the South Coast Plaza Shopping Center. The unknown male explained to Ledgard that they would first meet the other men in front of the main door of Sears, and that they would then go to the vicinity of the Sears Auto Department. Tony should tell the others. Tony explained to the unknown male that Roberto would not be there tomorrow because he was going on a trip. Tony and the unknown male then began speaking in Spanish. The unknown male asked if they could "avoid the law during their meeting." Tony explained to him that there would "be no problem with the law."

Based on the information provided by the foregoing interceptions, federal agents attempted to substantiate some of the information. On September 8, 1984, DEA Special Agent David Knight contacted the desk clerk at the Lido Shores Hotel in Newport Beach and was told that a Fernando Harmsen-Andress had registered in Room 42 on September 6, 1984 and was booked through September 10, using a 15% Iberia Airlines discount. The desk clerk also told Agent Knight that several calls had been made from Room 42 to unknown numbers in Lima, Peru and to the La Jolla Shores Motor Hotel, in La Jolla, California. Fernando Harmsen-Andress provided a passport number and listed his address as Box 63, Lima, Peru, in hotel registration documents. On September 7, 1984, DEA agents observed a 1984 white Mercury Cougar at the La Jolla Shores Motor Hotel. They learned that the individuals who were occupying Room 23, which was registered to Roberto Cordero, drove the car. Agent Knight contacted the offices of the Hertz Car Rental Corporation in Newport Beach on September 8, 1984 to learn that on August 2, 1984 Carlos R. Cordero rented the above-described 1984 Mercury Cougar. Cordero gave his local telephone number as Room 23 of the La Jolla Shores Hotel, and also provided the Hertz Corporation with the number for the Lido Shores Hotel. Hertz records indicated that Cordero agreed to turn the car in at their Los Angeles International Airport office on August 17, 1984 but had not done so.

DEA and FBI agents set up physical surveillance of the meeting that had been planned at South Coast Plaza Shopping Center on September 9, 1984. At 9:45 a.m. agents observed an unknown Latin male pacing back and forth in front of the Sears Department Store. He appeared to be very nervous as he awaited the arrival of someone. At 10:25 a.m., agents observed a blue Mercedes-Benz, known to the agents to be a vehicle utilized by Jose Antonio Ledgard, pull into the parking lot at Sears. Ledgard parked the car, exited the vehicle, walked over, and greeted the man who had been waiting in front of the Sears Department Store. Agents believe the unknown male to be Fernando Harmsen-Andress. Harmsen-Andress and Ledgard then began to walk around the Sears Department Store until 10:50 a.m. when they returned to Ledgard's Mercedes-Benz and drove several times around the parking lot. Eventually, they drove to a corner of the parking lot to the location of a 1984 grey Ford. The California Department of Motor Vehicles later informed agents that the car was registered to Hertz Rental Car Corporation at the Los Angeles International Airport. Harmsen-Andress then exited Ledgard's vehicle, got into the Ford, and moved it to another part of the parking lot located

within view of several pay telephones located in the shopping mall. Agents then observed Harmsen-Andress and Ledgard, who had also parked his vehicle nearby, go over to the pay telephones and make a number of telephone calls. Other agents who had intercepted a call at 11:01 a.m. over Ledgard's residential telephone from Tony Ledgard to Donna Ledgard then contacted those agents on their car radio. Donna Ledgard advised Tony that Raul was waiting for him at the Rusty Pelican Restaurant on the Pacific Coast Highway in Newport Beach. Ledgard told Donna that if the individuals called back that she should tell them that he would be over shortly. At 11:12 a.m. Ledgard and Harmsen-Andress exited the Southcoast Plaza Shopping Center in Ledgard's blue Mercedes-Benz and drove to the Rusty Pelican Restaurant. Fourteen minutes later, they parked the car near the Rusty Pelican and proceeded on foot to the restaurant's parking lot. Agents observed three unknown males standing by the door of the Rusty Pelican Restaurant and viewed Ledgard and Harmsen-Andress walk over to them and talk to them. Two of the three unknown males and Harmsen-Andress then walked back to Ledgard's blue Mercedes and drove away. Agents followed the Mercedes back to the area of the South Coast Plaza Shopping Center and observed it cruising around the parking lot in the vicinity of the previously described Ford automobile. They parked the blue Mercedes near the Ford. Two minutes later a black Buick Riviera approached the vicinity of the Ford. Agents contacted the California Department of Motor Vehicles and were apprised that the Buick Riviera was registered to the Alamo Car Rental Corporation of Fort Lauderdale, Florida. Agents observed that the unknown male left behind at the Rusty Pelican drove the Buick Riviera, with Tony Ledgard as a passenger in the car. A few minutes later, one of the men in the blue Mercedes went to the trunk of the black Buick Riviera, opened it, and took out a large white package. One of the other unknown males took this package to Tony Ledgard who was standing by

his blue Mercedes. Tony Ledgard put the package in the trunk of his Mercedes. Ledgard and the man shook hands, Ledgard got in his car and left the area. The unknown male joined the other male in the black Riviera and sped off. The last unknown male and Harmsen-Andress also left the area in the Ford Hertz rental car. On September 9, 1984, agents observed the man believed to be Fernando Harmsen-Andress arrive at the Lido Shores Hotel. On September 10, 1984, the agents who conducted the surveillance at the South Coast Plaza Shopping Center positively identified Harmsen-Andress after being shown a picture of him.

During this time period FBI Special Agent Eddie Hill conducted an investigation at the La Jolla Shores Motor Hotel and made contact with the hotel manager. The manager advised him that seven foreign individuals had rented two rooms there on August 30, 1984 and that one of those individuals had checked out of the hotel on September 4, 1984. Two individuals named Robert Cordero of Lima, Peru, and Fernando Harmsen-Andress of Lima, Peru rented the two rooms in question. The manager advised that Andress had been the one who checked out; Cordero and two other persons were presently staying there in Room 23. During surveillance of the hotel on September 8, 1984 Agent Hill observed Tony Ledgard arrive at the hotel and meet the occupants of Room 23. Later that day, Agent Hill checked the records of telephone calls made from Room 23 which disclosed that a call had been made from Room 23 to the Lido Shores Hotel in Newport Beach and to several numbers in Miami, Florida. In addition, several calls were made to the residence telephone of Tony Ledgard. On September 9, 1984, Agent Hill observed the occupants of Room 23 checking out of the hotel. They loaded the previously described White Mercury Cougar, the Hertz rental car registered to Roberto Cordero, and left the area. They were followed to the area of the Intercontinental Hotel on Harbor Drive in San Diego and were observed boarding a forty foot

single mast sailboat named *Sans Souci.* They loaded their possessions from the vehicle onto the boat. An hour later, the boat left the dock and sailed out of the harbor.

On September 10, 1984, the FBI checked DEA records for information concerning Carlos Roberto Cordero and Fernando Harmsen-Andress. Agent Knight advised that reliable source information contained in DEA records in 1977 disclosed that Fernando Harmsen-Andress was involved in one of the largest, multi-hundred pound quantity cocaine smuggling operations from Lima, Peru. In 1977, Fernando Harmsen-Andress was listed as controlling one-quarter of. the cocaine smuggled from Peru. DEA files disclose that Carlos Roberto Cordero, possessing about eleven and one-half pounds of cocaine, was arrested in 1981 in Savannah, Georgia. Cordero was eventually deported.

On September 10, 1984, Roberto Cordero phoned Ledgard at his residence. They spoke in Spanish and discussed the meeting from the previous day in the Sears parking lot. Ledgard said that the "bag man" had felt some heat because some strange guys at his hotel had asked some questions about him. Ledgard and Cordero discussed from where the heat had come and whether it had been brought on by Ledgard, the "bag man" or Bill. Ledgard said that the "bag man" felt that it resulted from what had happened at his hotel. At the end of their conversation, Cordero told Ledgard to come see him on the boat *Sans Souci* which was tied up near the Chart House Restaurant on Coronado Island. Also on that date, Ledgard was observed dropping off his family at the San Diego Airport and then proceeding to the Chart House Restaurant in Coronado. There he met with several Latin individuals, some of whom the DEA had observed at the La Jolla Shores Motor Hotel on September 8 and 9, 1984. One of the individuals was positively identified as Roberto Cordero. Agents later observed Ledgard and Cordero in an dinghy heading to the ship *Sans Souci.*

On September 11, 1984 at 9:18 a.m. Ledgard called a phone number subscribed to John R. Comancho in Woodruff, Wisconsin. Ledgard spoke in Spanish with this person and told him that he had sent his wife, Donna Ledgard, back to Miami, Florida. Ledgard also told Comancho that he might be moving back there as well. On September 11, 1984, at 10:41 a.m. an unknown male phoned Ledgard and they conversed in Spanish. The unknown male inquired if Ledgard was "in real need" and commented that everything was "real dry right now" because someone had had an accident. It was "causing things to be late." At 5:40 p.m., Donna Ledgard called Tony at their Luciernaga Court residence. She inquired when Tony would be joining her in Florida and he told her that he had to "stick around to settle things with Mike Sullivan," with whom he was going to get "a little aggressive."

Conversations intercepted over Ledgard's residence phone on September 13, 1984, indicate that Roberto Cordero was telling others that he could be reached at that number. On September 15, 1984, Bobby called Cordero at Ledgard's residence and they had a conversation in Spanish. Cordero inquired whether Bobby was calling from a pay telephone and Bobby said he was. They discussed the occurrences in the Sears parking lot on September 9, 1984, and Roberto said that Fernando believed he was being followed so that he took off and left everything. Roberto said he met Fernando the next day and then Fernando left for Panama. Bobby asked when Cordero was going to be leaving. Cordero said he didn't know when he would be able to leave because he was having so many problems with "mine." Cordero and Bobby discussed the fact that "they do not want to pay for it" and "they have the merchandise." Cordero told Bobby, "I'm going to have to send them someone to collect." Cordero repeated, "I want to contract someone."

On September 15 and September 16, 1984, conversations were overheard on Ledgard's residence phone indicating that Raul, Ledgard and Cordero were having

trouble making a narcotics-related collection of money.

Agent Walker's affidavit notes that on an almost daily basis since September 5, 1984, Tony Ledgard has spoken over his residential phone with Hernando Carrillo, with whom Ledgard is heavily involved in real estate investment in Miami, Florida. Ledgard has sent Carrillo an unspecified amount of cash to be used in real estate investments. During one of those conversations on September 18, 1984, Ledgard explained to Carrillo that he was in the process of collecting some debts and referred specifically to the problem he was having with Sullivan. Ledgard told Carrillo that he wanted to help get Sullivan a loan against the equity in Sullivan's factory. A few minutes after Ledgard's conversation with Carrillo, Ledgard called Sullivan at "Conceptual Artists" and told him that he had just spoken to his partner. Ledgard advised Sullivan to prepare a letter outlining Sullivan's equity in his factory and that Ledgard and his partner would present it to the bank and get a loan out of it. Ledgard told Sullivan that "these guys own the bank."

On September 23, 1984, Cordero received a call from Harmsen-Andress who identified himself as "the bag" and they had a long conversation in Spanish. They voiced their irritation with Bill (LNU) who had not yet paid them money. Cordero stated that "they" had not sent him anything and that he was "going to contract a person" to collect the money owed them. Cordero told Harmsen-Andress that he needed all the information about Bill, including phone numbers and addresses which would assist him in locating Bill. Harmsen-Andress said that he had all this information, but that Cordero should go out to a pay telephone and call back to get the information. The two of them discussed the fact that paying the collectors was expensive in that they would keep a percentage of the total owed. Harmsen-Andress stated that he would call Bill one more time and try talking to him. Cordero said that Harmsen-Andress would be the last one to talk to Bill. Cordero told Harmsen-Andress to tell Bill that he was behind with Cordero and that Harmsen-Andress needed Bill's final answer because he didn't want to be responsible for what Cordero did to Bill. Forty minutes later, Cordero received another call from Harmsen-Andress, and again they spoke in Spanish. Cordero told Harmsen-Andress that the collectors would receive 30% of the money collected from Bill. Cordero said that if "they" proceed, Cordero was going to Lima, Peru and that Harmsen-Andress should do the same. Cordero said he would have to go to Peru by way of Panama to pick up money because he only had $15,000. The following day, FBI agents contacted the management of the Pere Marquette Hotel in Peoria, Illinois and learned that a Fernando Harmsen-Andress rented Room 304 in that hotel on September 23, 1984. The hotel advised that Fernando Harmsen-Andress had made several long distance telephone calls charged to his room including two to Tony Ledgard's residential phone and one to a number in the Los Angeles area.

On September 26, 1984 at 12:11 p.m., Sullivan called Ledgard at his home and engaged in a lengthy conversation. Ledgard chastised Sullivan for not calling as Sullivan had promised. Ledgard said it was time for "extreme things to come up." Ledgard said that Sullivan was now in bad shape. Ledgard was not "going to cover up" for Sullivan anymore because Sullivan had gone beyond his limits. Sullivan said he had been trying and that he had been paying Ledgard back. Ledgard said he was not going to be responsible for what happens to Sullivan. Ledgard told Sullivan that "they are going to make you get your shit together" and threatened that Sullivan was going to have to "learn the hard way." Sullivan continued to plead his case and discussed measures that he had taken to get money from people who owed money to him. Ledgard said that Sullivan should "take their cars, take their houses, take anything." Ledgard said that in connection with people who owed Sullivan, "you should break their fucking legs." Sullivan countered that if someone came over to

muscle him it would "not go anywhere and it would start to come back to Ledgard." Ledgard said that in that case, someone is "going to fuck with your life." Ledgard told Sullivan that he was leaving now for Miami and Sullivan had better call Ledgard soon with the money. Sullivan said he was going to keep trying to pull some cash out of the company and pay Fernando and Ledgard and "start working again."

Agent Walker also provides a detailed description of phone calls that he believes establish probable cause for further interception of the telephones at "Conceptual Artists." He notes that recent interceptions demonstrate that Sullivan used his business telephones to raise money to finance another load from Ledgard and to pay off Ledgard. Sullivan also used these telephones to contact alternate sources of cocaine, Nick (LNU) and Alvaro (LNU), in attempts to get cocaine which could be sold to raise. cash to pay off Tony Ledgard. Agent Walker notes that electronic surveillance has disclosed conversations between Sullivan and Nick regarding the apparent murder of one of Nick's criminal associates. Sullivan has also used these phones to contact Carlos (LNU) who has apparently financed past cocaine deals with Sullivan. Carlos told Sullivan about an airplane that disappeared with four of his associates and 1.5 million dollars. Sullivan also used his business phones to further his efforts to have the "Conceptual Artists" business go public on the New York Stock Exchange.

On September 6, 1984, Brian (LNU) phoned Sullivan at "Conceptual Artists." Sullivan told Brian that one of the "runners" got picked up, that there was a problem with the deal, and that they may have lost one. Sullivan said he would explain it in detail to Brian later on another telephone. At 2:35 p.m. on September 10, 1984, Nick (LNU) called Sullivan at "Conceptual Artists" and apologized to Sullivan for not having completed the deal previously discussed over the weekend of September 8 and 9. Nick explained to Sullivan that the reason the deal did not go as planned was because an unidentified individual had attempted to steal "712 big ones." Nick explained that this had prevented the deal from going on as scheduled and that the individual who had attempted to steal the "712 big ones had been taken care of." During the conversation, Nick indicated to Michael Sullivan that this unknown individual had been killed and that this murder victim was someone who had gained access to Nick through one of Nick's close friends. Nick noted that the close friend who had introduced this individual to his operation had "taken care of" this individual for Nick. Most of the $712,000 was returned. Throughout the period of interception authorized in Order E, Sullivan utilized his office telephone to call Nick at (800) 458–4404, which is an answering service in Los Angeles known to be used by major narcotics traffickers. Within minutes of calling this 800 number, Sullivan would receive a call back from Nick (LNU) who called from a pay phone.

On September 12, 1984, Sullivan used one of his business phones to call Ken Clarke in Miami, Florida. Clarke told Sullivan that something had come in, but that it was "too powdery" so Clarke "passed on it." Clarke said that his sources in Florida did not want to extend credit. Clarke said he would send some out to Sullivan as soon as the quality gets better. On September 13, 1984, Sullivan placed a call on one of his business phones to Frank Jackson. Sullivan inquired about the money Jackson had agreed earlier to "kick in ... for a quick turn around situation" and Jackson said that Bob Anderson owed him $35,000. If Anderson didn't pay, Jackson was going to take Anderson's Rolls Royce.

On September 17, 1984, Dee Casperson phoned Sullivan at his business. Sullivan told Casperson that he was trying to collect a "bunch of money" and that once this was collected, they would meet with Tony. They spoke again about two hours later and discussed Sullivan's attempts to raise cash and the future meeting with Tony.

On September 18, 1984, Sullivan used his business phone to call Carlos (LNU). Sulli-

van told Carlos that he was attempting to raise money and was looking for someone "who wanted to make a quick return on their dollar or get a part of what I am trying to bring in." Carlos told Sullivan that he could not participate at this time and Sullivan asked if Carlos knew anyone who might like to participate. Carlos responded that the "four ones I knew were on that airplane that's gone." Carlos said the four guys that took off in the missing airplane had 1.5 million which was lost. The FBI investigated this missing airplane and on September 20, 1984, Customs Special Agent Steve Trent advised Agent Walker that a confidential informant informed the Air Support Unit of Customs about a leased airplane which disappeared on August 29, 1984. The plane was leased from Palomar Airport on August 20, 1984 by four individuals, one of whom was Charles Eric Jenkins, a furloughed Western Airlines pilot. The individuals who leased this airplane filed a flight plan from San Diego to Houston, Texas, to Orlando, Florida and a possible stop in Canada. According to the FAA, the plane never made it to Houston. It has not been heard from since. The confidential source told Customs that the four individuals who leased the airplane were observed loading the airplane with food and money and that they were overheard saying their true destination was Mexico.

On September 19, 1984, Sullivan used his business phone to call Tony Ledgard and told Ledgard that he was meeting with an attorney that day and that he would soon have all the information concerning his business that Ledgard needs. At one point in the conversation, Sullivan complained about the damage to his nose caused by cocaine use. Ledgard said that his nose never bothered him because he, Ledgard, grew up with it.

On September 19, 1984, Sullivan called an individual named Javier (LNU) on his office telephone. Sullivan asked Javier if he would be interested in investing some money to finance some "things" that Sullivan was trying to arrange. Javier said that he was interested and would raise the money. Sullivan told Javier that he would send Tim Halley to him to pick up the money. After that conversation, Sullivan called Tim Halley and told Halley that he was to go to Austin, Texas, and pick up $30,000 from Javier. Later that day, Halley came over to Sullivan's office and used Sullivan's telephone to call a travel agent to reserve a flight to Austin, Texas. Halley also called Javier in Austin. On September 19, 1984, FBI agents observed Halley arrive in Austin, Texas and meet with an individual believed to be Javier. Halley and Javier were followed to an apartment in Austin, Texas where Halley spent the night. The next day, Sullivan placed a call over his business phone to Halley in Austin, Texas. Halley told Sullivan that he was with Javier and that he was getting the money. At 4:45 p.m. that same day, Javier called Sullivan at his business. Javier explained to Sullivan the details about the money that Tim Halley was picking up. Javier told Sullivan that Halley would be flying, with the money, into San Diego the next morning. Javier also said that he had some guys in California who were also going to kick in some money and that Halley and Sullivan would be kept posted.

On September 21, 1984, conversations were intercepted which disclosed that Sullivan left on that day for San Francisco where he was scheduled to attend a restaurant suppliers trade show at the Moscone Center. Prior to leaving, Sullivan had several conversations with a Jerry Sensil (sic) and another individual identified as Alvaro. Alvaro spoke with a heavy Latin accent and was identified previously as being from Panama. Sullivan made arrangements to see Sensil while in San Francisco to complete a cocaine purchase. Sullivan then called Halley and told him to bring the money that he had picked up from Javier in Austin, Texas, to San Francisco. Sullivan indicated to Halley that he was going to use this money to pay off a debt to Jerry Sensil and Alvaro, who, in turn, would front Sullivan seven kilograms of cocaine. Two days later, Sullivan called Halley's residence in San Diego and instructed Hal-

ley to bring the cash to San Francisco. Sullivan told Halley that he would arrange for Halley to pick up "8 of them" to take back to San Diego. Halley stated that he would not dispense the cocaine to anyone unless it was "cash up front."

Agent Walker's affidavit also notes that since the interceptions pursuant to Order E have commenced, Sullivan has used his home phone and his office telephone to talk to an individual believed to be Michael R. Diebert. Diebert has also been intercepted in conversations with Sullivan over these telephones during the period which commenced with Order D. At first, this individual was identified only as "Mike" and the conversations concerned efforts on the part of Mike (Diebert) to finance a load of cocaine. Sullivan used his phones to call Mike at a number subscribed to by Alan Brint in Fallbrook, California. In one of the earlier conversations, Mike (Diebert) told Sullivan that he had been "laying low" because he had been under some heat somewhere else. Physical surveillance at the Fallbrook address disclosed that a 1978 Cadillac with Ohio license plates parked at the address on a regular basis. The FBI contacted the Ohio Department of Motor Vehicles which disclosed that this vehicle was owned by Robert Diebert with a Toledo, Ohio address. On September 20, 1984, Agent Walker was advised by Customs that a warrant had been issued on April 27, 1984, for the arrest of Michael R. Diebert in Cincinnati, Ohio and that there were underlying charges against Diebert for conspiracy to import and distribute and importing and distributing controlled substances. Customs also advised Agent Walker that Diebert was a major participant in an international smuggling operation responsible for the importation of multi-tons of marijuana. Intercepted conversations between Diebert and Sullivan disclosed that Sullivan was attempting to get Diebert to invest $25,000 which would assist Sullivan in financing a load of cocaine which Sullivan hoped to pick up in San Francisco around September 24, 1984.

Application G also seeks extension of interception by microphone at "Conceptual Artists." Agents feared that certain technical difficulties with the installation of the microphone pursuant to Order E could have led to Sullivan's discovering that he was the subject of electronic surveillance. Agent Walker describes the problem as follows: if one of the telephones in the building was picked up by someone at the business once the microphone was activated, this individual could hear conversations from Sullivan's office over this phone. One of Sullivan's employees discovered this and immediately brought it to Sullivan's attention. Sullivan told the employees not to use the telephones and to be careful what was said. In order to avoid detection of the microphone, the FBI decided to turn the microphone off. Eventually, Sullivan returned to his habit of using his office telephones to conduct his illegal activities. As a result of the technical problem, intercepting agents selected carefully the times they used the microphone. They activated the microphone only at times when they determined that Sullivan was having a meeting with one of his co-conspirators and that no one else at the business was on the telephone at the time.

On September 12, 1984, Sullivan set up a meeting with Tom Pool. At 5:30 p.m. that afternoon, Tom Pool was observed arriving at "Conceptual Artists." At 5:53 p.m. Sullivan told Pool that there was "real good cocaine available" and Sullivan described it as being "high connoisseur." Sullivan told Pool that his source "has this available now" and if Sullivan could raise some cash to give to his source, that this would "help Sullivan out" and make him "look good to his source." Pool responded that he could probably raise some money, but that he would have to get the "coke" that night. Sullivan told Pool that he couldn't see his supplier unless he had $30,000; if he gave "this guy" $30,000, they would be 24 hours away from making a deal for a load.

On September 19, 1984, Sullivan had a conversation in his office with Tim Halley. This conversation followed a telephone conversation between Sullivan and Javier (LNU) in which Sullivan asked Javier if he

was interested in investing in a deal which would insure Javier a price of "28 on 4 or 5." Javier told Sullivan that he was interested in investing some money, and Sullivan said he would send Halley to Javier's location in Austin, Texas, to pick up the money. During his conversation with Halley, Sullivan told Halley to leave right away for Austin and to come back as soon as possible the next day. Sullivan gave Halley money to cover his expenses while on the trip. He suggested that Tom Pool go along as well because Javier had a "whole bunch of marijuana." Sullivan planned to pick up Halley's airline tickets and told Halley to come by the office and get them later. Sullivan told Halley to stay on the beeper. Sullivan would let Halley know if Pool would be accompanying him.

From September 21 through September 29, 1984, Sullivan travelled to San Francisco. Telephone conversations intercepted in that time period indicated that Sullivan intended to conduct meetings in his office upon his return. On September 29, 1984, Mike Diebert came to "Conceptual Artists" and had a lengthy conversation with Sullivan in Sullivan's office. Diebert told Sullivan that he had recontacted a source who had previously dealt to him. Diebert said that the source had the cocoa paste and was able to deal over 30 or 40 kilograms of cocaine. Sullivan said that he could help set up Diebert's source with a laboratory to convert the cocoa paste to cocaine. Diebert asked if Sullivan would like to participate. After inquiring about the quality of the product, Sullivan told Diebert he had $40,000 to put up towards the seven kilograms that Diebert said he was going to receive.

On October 1st, 1984 an individual identified as Greg Canada entered Sullivan's office and engaged in a lengthy conversation concerning prior and current narcotics activity with Sullivan. Sullivan invited Greg to invest in a cocaine deal. Greg refused, stating that all of his money was tied up in a boat load of Mexican marijuana. Greg explained that he was having trouble with the Federales (federal police) in Mexico and that he would have to pay them $20,000 to load the boat with marijuana. Sullivan told Canada that he had a source for 60,000 pounds of marijuana and that partial transportation would be provided. Sullivan said that the source wanted to bring the load out on the Pacific Ocean, not the Atlantic. During further conversation regarding marijuana smuggling and their respective past experiences, Canada told Sullivan that one of their associates, Pat (LNU), had been arrested in Colorado. Canada said that he had dealt with Pat longer than Sullivan had, but that "the load he went down with" was Sullivan's. Canada warned Sullivan to be careful. Sullivan described to Canada his methods to avoid law enforcement detection. Sullivan told Canada that he was able to use his business as a front for travel and that he hired lawyers who were able to check and see if anyone was investigating him. Sullivan and Canada also discussed ways they used to conceal their income and to launder money. Sullivan told Canada tht he had recontacted an old source in San Francisco and that Sullivan was close to arranging a load of cocaine in "the boxes." Sullivan said that the car was loaded and that Sullivan was close to having the car driven down to San Diego. Sullivan said that he was going to leave for Florida the following Tuesday to set up the deal.

Agent Walker's affidavit also discusses the need for electronic surveillance of Sullivan's residence at 399 Bellaire, Del Mar, California. Walker notes that Sullivan uses that phone almost on a daily basis to call the other members of the conspiracy. Previously intercepted conversations have included attempts by Sullivan to raise money to pay off Tony Ledgard and to arrange for another load of cocaine to be distributed by Sullivan's operation. Sullivan also uses his residence telephone to find alternate sources of cocaine so that he could sell it to pay off Ledgard. Previously intercepted conversations have also indicated that Tina Sullivan, Michael Sullivan's sister, lives at his residence and has been an important conduit of messages to Sullivan from other members of the organization,

including Tony Ledgard, John Kerr, Frank Jackson, Tom Pool, Tim Halley, and Gary Wooten. Her participation in these conversations demonstrates that she is aware of Sullivan's narcotics activities, but her role in the conspiracy is as yet undefined.

Agent Walker provides three examples of Sullivan's use of his home telephone to further the conspiracy. On September 6, 1984, at 11:00 p.m., Sullivan used his residence phone to call Tony Ledgard at his residence. Sullivan apologized to Ledgard for not getting together with him, but explained away his delay because of a legal problem. Ledgard told Sullivan that it was "no problem" and explained that while he could not yet give Sullivan "an appointment date" it may happen over the weekend. Sullivan inquired whether he would be able to do future deals with Ledgard and Ledgard stated that that could be arranged. Sullivan also told Ledgard that he was a little worried because a guy named Russ, who knew too much about Sullivan, is suing him. Sullivan told Tony that he had a guy with him who "breaks bones" and that this individual was going to be watching. On September 21, 1984 at 9:09 a.m., Sullivan called Javier (LNU) in Austin, Texas. Sullivan asked about Tim Halley, who had flown to Austin the previous day. Javier told Sullivan that Halley was due to arrive in San Diego that morning and that Halley would be picking up $10,-000 from one of Javier's friends in San Diego. Javier said that there would be another $10,000 arriving in San Diego around noon and that Halley "knew about that as well." Javier also said that he had access to another $10,000. On September 30, 1984 at 1:51 p.m., Sullivan received a call from Alvaro (LNU) calling from Miami, Florida. Previous intercepted conversations disclosed that Sullivan owed money to Alvaro and Jerry Sensil (sic) and that once this money is paid, Alvaro may front Sullivan some cocaine. During the conversation on September 30, Sullivan told Alvaro that he had a cashier's check and that he was going to bring some money that week to Alvaro in Miami.

Agent Walker concludes that the only reasonable method of developing the necessary evidence of narcotics violations in this case is to intercept wire and oral communications as requested in his affidavit. To support that conclusion, he provides the following reasons. First, he incorporates the statements in all the prior applications regarding the necessity for interception and the exhaustion of investigative techniques. The facts have demonstrated that an international network of Peruvians represented in San Diego by Austin Fernando Maurtua and Jose Antonio Ledgard supplies Michael Sullivan cocaine. Calls summarized in the affidavit have shown that other key members of the cartel are Fernando, Harmsen-Andress and Roberto Cordero. Agent Walker concludes that the very nature of the cartel underscores the need for additional electronic surveillance. He notes that intercepted conversations have disclosed that the Maurtuas have connections throughout the United States and in several Latin American countries. Walker also sets forth his knowledge that of all groups operating within the United States, Peruvian and Colombian cocaine smuggling cartels are the most sophisticated and difficult to penetrate. This is because these groups are comprised of blood family members, who embrace strict rules of silence. They are known for their propensity for violence. Agent Walker stresses that it is the violence that ensures that if one of the cartel's members is apprehended, he or she will not cooperate with law enforcement. Because some of the suspects undoubtedly have family and property in Peru, Agent Walker concludes that they would follow the code of silence for fear of reprisals by those conducting illegal activities in the United States. Thus, it is unlikely that Augustin Fernando Maurtua or Tony Ledgard would be willing to cooperate against members higher up in the organization. He makes a similar assessment with regard to Fernando Harmsen-Andress and Roberto Cordero. Agent Walker also notes that previous surveillance has indicated that the Peruvians are sophisticated enough to know that they

should use pay phones whenever possible. However, key members of the conspiracy are located all over the country and certain telephones, such as Ledgard's phone, must be used on occasion. Continued electronic surveillance of the individuals using Ledgard's phone is, in Agent Walker's estimation, the only plausible investigative technique which would make a major impact on the Maurtua operation. Agent Walker notes that intercepted conversations involving Fernando Harmsen-Andress and Roberto Cordero have disclosed that a collection problem exists with Bill (LNU). Harmsen-Andress and Cordero may resort to the use of extortion tactics in order to collect the money. Agent Walker states that the identity of Bill (LNU) in Los Angeles has not yet been determined but there have been calls from Harmsen-Andress in Peoria, Illinois, to a number in the Los Angeles area which may ultimately reveal Bill's identity. Agent Walker remarks that were it not for electronic surveillance, this fact would not be known. Agent Walker proposes that if the FBI learned Bill's identity through continued electronic surveillance, they would attempt to interview him concerning the possible harm which might befall him. This in turn, might induce Bill to cooperate with the FBI. Agent Walker believes that Sullivan's safety may also be endangered since Tony Ledgard has threatened him. Ledgard has run out of patience with Sullivan; a volatile situation is brewing in light of Ledgard's repeated threats. Agent Walker pledges that the FBI will actively monitor the situation in an attempt to prevent Sullivan from being harmed. He notes that continued electronic surveillance is the only method to determine what steps may be taken by the Maurtua operation against Sullivan and would be the key factor in determining if an approach should be made to Sullivan to prevent Sullivan from being harmed. The possible homicide of an associate of Nick (LNU) who is an alternate source of cocaine to Mike Sullivan is another reason why electronic surveillance is needed. Further wiretapping may provide direct evidence connecting the murder with Nick's narcotics activities. Agent Walker highlights Nick's communication to Sullivan that the FBI had contacted his answering service. The FBI made no further overt attempts to identify Nick, but Agent Walker believes additional electronic surveillance may identify Nick and lead to evidence of a homicide in this operation.

Agent Walker speculates that continued electronic surveillance may also result in information to clarify Carlos' involvement with the missing airplane that disappeared with four people and 1.5 million dollars. Agent Walker notes that prior electronic surveillance has been successful in locating Michael Diebert, a federal fugitive from Ohio, who Walker believes is continuing illegal activities in California. Agent Walker admits that the relationship between Diebert and Sullivan is not defined, but conversations indicate that they have done deals before (although it is unclear if Sullivan was involved in the Ohio indictment). Agent Walker believes that continued electronic surveillance could identify the new major source of cocaine that deals in cocoa paste and may supply over forty kilograms of cocaine.

*Application H*

Application H sets forth the government's request to continue surveillance of the phone subscribed to by Donna Ledgard, located at 6827 Luciernaga Court in Carlsbad, California and to initiate electronic surveillance of a phone subscribed to by Charles Jones, located at 1522 Camino Del Mar, Apartment No. 643, Del Mar, California. In an affidavit supporting the request, Agent Walker summarizes the progress of the investigation to date and opines that Fernando Maurtua, Tony Ledgard and Roberto Cordero are the San Diego representatives of an international cocaine smuggling cartel and money laundering operation. Superior to Maurtua, Ledgard and Cordero is Jose Omar Orozco, who resides in Los Angeles and controls the flow of cocaine in the western United States. The cocaine distributed by this operation comes from Peru and Colombia where blood relatives of Fernando Maurtua and Omar Orozco reside. To date, FBI

agents remain unsure as to how the cocaine is actually smuggled into the United States, but it is apparent that the Peruvians and Colombians have formed a national cartel to further this illegal activity. Raul Cabada, Fernando Harmsen-Andress, Roberto Franco-Posada, aka "Fercho," and Lawrence Zuanich are other participants in this operation. Agent Walker notes that Maurtua and Ledgard are still using the phone subscribed to by Donna Ledgard at 6827 Luciernaga Court. Roberto Cordero uses the phone subscribed to by Charles Jones at the Camino Del Mar address.

Agent Walker's affidavit describes a major breakthrough in the case. Tim Halley agreed on October 26, 1984 to cooperate with the FBI in its investigation of Mike Sullivan and Fernando Maurtua. Halley has advised the FBI that he has been an employee of "Conceptual Artists" where he specialized in making tables for restaurants. When Michael Sullivan learned that Halley could speak Spanish, Sullivan came to rely on him to translate conversations with Latinos who frequently visited him at the office. Around Christmas 1983, Halley began to serve as a courier and record keeper for Mike Sullivan's cocaine distribution operation. Halley admits to serving as a courier of cocaine and money for Mike Sullivan for approximately one year. In this time, Halley estimates transporting approximately one hundred forty kilograms of cocaine. Halley informed the FBI that Sullivan has strong connections with several South American cocaine smuggling families, including one represented in San Diego by Fernando Maurtua. Halley advised that most of the cocaine he transported was supplied by Fernando Maurtua's group. Halley admits to meeting Maurtua on numerous occasions to pick up cocaine or to deliver money. Halley remembers that the cocaine he picked up from Maurtua was usually concealed in a Hertz Rent-a-Car. He recalled that on one occasion, he met Fernando Maurtua at the South Coast Plaza Shopping Center in Costa Mesa, California, to pick up cocaine and that Maurtua had concealed the cocaine in gift-wrapped packages which Maurtua loaded in Halley's truck.

During conversations with Mike Sullivan and Fernando Maurtua, Halley learned that Maurtua is part of a cocaine smuggling operation which is centered in Los Angeles, and that this group is headed by two individuals named Oscar and Omar. Halley also learned that Fernando's partner in San Diego is named Tony. Halley met Tony on one occasion. Halley identified a photograph of Tony Ledgard as the Tony that was Fernando's partner. Halley also recalled meeting another member of the operation named Fercho. Halley picked up cocaine from Fercho on one occasion in the Los Angeles area. Halley identified a photograph of Alberto Franco-Posada as being the individual he met called Fercho. Halley described for the FBI Michael Sullivan's deep indebtedness to the organization represented by Fernando Maurtua. Halley learned that this debt originated as a result of Michael Sullivan's inability to control and collect for cocaine which was fronted Sullivan by Maurtua. According to Halley, Sullivan was "ripped off" several times by people to whom Sullivan supplied cocaine, one of whom was Ken Clarke. Because Sullivan has been unable to pay Maurtua, Maurtua has gotten in trouble with his operation. Because he "let the situation with Sullivan go too far," Maurtua's judgment has been questioned.

Halley has never learned how the cocaine was smuggled into the United States by Maurtua's operation. Maurtua refused to discuss with Halley details of his operation or to identify individuals who were above him in the operation.

While serving as a courier for Sullivan, Halley also picked up cocaine from Alvaro Jaramillo. It was Halley's understanding that Jaramillo worked for a different operation from Fernando Maurtua's. Halley met Jaramillo in Miami, San Francisco and San Diego. Halley learned that Jaramillo's boss was an individual named Julian. Halley also learned that Jaramillo was involved with Mario Mora and Jerry Sencial. Halley learned through conversation with Sullivan

that Sullivan owed Jaramillo's operation a large amount of money.

Agent Walker's affidavit sets forth information provided to him by the DEA regarding a six month long investigation into Jose Omar Orozco's activities. That investigation included physical surveillance, the use of criminal informants, and a "trash cover." The DEA suspects that Orozco is the head of a cocaine smuggling cartel centered in Southern California and operating out of the western United States. Orozco is also believed to be involved in a money laundering scheme in which the money derived from the sale of cocaine is diverted out of the country. Orozco's partner in the operation is Oscar Medina. They own a business in Medellin, Colombia. DEA Special Agent Eddie Hill also provided Walker with information received from a criminal informant that Alberto Franco-Posada, aka Fercho, would be leaving Los Angeles, bound for Panama, and he would be carrying money from the Orozco operation. The accuracy of that information was confirmed when Fercho Posada and the daughter of Omar Orozco, Liliana Gutierrez-Arango, were detained at the Los Angeles Airport by Customs agents. Agents seized approximately $219,000 and pages from a ledger which appeared to be records detailing financial activities of the Orozco operation. Agent Hill advised that the money was actually seized off Gutierrez-Arango's person and was kept by DEA. Neither Franco-Posada or Gutierrez-Arango was charged. Physical surveillance of Omar Orozco was conducted in the Los Angeles area. At different times Orozco met with Fernando Maurtua and Tony Ledgard. In early September, 1984, Ledgard was observed in Los Angeles handing Omar Orozco a package. Agent Walker notes that electronic surveillance conducted in San Diego confirms that Tony Ledgard was in Los Angeles during the first week in September. Ledgers retrieved from Orozco's residence disclosed an entry under the name "Sept 84, $40,000."

The trash cover at Orozco's residence in Palos Verdes Estates, California, has disclosed that Orozco maintains detailed ledgers showing various figures in dollar amounts corresponding to names in the ledgers. The names in the ledger appear in Spanish and include the names "Tono," "le Bolsa," "Pecos", "Roberto," and "Fercho." Based on electronic surveillance of the telephone utilized by Tony Ledgard and Maurtua, Agent Walker knows that Tony Ledgard is referred to as "Tono" and Fernando Maurtua is called freckles, or "Pecos," in Spanish. Electronic surveillance has also revealed that Fernando Harmsen-Andress is "le Bolsa" or "the bag."

Electronic surveillance of Mike Sullivan's phones has disclosed that Sullivan has wired money to the address of a business in Mageline, Columbia, which is jointly owned by Orozco and Oscar Medina.

Agent Walker addresses the need for surveillance at the Luciernaga Court residence and observes that since interception authorized by Application G began, Fernando Maurtua has used that telephone on an almost daily basis to talk with Sullivan about past cocaine debts and future cocaine deals. On October 17, 1984 at 6:23 p.m., Maurtua received a call from Sullivan and told him that if he did not start paying, that Maurtua was going to start taking Sullivan's property.

On October 22, 1984 at 3:05 p.m., Halley called Maurtua and asked if he had seen Sullivan. Maurtua said he hadn't seen Sullivan since the preceding Friday and that Maurtua had given Sullivan a dead line of that coming Friday to "meet my terms." Halley informed Maurtua that he was not "working" for Sullivan anymore. Maurtua said that he did not have "much work" right now. Halley mentioned that Maurtua owed him money. Maurtua stated that he was trying to get it from Sullivan. Later that day, at 3:47 p.m., Lawrence Zuanich called Maurtua and said that he was leaving Guam on Tuesday and travelling to Miami, Florida. Lawrence wanted to know if Fernando had "anything to do." Fernando said that he did not have much and that he would call Roberto and see what he said. Agent Walker's affidavit then summarizes

five conversations intercepted between October 11 and October 23 which confirm that Ledgard was out of town but would be arriving in San Diego shortly, having some "good ones" that could be provided to Cordero and Lawrence Zuanich. On October 24, 1984 at 7:45 a.m., an unknown male called Tony Ledgard who notified the unknown male that he was able to get the "stuff" a little cheaper. Tony said that he was able to get "8." They also discussed when the next "load" would be arriving. At 9:14 a.m. on that same day, Cordero called Ledgard at the Luciernaga residence and inquired how much time would pass before "it" comes. Ledgard said that he had to go to Los Angeles to find out. At 7:31 p.m. that evening Cholo called Tony Ledgard and stated that he had just arrived from Peru. Cholo said that he was calling from Raul Cabada's home in Pacific Palisades, California and that he was trying to get in touch with Fernando Maurtua. Ledgard said that Fernando was with Lawrence Zuanich in Los Angeles, but that they were coming down to San Diego because Lawrence needed to pick up some "vitamins." Ledgard inquired whether Cholo was making any money. Cholo stated that he was and that they "gave him the papers." Cholo said that they gave him "40 to 42." Raul Cabada got on the line and also spoke with Ledgard. Ledgard told Cabada that he had come to San Diego to see how the "work" was going.

On October 25, 1984 at 6:34 a.m., an unknown male called Tony Ledgard from Los Angeles. Ledgard told the man that he had to leave soon for Daytona, Florida, but that his departure depended on how things went in San Diego. The man said that Juan had the answers they were looking for concerning the "powder." Ledgard asked if he could come see "it" and the unknown male said that he could come see "it" today. Ledgard told him that he would have to make a few collections before coming to see it. The unknown male asked Ledgard what price Ledgard had been quoted on the "powder." Ledgard said he had been told the price would be around 20. The unknown male asked if

Ledgard would have all the papers collected today. Ledgard said that he would be collecting "today in every direction."

On October 25, 1984, Fernando Maurtua's brother, Jorge Miguel Maurtua, called Ledgard and asked if there was "any" because there had not been "any" for awhile. Ledgard said that he had been "working," that it appeared that there was "some," but that Maurtua had better hurry because "it" would soon be gone. Ledgard said that "it" was there right now. Maurtua asked what the price would be and Tony Ledgard said that the price would depend on Maurtua's brother, Fernando. Ledgard said it would be somewhere around "37 or so." Maurtua responded "so much" and asked if it was here and if it was "covered." Ledgard confided that Fernando Maurtua had not "done anything" for Ledgard and as a result they were not getting along too well because Fernando had very little money for Ledgard. Ledgard indicated that he would be seeing Jorge Maurtua soon because Ledgard would be coming to the mountains (Sun Valley, Idaho) from December 15 to January 2, 1984. Ledgard said that it depends on "how many kilos he makes, but we can quickly arrange the numbers." In the middle of his conversation with Jorge Maurtua, Ledgard used "call waiting" and spoke to Fernando Maurtua who called from Los Angeles. Ledgard informed Fernando that Jorge was on hold. Fernando told Ledgard to bring the paper to Los Angeles that day because they needed to be able to stay in communication with Robo's house. At 2:40 p.m. that afternoon, Donna Ledgard called Tony Ledgard and requested that he call his brother because they needed to "take care of some things there." Donna Ledgard also said there was some trouble in Lima, Peru and Tony said that he was aware of the trouble.

Among other calls received that day, Tony Ledgard received a call from Donna Ledgard on October 26, 1984 at approximately 8:39 p.m. Ledgard told his wife that he had been working hard in San Diego and would not be able to return to

Florida by the weekend. Ledgard said that he was late because the guy who was supposed to bring the money for the "stuff" was late. Ledgard said that his godfather was useful right now because he was on the Supreme Court in Lima, Peru. On October 27, 1984 at approximately 10:53 a.m., an individual in Los Angeles identifying himself as "Omar" called Fernando Maurtua at the Luciernaga Court residence. During this conversation Omar referred to Maurtua as "Freckles." Omar advised that he was learning to be an announcer. Omar referred to a conversation he had with Maurtua the other night and asked if Maurtua's wife had gone back to Lima, Peru. Omar said that he was leaving Monday to go back to New York. Maurtua asked if Omar was going to be helping Maurtua and Tony Ledgard again. Omar responded that the reason he had called was to talk to both of them about the situation. Omar said they should meet the following day and instructed Maurtua to have Tony call him at 260–6651 in the afternoon and they would reach an agreement. Omar told Maurtua that if Tony wanted, Omar would move by tonight. Maurtua asked if Omar was changing sides and Omar responded that they should go ahead and agree. Maurtua said that they can't reach any agreement without Tony Ledgard. Omar said he would await a call. On November 6, 1984, Agent Hill advised Agent Walker that Jose Omar Orozco utilizes a pager number and that his associates refer to him as Omar. Additionally, Agent Hill told Agent Walker that Orozco is known to be taking broadcasting courses.

On October 27, 1984 at 4:27 p.m., Omar Orozco called Fernando Maurtua and learned that Maurtua had given his phone number to Tony Ledgard. Ledgard had gone out possibly to call Orozco. Orozco told Maurtua that he was calling from his car phone, and he was on the road. He was not wearing his pager. Orozco inquired where Tony Ledgard was. Maurtua said that Tony had gone out to talk to Mike Sullivan, "the pretty one." Maurtua complained to Orozco that Sullivan owed him

more money. Orozco asked if Mike Sullivan went too far again. Maurtua said that he had. Orozco asked if Sullivan was or was not paying. Maurtua said that he wasn't paying. Maurtua was preparing to take Sullivan's car and other things and had given Sullivan until the upcoming Monday to pay. Orozco wanted to know what kind of car Sullivan drives. Maurtua said it was a 1982 Mercedes. Orozco said he could "use an '82 Mercedes."

On October 27, 1984 at 7:29 p.m., Ledgard used his residence phone to call Donna Ledgard in Atlanta, Georgia. Ledgard told his wife that Omar had been calling for him so that he had to go out and call Omar. Ledgard also said that Oscar had not done anything for him lately but that he was attempting to get Oscar to do something for them. Ledgard also told her that Mike Sullivan "may come through" tomorrow because "the underwriters are working out details" on the factory.

On October 28, 1984 at 8:57 a.m., Carlos phoned Ledgard at the Luciernaga Court residence to see if Ledgard had "it." Ledgard said that for all practical purposes "everything is ready." He had "it;" there would not be any problem. Ledgard said that he would leave San Diego soon and would return to Florida. Later that day at 2:55 p.m., Raul Cabada called Maurtua at Luciernaga Court and spoke with him at length about Lima, Peru, and other matters. During the conversation Cabada inquired whether there was "any" and Maurtua replied that "there was some." They also discussed the price. Maurtua warned Cabada to talk in code because Maurtua did not like to talk like that on the phone. Cabada asked if Maurtua had the "fish" and where Maurtua had the "fish." Maurtua told him that other people have the "fish" under control, but that tomorrow the "fish" will belong to Maurtua.

Also on October 28, agents intercepted several conversations between Mike Sullivan and Tony Ledgard in which they discussed in a coded fashion doing a quick turnaround of one kilogram of cocaine. An unknown male phoned Maurtua at the Led-

gard residence and was told to stay close to the phone tomorrow because "there will be work." On October 29, 1984 at 12:25 p.m., Tony Ledgard phoned his brother Gonzalo Ledgard and discussed an upcoming trip to the Cayman Islands. Gonzalo informed Tony that the "Chinaman" urgently needed Tony's help. Gonzalo also said that he was interested in some "work." Four minutes later, Ledgard called the "Chinaman" at a number in the San Francisco area. Ledgard said that he was calling to notify him that there was "work." Ledgard was going to leave an order for "one" so that the "Chinaman" could come down to San Diego on Wednesday or Thursday to pick it up. A few hours later, Tony Ledgard phoned Maurtua at the Ledgard residence. They discussed a van parked near Maurtua's residence which they both suspected to be a police surveillance van. Agent Walker notes that the van in question was actually an FBI surveillance van. Ledgard warned Maurtua to take precautions when the van was in the neighborhood.

Agent Walker's affidavit sets forth the circumstances of an undercover buy involving Tim Halley on November 1, 1984. At 10:25 a.m., Fernando Maurtua met Tim Halley in front of the Country Kitchen Restaurant in Encinitas, California. They conversed in Fernando Maurtua's rental car. The conversation was consensually recorded. At the outset, Maurtua told Halley that he had two kilograms of cocaine in the car for Halley. Maurtua established the price per kilogram for the first four kilograms at $37,500 and then for all others at $38,000 per kilogram. Maurtua explained that he offered Halley a reduced price because he owed him money "from back when Halley was working for Michael Sullivan." Halley told Maurtua that he no longer worked for Sullivan and that he had some new customers. Halley said that he did not "have the money together" that day and gave Maurtua his home telephone and pager number. They agreed to do "a deal" when Halley "had the money together." At 11:02 a.m., Maurtua dropped off Halley and proceeded to a Von's Market in Carlsbad, California. From there he called

his residence and spoke to Tony Bazo. Maurtua told Bazo that he was being called to go up north right away and that Maurtua needed to meet Bazo in front of the pasta shop because Maurtua had "the things in my car." Maurtua explained that he did not wish to drive to Los Angeles with "the things." Bazo agreed to meet Maurtua to pick them up.

Agent Walker's affidavit summarizes calls intercepted at the end of October, 1984 which disclosed Maurtua's attempts to rent an apartment. He contacted several real estate agencies. Maurtua succeeded in renting an apartment through the La Costa Realty Company. Further FBI contact with the La Costa Realty revealed that Maurtua had rented a furnished apartment at 2348 La Costa Avenue, No. 201, Carlsbad, California. Physical and electronic surveillance disclosed to the FBI that Maurtua continued to reside at the Luciernaga Court address but that he made several trips each day to the apartment at La Costa Avenue.

On November 2, 1984, Halley called Maurtua at Luciernaga Court and told Maurtua that he could "work" that afternoon and that Halley could handle "1." They made arrangements to meet at the Von's Shopping Center in Carlsbad, California. On the morning of November 2, 1984, FBI agents observed Fernando Maurtua entering the apartment complex at La Costa Avenue. Also that morning, Halley was given $37,500 by FBI Special Agents in anticipation of the meeting with Maurtua. Halley was to purchase one kilogram of cocaine from Maurtua. Halley agreed to consensually record his conversation with Maurtua. At 3:30 p.m., Halley and Maurtua met in front of the Pasta Experience Restaurant in Carlsbad, California. After a brief conversation, Maurtua went to Halley's car and removed the $37,500. Maurtua went to his car and removed a plastic shopping bag containing the kilogram of cocaine and placed it in Halley's car. During the recorded conversation, Maurtua told Halley that he had two kilograms of cocaine in his car. Halley and Maurtua left

in their respective vehicles. FBI agents then followed Maurtua to the apartment complex at La Costa Avenue.

On November 5, 1984 at 3:03 p.m., Ledgard called Maurtua at the Luciernaga Court residence. Maurtua related that he had gone up to Los Angeles to get the "stuff" but had to return because the guy didn't have it. Maurtua said that he was now at "two-six." Walker interprets this to mean twenty-six kilograms. Following further conversation about the "stuff," Maurtua warned Ledgard that they should talk about this on another telephone. Maurtua noted that he had not been giving Sullivan anything. Ledgard said that he had told Sullivan that Maurtua would give him some, but only "two maximum," "one by one if you can." Maurtua said that he would comply if that was what Ledgard wanted. Later that same day, Sullivan and Maurtua had a conversation in which Sullivan stated "he had some people that were ready to go in an hour." Maurtua said he could not "do it that day" because he had to go up and back to Los Angeles. Other conversations on November 6, 1984 set up deals between Maurtua and "Fred" and between Maurtua and Sullivan.

On November 7, 1984, there were several phone calls between Maurtua and Roberto Cordero concerning "an arrival." At 9:31 a.m., Maurtua called Cordero and said "it" would be arriving shortly. Later at 9:40 a.m. Cordero called Maurtua and said "it" arrived and Cordero asked what he should do with "it." Maurtua told Cordero to come by his house and pick up the "keys." At 11:14 a.m., Cordero called Maurtua and asked if Maurtua needed "any right now." If not, Cordero was going to the airport to pick up a rental car. At 12:52 p.m., Cordero called Maurtua and Maurtua told him to come over to his house and bring the apartment key back. After Cordero returned the apartment key, Maurtua spoke with Sullivan and told him that he could now deal. They agreed to meet at the Flower Hill Shopping Center at 2:00 p.m. FBI agents observed Maurtua leave 6827 Luciernaga Court and proceed to the apartment at La Costa Avenue. Maurtua entered the apartment complex and remained approximately five minutes. He left carrying a package. Maurtua then proceeded to the Flower Hill Shopping Center where he met with Michael Sullivan at 2:45 p.m.

On November 13, 1984 at 10:35 a.m., Maurtua received a call at Luciernaga Court from an unknown male who instructed him to call Pancho at 546–6370. Maurtua said that he would be sending a gift to Pancho for Omar and that it would be "19." Following that call, Maurtua called Roberto Cordero to tell him that he had just had a telephone call concerning "paying my account." Cordero commented that those guys won't "let you breathe."

Agent Walker's affidavit highlights information he feels demonstrates the need to electronically surveil the telephone at Roberto Cordero's residence at 1552 Camino Del Mar, Apartment 643, Del Mar, California, subscribed to by Charles Jones. Walker notes that since the inception of electronic surveillance pursuant to Order G at Luciernaga Court, Maurtua has contacted daily Roberto Cordero at his residence. Apparently, Cordero is an important part of Maurtua's organization. In addition, the FBI has learned through intercepted conversations that Cordero's roommate, Charles, is also involved in the conspiracy to distribute cocaine. Agent Walker summarizes the calls which exemplify the nature and content of Maurtua's and Cordero's calls.

On October 20, 1984 at 6:05 p.m., Maurtua called Roberto Cordero at his residence. Cordero inquired how Maurtua was fixed for "vitamins." Maurtua told Cordero that he had very little but that some were coming from Idaho. Cordero and Maurtua discussed and agreed that the price of "vitamins" was too expensive. Agent Walker's affidavit provides a summary of three conversations on October 20 and 21 between Maurtua and Cordero which concern the arrival of "it."

On October 26, 1984 at 1:01 p.m., Maurtua called Luciernaga Court and left a recorded message for Tony Ledgard. Maur-

tua said that if Ledgard was unable to communicate with him that he should call Roberto's house to leave a message.

On October 27, 1984 at 9:14 a.m., Cordero called Ledgard and said he was calling to "check out the situation." Ledgard said that he would have to check to see how he was going to get "it" out of there. Ledgard asked what Cordero wanted, and Cordero said he needed "two now and three later."

On October 29, 1984 at 12:04 p.m., Roberto Cordero called Ledgard at Luciernaga Court. Ledgard told Cordero to have Raul come by Cordero's house and Ledgard would come over and drop some "work" off for Raul. At 8:49 p.m. that evening, Maurtua called Charles at Cordero's residence. Charles asked Maurtua when "it" will happen. Maurtua said "it" would probably happen the following day. The following day at 3:40 p.m., Maurtua called Cordero at his residence and told him that Ledgard should be back around 5:30 p.m. Maurtua asked Cordero if Tony Ledgard was coming back with some "ripe ones."

On October 31, 1984, Maurtua placed two calls to Cordero at Cordero's residence. Maurtua wanted Cordero to bring over a small mixture of cocaine for Kathy Davis, the girlfriend of Michael Sullivan. Cordero told Maurtua that he would have his roommate, Charles, bring it to Maurtua.

On November 2, 1984 at 6:53 p.m., Cordero called Maurtua at Luciernaga Court. Cordero asked if he could take "them" out now and pay the money tomorrow at 11:00 a.m. Maurtua asked Cordero "not to talk like that" over the telephone; Cordero could come over and they would discuss it. Cordero said that he was at home and would be over in 20 minutes.

The following day, Maurtua placed three calls to Cordero's residence. Maurtua spoke to Charles during the first call at 1:59 p.m., and asked if "they" would complete shortly. During the second call at 3:02 p.m., Maurtua spoke to Cordero, who said he was waiting for Alex. Maurtua asked how "the rest of the stuff" was and Cordero said that "it" was all over there.

During the third call at approximately 3:14 p.m., Maurtua asked "how many" Cordero had loaned Maurtua yesterday. Cordero said that he had loaned Maurtua "3." Cordero and Maurtua also discussed that there are "30" over there.

On November 5, 1984 at 5:16 p.m., Roberto Cordero phoned Maurtua at Luciernaga Court and reported that Tony Ledgard had called him. Cordero also got a call from Alex who would be ready to go at 7:30 p.m. Maurtua said that he was "going to see Mike for a moment" and would be right back. At 9:43 p.m., Maurtua placed a call to Cordero at his residence. Alex has just called Cordero and Cordero noted it appears "that everything is ready." Cordero said "they" spoke to Cordero's roommate, Charles, and said "everything was ready" and that they are going to call Cordero at 10:00 p.m. to confirm. Maurtua asked Cordero to advise him right away when he got that call. Maurtua asked if Cordero had "any" there and Cordero said he did. At 10:30 p.m., Cordero called Maurtua and said that "it" arrives tomorrow morning "up there." Cordero said that he had "20 more," and that Maurtua can call up there and get a loan for 20. Maurtua said that he would go up to Los Angeles first thing in the morning. Maurtua said that "75" was still missing. Cordero said that someone up there had the 75.

The next day at 9:55 a.m., Maurtua called Cordero at his residence and asked "have they brought up all of mine yet?" Cordero said he didn't know because they haven't yet called back. Maurtua told Cordero, "when the stuff is ready, call me." Cordero said they should call him soon; they are up in Newport. At approximately 10:41 a.m. Cordero called Maurtua to tell him that he could not go up north because "their people had not called back yet." Cordero had to stay at home by the telephone to receive the call. Cordero told Maurtua "to go on up" to Newport and then to call him. By that time, Cordero would have received their call. At approximately 11:26 a.m. Maurtua placed another

call to Cordero's residence and spoke to his roommate, Charles. Maurtua told Charles that he was leaving now.

On November 13, 1984 at 10:32 a.m., Maurtua called Cordero at his residence and told him that there would not be "any" until the weekend.

Agent Walker discusses the need for interception and the exhaustion of investigative techniques. He assesses that the investigation to date develops Ledgard's and Cordero's part in an international drug smuggling cartel consisting of Peruvians and Colombians. This cartel brings large amounts of cocaine into the United States. While electronic surveillance provides evidence against Maurtua, Ledgard and Cordero, it fails to show the exact scope and extent of the entire operation. To this extent, Agent Walker asserts that the overall operation and the structure of the hierarchy remains unclear. How the drugs are smuggled into the United States and who directs this activity are unresolved questions. The extent of the money laundering scheme is also undetermined. Agent Walker asserts that the only way to answer these questions is through the use of continued electronic surveillance. Past electronic surveillance successfully uncovered evidence against Frank Jackson, John Kerr and Michael Sullivan, and Agent Walker expects that continued use of electronic surveillance will develop evidence against those who are closest to the source of the cocaine.

Agent Walker discusses Halley's role in the investigation. Halley assisted in exposing the higher-ups in the organization by providing specific information regarding Oscar Medina and Omar Orozco. However, Halley has never met either man and it is an unlikely prognosis that such a meeting would ever occur. Halley's efforts to have Maurtua meet an undercover agent have been unsuccessful. Maurtua's conversations with Halley can only be characterized as very short and to the point.

Agent Walker discusses the unsuccessful results of hours of physical surveillance conducted by the DEA and Customs of the group headed by Omar Orozco. Agent Walker also discusses the trash cover at Orozco's home. To date, these investigations have not produced sufficient evidence to sustain a prosecution of members of that group. The only investigative effort which has proven successful involve violations of United States currency laws and the seizure of large amounts of cash from various members of the group trying to leave the country. Agent Walker believes that the investigative techniques he details, when combined with electronic surveillance of certain members of the group, would build a foundation to prosecute eventually the leaders of the organization.

Agent Walker observes that Maurtua and Ledgard maintain almost daily contact. Ledgard now resides in Florida but travels extensively in the United States in furtherance of the cocaine conspiracy. Maurtua also maintains daily contact with as yet unidentified individuals residing in the Los Angeles area. The cocaine distributed by Cordero and Maurtua appears to come from the Los Angeles area to San Diego. What remains unclear is whether this cocaine enters the country through Los Angeles or somewhere else. Given these circumstances, the operation depends on the use of the telephone.

*Application I*[1]

Application I includes the affidavit of FBI Special Agent George T. Sinclair, Jr. Application I seeks interception of communications on a telephone line presently assigned to Jorge Maurtua at 315 Sage Road, Ketchum, Idaho. Agent Sinclair describes for the reviewing judge all previous orders authorizing interception and notes that an application for an order is currently being prepared for submission to a United States District Judge in the Southern District of Florida (See Application K).

---

1. When the government submitted the applications as an exhibit to their moving papers, the letter designations assigned to each application were different from those assigned by the court. The court assigned designations to put the applications in chronological order.

Agent Sinclair supplies information regarding the status of the investigation. He opines that Jorge Maurtua represents in Ketchum, Idaho an international cocaine smuggling cartel and money laundering operation. Sinclair parallels Jorge Maurtua's position to his brother, Augustine Fernando Maurtua's in San Diego, California. Sinclair asserts that Fernando Maurtua supplies multi-kilograms of cocaine in the Southern California area and that Jose Omar Orozco occupies the position above him in the distribution chain. Orozco resides in Los Angeles and controls the flow of cocaine in the western United States. The cocaine originates in Peru and Colombia, where blood relatives of Augustine Fernando Maurtua, Jorge Maurtua, and Omar Orozco reside. How the cocaine is actually smuggled into the United States remains unclear, but the Peruvians and Colombians appear to have formed an international cartel to further their illegal activities. Agent Sinclair recounts the information provided to him by Agent Rosen concerning Fernando Maurtua's network in San Diego. He also describes Halley's controlled purchase from Maurtua of one kilogram of cocaine on November 2, 1984, in San Diego, California. His affidavit also includes background information on Jose Omar Orozco and the seizure of $219,000 at Los Angeles International Airport in August, 1984.

Agent Sinclair reports that a confidential informant of unknown reliability first alerted the DEA to Jorge Maurtua's role as a supplier of cocaine in the Sun Valley, Idaho area in March of 1984. Through the Seattle, Washington office of the DEA, the confidential informant provided information regarding Maurtua's smuggling activities until approximately June of 1984. The source represented that he or she had knowledge of a cocaine distribution and money laundering operation involving Panama, Peru, Mexico, Hawaii, California and Idaho. Female couriers allegedly took money from the United States and deposited it in Panamanian banks. The source identified a Peruvian involved in the smuggling operation as "Rabo." Rabo is described as having associates in both Hawaii and South America. A 1978 report by DEA Special Agent Joel K.W. Wong lists a Peruvian Jorge Maurtua as having the nickname Rabo. At that time, Maurtua lived in Haleiwa, Hawaii. The March 1984 informant stated that Rabo and a William Jeppesen imported cocaine originating from Peru into the Sun Valley, Idaho area. The cocaine was then distributed to California and to the western United States. The source stated that Jeppesen utilized female couriers to smuggle cocaine into the United States and to smuggle cash to Panama. In detailing the operation, the source identified two female couriers used to transport money out of the United States. The source also identified four individuals responsible for the importation of the cocaine. The source indicated that the money being transported ranged from $100,000 to $250,000 per courier. The source stated that the couriers drove motor homes and other vehicles across the United States border at San Ysidro, California. The source also stated that the couriers were given the impression that they were smuggling money into the United States, but that they were actually transporting narcotics across the border.

William Jeppesen allegedly met the individual known as Rabo while in the Peace Corps in Peru in the early 1970's. The source further stated that Jeppesen was smuggling cocaine supplied by a syndicate managed by Rabo's mother. Peruvian authorities eventually imprisoned Rabo's mother. Agent Sinclair substantiates the source's information by including information provided to him by IRS Special Agent Greg Gleason. Agent Gleason independently investigated the two couriers named by the source and verified their existence and their residences. Agent Rosen reported to Sinclair that the San Diego investigation confirmed the arrest of Maria Theresa Maurtua, the mother of Jorge Maurtua in Peru for possession of 35 kilograms of cocaine. Agent Rosen notified Agent Sinclair that Mrs. Maurtua is believed to be actively involved in the cocaine operations

of her son, Augustine Fernando Maurtua. Agent Sinclair notes that the $219,000 seized by Customs in Los Angeles was transported by a female courier, substantiating the idea that females are used as couriers.

Physical surveillance appears to substantiate the acquaintance William Jeppesen with Jorge Maurtua. On December 21, 1984 at 11:59 a.m., a DEA agent observed William Jeppesen arrive in a brown Toyota Land Cruiser at Jorge Maurtua's residence at 315 Sage Court in Ketchum, Idaho. Almost immediately after arrival, Jeppesen and an unidentified passenger departed in the Land Cruiser from Maurtua's residence.

Agent Sinclair's affidavit summarizes pen register coverage of Maurtua's phone at 315 Sage Court, Ketchum, Idaho, from December 20, 1984 until January 1, 1985. Eight hundred forty-one, either incoming calls, outgoing calls, or electric surges indicating attempts to dial, were registered. Four telephone calls were made to Carl Curtis. Curtis is a pilot and addresses for him include Ketchum, Idaho and Sherman Oaks, California. Agent Sinclair cites NADDIS records indicating that in March, 1979, Curtis was identified as possibly being involved in the sale of large amounts of cocaine in the Sun Valley, Idaho area. Two calls were made to Gary Michael Blash. NADDIS records also contain information regarding Blash, who has been identified in prior narcotics investigations through the examination of telephone toll records relating to narcotics activities of Stephen Lee Lucas. Nine calls were made from the Sage Court residence to Michael Paul Christino. NADDIS records indicate that in May 1983, Christino was suspected to be a large cocaine dealer in the Sun Valley, Idaho area and that on May 4, 1983, he was ordered to surrender for contempt of court. Two calls were made to a number registered to Lawrence Anthony Zuanich in the United States Territory of Guam. NADDIS reports identify two individuals named Lawrence Anthony Zuanich. The individuals are father and son. Lawrence Zuanich, Jr., a Colombian national, is 30

years of age. In July 1979, he was identified as the captain of the vessel *Don Juan*, which was suspected of narcotics smuggling. In July, 1982, a confidential informant advised the DEA that Zuanich was involved in cocaine trafficking on a daily basis. In July, 1983, Zuanich, Jr., was identified as the co-owner of the vessel *Cali* on which both crew members and aliens were arrested. DEA records provide an alternate address for him in Medelan, and indicate that he is a Colombian national.

Agent Sinclair outlines the seven conversations intercepted over the Luciernaga Court wiretap in which Zuanich could be identified as one of the participants. These conversations either involve Zuanich asking Maurtua directly if there was "work," "stuff," or "anything to do" or they involve others' discussions of Zuanich's involvement in the movement of cocaine.

Agent Sinclair describes isolated incidents of physical surveillance of Jorge Maurtua's residence from December 17, 1984 through December 21, 1984. No activity occurred on December 17. On December 18, agents observed an unidentified white female departing and returning to the residence. On December 19, no activity was observed. On December 20, agents observed a Chevy Pick-up belonging to Michael Christiano at Maurtua's residence. A 1980 Chevy Pick-up belonging to Carl Curtis was also there. A short time after the departure of the above-described vehicles, agents observed Jorge Maurtua and an unidentified individual drive from the residence. On December 21, 1984, agents saw Jeppesen's previously-described land cruiser at Maurtua's residence. The vehicle quickly departed after its arrival. Later that day agents observed Jorge Maurtua, accompanied by Augustine Fernando Maurtua and two unidentified white females, at Sage Court.

Agent Sinclair's affidavit discusses Jorge Maurtua's lack of employment. Maurtua's only known employment involves his association with World Wide Promotions, S.A., a corporation registered in the State of

Idaho and incorporated under the laws of the Republic of Panama on July 24, 1978. Incorporation documents state the corporation's purpose is to purchase, develop, and/or sell real estate and to engage in all lawful endeavors. Maurtua lists World Wide Promotions as a co-owner of both his vehicle and his residence. The Directors and Officers of World Wide Promotions are Oscar de la Guardi, Augusto Medina, and Sergio Gonzales O. All three individuals listed their residences in Panama. Agent Sinclair has consulted the Ketchum Chief of Police, DEA Special Agent Gainer and IRS Special Agent Gleason. In the course of their investigations, none of these men has seen any activity indicating a meaningful or legal occupation for Jorge Maurtua.

Agent Sinclair notes that the IRS is conducting a trash cover of Jorge Maurtua's residence. Since July of 1984, the trash cover reveals no evidence—through bills, stationery, or other evidence—which suggests that Maurtua is legitimately employed. Moreover, the trash cover fails to indicate that World Wide Promotions locates in an office anywhere else in the vicinity. The trash cover has produced, however, a variety of pieces of paper with the name Rabo on them. Agents have also revealed three or four sno-seals. (Sno-seals are square 4x4 pieces of wax paper known by Agent Sinclair to be used to package narcotics in the Ketchum, Idaho area.)

Agent Sinclair notes that 315 Sage Court, Ketchum, Idaho, appears to be jointly occupied by Jorge Maurtua and his paramour, Lynne Karrys. During surveillance of the residence, Agents Sinclair, Gleason and Gainer have observed Jorge Maurtua and Lynne Karrys together at various times in the past six months. Vehicles registered to Jorge Maurtua were located there in November and December, 1984. Maurtua purchased the 315 Sage residence in 1981. Title to the property names World Wide Promotions and Jorge Maurtua as owners. Agent Sinclair notes that the Jorge Miguel Maurtua identified in the affidavits in support of San Diego wiretap applications is in fact the Jorge Maur-

tua residing at 315 Sage, Ketchum, Idaho. Investigation to date reveals that two Maurtua brothers share the first name Jorge. Jorge Miguel Maurtua currently resides in Lima, Peru and Jorge Augustin Maurtua resides in Ketchum, Idaho. Agent Sinclair states that the initial identification of the Jorge Maurtua residing in Ketchum, Idaho as Jorge Miguel Maurtua resulted from the previous listing of that name in DEA records as an alias.

Agent Sinclair also summarizes telephone calls involving or regarding Jorge Maurtua that had been intercepted pursuant to court orders. Agent Sinclair recounts the October 25, 1984 conversation between Jorge Maurtua and Tony Ledgard. Ledgard told Maurtua that they were waiting for "it" to come from "there." Ledgard said that he had been "working" and that it appeared that there was some, but that Maurtua had better hurry because "it" would soon be gone. Ledgard said that "it" was there right now. Maurtua asked what the price would be. Tony Ledgard responded that the price would depend on Jorge's brother, Fernando. Ledgard said that it would be somewhere around "37 or so." Maurtua commented "so much" and asked if it was here and if it was "covered." Later in the conversation, Ledgard indicated that he would be seeing Maurtua soon because he would be coming to the mountains from December 15 to January 2, 1985. Ledgard and Jorge Maurtua's conversation on the Luciernaga Court telephone was interrupted by another call. Ledgard utilized "call waiting," placed Jorge Maurtua on hold and spoke to Fernando who was calling from Los Angeles. Ledgard informed Fernando Maurtua that Jorge Maurtua was on hold. Fernando told Ledgard to bring the paper to Los Angeles that day because they needed to be able to stay in communication with Rabo's house. At 3:25 p.m. that same day, Jackie (LNU) called Ledgard at Luciernaga Court. She said that she was calling from the Alpine Resort, Sun Valley, Idaho. Jackie stated that she had spoken to Ledgard's friend, Rabo, who advised her that Ledgard need-

ed a place for Christmas. Jackie said that she had a luxury apartment available for Ledgard.

On December 4, 1984 at 9:59 a.m., Jorge Maurtua phoned his brother, Augustin Fernando Maurtua at Luciernaga Court. Jorge stated that he was working with a very good company. Fernando wondered if he was going to get "the facts." Jorge said "more or less." Fernando said "this week, I hope. I need help tomorrow." Jorge told Fernando that he was waiting for a guy to come by and that later they could talk in more detail. Fernando told Jorge that he would send Javier Laos to see him and that they could talk about it. Jorge told Fernando that he was in Canada but had to return. The following day at 7:27 a.m., Ledgard called Fernando Maurtua at Luciernaga Court. Ledgard asked about "the man in Canada" and Fernando told Ledgard that he was already back and that he had talked to him. Fernando inquired what Ledgard wanted him to do with the "return" and Ledgard told him to keep it there for him.

On December 10, 1984 at 4:01 p.m., Fernando received a call from Jorge Maurtua. Jorge told Fernando that he needed to talk to Tony urgently and that it was not necessary for Fernando to drive to the point. Fernando asked which point and Jorge replied, "don't worry everything is fixed." Fernando told Jorge that everything was "fine there" and there was "fever."

Agent Sinclair describes the activity that occurred while Augustin Fernando Maurtua visited Jorge in Ketchum, Idaho. On December 22, 1984, agent Gainer conducted a physical surveillance in Ketchum and observed Fernando Maurtua accompanied by his brother, Jorge. At 4:39 p.m. on that same day, Charles Jones received a call from Fernando Maurtua. Fernando asked about two of his confederates, Javier Laos and Alex Sarda. Jones advised that Laos was still at Fernando's house and that Sarda was almost finished. Fernando told Jones to take what Fernando had left there and to combine it. Charles told Fernando that he already "had everything" and that

he was waiting for a call. He would not be able to go out that night but the next day he would send Javier Laos. Fernando told Jones to have Laos go to a pay phone and call Antonio Ledgard at his home. Jones asked Fernando which Ledgard, and Fernando stated, "Donna's Tony." Jones told Fernando that he thought that he was ready for the "serenade." Fernando then told Jones to have Laos call Ledgard because that was where "the serenade was." On December 26, 1984, while in Ketchum, Fernando Maurtua phoned Luciernaga Court and left a message asking "Javier, how the collection was going?" (sic) On December 27, 1984, while still in Ketchum, Fernando Maurtua telephoned the Camino Del Mar apartment and conversed with Charles Jones and Javier Laos. The conversation initiated by Fernando regarded money owed to Alex Sarda and Tim (LNU).

Agent Sinclair presents a lengthy statement regarding the need for interception and the exhaustion of routine investigative techniques. He notes that while the previously-employed investigative techniques have succeeded in establishing probable cause for electronic surveillance, it is his opinion that these would not sufficiently make a prosecutable case against all of the subjects currently involved in the sale and distribution of cocaine in the Ketchum, Idaho area. He remarks that there are no confidential sources currently available to provide information regarding the ongoing operation of Jorge Maurtua and individuals conducting narcotics transactions with him. The previously-described confidential source cooperated from approximately March, 1984 until July, 1984, at which point the authorities decided that the source was too unstable to continue as a reliable source or to be involved in undercover activities. Agent Sinclair notes that physical surveillance of Jorge Maurtua has been attempted. However, physical surveillance is extremely difficult to conduct in an operation at the level at which Jorge Maurtua participates. Moreover, Agent Sinclair asserts that ongoing surveillance is highly unlikely to establish illegal activity.

Toll record analysis of Jorge Maurtua's phone to date indicates a pattern of telephone calls to phone numbers associated with places throughout the United States, Canada, Guam and South America. The pen register analysis also reveals numerous calls between Jorge Maurtua's telephone and individuals previously identified as involved in narcotics activity by the DEA or the FBI in San Diego. Agent Sinclair concludes that the investigative techniques have their shortcomings; they do not identify individuals actually making and receiving telephonic communications nor do they ascertain the nature and substance of the communications.

The use of search warrants, in Agent Sinclair's opinion, would not provide sufficient evidence to determine the full scope of the continuing criminal activities and the various methods used by Jorge Maurtua, William Jeppesen, Carl Curtis, Mike Christino and Gary Michael Blash. Sinclair believes that those individuals do not maintain sufficient records which would show the extent of, or identify all the individuals involved in, the criminal enterprise. He acknowledges the risks involved in executing a search. Should the results of a search on any given occasion be less than expected, word that a search warrant had been executed would likely jeopardize the entire investigation. Consequently, many, if not most, of the subjects of the investigation would likely escape prosecution.

Agent Sinclair characterizes the information provided by the DEA source as incomplete in many ways. The source did not know the full extent and scope of the illegal drug activities of the named individuals nor could the source identify all of the members of the criminal activity. The source's information, standing alone, would not convict anyone involved in the drug conspiracy. Agent Sinclair believes that electronic surveillance is needed to fully identify all of those who are participating in the above described drug conspiracy as well as to provide details about the true and complete scope of the conspiracy, which the source and other investigative techniques have been unable to provide.

Agent Sinclair notes the inefficaciousness of conducting interviews with any of the aforementioned parties or their associates at this stage of the investigation. Interviews would compromise the investigation and would prompt the destruction of evidence. For the same reasons, the use of grand jury subpoenas directed at obtaining witness testimony would likely undermine the objectives of the investigation. Agent Sinclair believes that electronic surveillance appears to be the only investigative technique likely to expose the overall scope and extent of the criminal activities described in his affidavit.

In a similar sense, Agent Sinclair opines that the arrest of subjects based on information from the previous investigations in San Diego, and Los Angeles, California would not provide sufficient evidence to involve any individuals in the District of Idaho, other than Jorge Maurtua. Based on the sophistication of the organization and the level of Maurtua's involvement, it is unlikely that Maurtua would cooperate with the government to assist in the prosecution and eventual conviction of others. To bolster his argument for the need for electronic surveillance in this case, Agent Sinclair highlights the international scope of the continuing criminal conspiracy and the degree of sophistication exhibited by its members. He believes that to expose and prosecute members of this conspiracy, electronic surveillance must be used in conjunction with more conventional investigative techniques. Based on the source's information, Sinclair believes William Jeppesen and Jorge Maurtua move large quantities of cocaine on a regular basis and that Jeppesen and Maurtua must involve at least several other individuals in this process. Agent Sinclair further believes that Maurtua uses his residence to transact this cocaine business because information uncovered to date fails to indicate any other business or residential premises available to him.

Agent Sinclair relies upon information provided by Agent Rosen of San Diego,

California. Sinclair is apprised of the extensive use of the telephone by individuals involved in the Maurtua organization in furtherance of narcotics transactions. The sheer number of telephone calls that must be made to sustain operations, the differences in time zones in which the various participants operate and the unexpected problems that they cannot anticipate, cause them to rely upon the use of the telephone to effect narcotics transactions.

Sinclair admits that while electronic surveillance to date has enabled agents to develop evidence against Fernando Maurtua, Jose Antonio Ledgard, Jorge Maurtua, Omar Orozco, and others in the operation, the exact scope of the operation still remains unclear. The questions of how cocaine is smuggled into the United States and who directs this activity remain to be answered. Furthermore, how cocaine is imported and distributed in the Ketchum, Idaho/Sun Valley area remains completely unclear. Agent Sinclair feels the case is unprosecutable based upon evidence currently available to the FBI. Agent Sinclair opines that Jorge Maurtua exists as the regional representative of the Maurtua family cocaine enterprise, and that electronic surveillance would aid in the identification of other members of the organization and would define how Jorge Maurtua's actions in Ketchum, Idaho, complement the West Coast operation currently being investigated by the San Diego Division.

Agent Sinclair discusses Tim Halley's undercover purchase of one kilogram of cocaine from Fernando Maurtua. Halley has helped clarify the roles, and the levels of involvement of two non-American individuals with whom he has met. But Fernando Maurtua and Antonio Ledgard have continued to refuse to meet with any unknown individuals when they discuss their cocaine transactions. Maurtua's conversations with Halley could only be characterized as extremely short and to the point. Agent Sinclair notes that it is highly unlikely that the San Diego source or any other source will be able to obtain direct evidence against anyone in the operation higher than Fernando Maurtua, or in a position parallel

to that of Jorge Maurtua. Agent Sinclair includes Agent Rosen's observation that the source's cooperation in the San Diego investigation hinged on convincing the source that agents had sufficiently developed a prosecutable case against him based on evidence derived from electronic surveillance. Agents initially presented arrest warrants to the source and his girlfriend. He then agreed to assist in the investigation.

The hours of physical surveillance on Jorge Maurtua's residence to this point have not yielded sufficient evidence to sustain a prosecution of members of the Maurtua operation in Idaho. Moreover, the fact that the Maurtua residence is located on a dead end street increases the chance that Maurtua will detect physical surveillance.

Agent Sinclair's affidavit also discusses information regarding Omar Orozco developed by the Los Angeles DEA office. He discusses the result of the trash cover and notes that the efforts in Los Angeles to date have not sufficiently led to evidence to sustain a prosecution of members of his group. Investigative efforts have only yielded large cash seizures from various members of the group to date. Agent Sinclair believes that efforts are currently underway in Los Angeles to institute electronic surveillance there of certain members of the Orozco group.

DEA, Customs and FBI agents advised Agent Sinclair that Peruvian and Colombian cocaine smuggling cartels are the most sophisticated and difficult to penetrate of any such groups operating within the United States. Comprised of blood family members who operate under strict rules of silence, these groups are known for their propensity for violence. Fear of reprisal ensures that if a member of the organization is apprehended, his or her cooperation with law enforcement cannot be contemplated. In this case, the fear of reprisal runs high because the people under investigation have family members and property in Peru or Colombia. Consequently, if Antonio Ledgard or Augustin Fernando Maur-

tua were indicted, they would be unlikely to cooperate against Jorge Maurtua or individuals higher in the organization, even if granted immunity for grand jury testimony.

The affidavit also analyzes information obtained from the dialed number recorders that were placed on telephones belonging to members of the conspiracy. These recorders do not provide information identifying persons making incoming calls. For example, intercepted conversations involving Jose Antonio Ledgard disclose that he used public telephone to call other members of the conspiracy. However, Ledgard has received telephone calls in which drugs were discussed at the Luciernaga Court residence. Such calls were made by other members of the conspiracy using public telephones. Agent Sinclair surmises that Ledgard and others feel relatively safe in receiving incoming telephone calls made from public telephones. Agent Sinclair concludes that the more important conversations conducted over these lines are incoming calls placed from public telephones because the conspirators know that they would not be identified by the use of dial number recorders or pen registers.

*Application J*

Application J seeks the continued electronic surveillance of three residence telephones. The first, the Luciernaga Court residence telephone, is subscribed to by Donna Ledgard. The second, the phone at 1552 Camino Del Mar, is subscribed to by Charles Jones. The third, phone located at 1935–C Estrella De Mar, Carlsbad, California, is subscribed to by David Strauss. Application J seeks interceptions of oral communications at the Luciernaga and the Estrella De Mar residences.

Application J is supported by an affidavit of Agent Charles B. Walker. Walker reviews the progress of the investigation of Orozco to date. He incorporates by reference what was described in Application H to detail the seizure of $219,000 at Los Angeles International Airport. The investigation being conducted in Los Angeles apparently indicates that the Orozco organization currently launders approximately $3 million dollars per month of U.S. currency derived from the sale of cocaine into the Republic of Panama.

In a joint task force effort the FBI, DEA, and IRS are currently investigating Jorge Maurtua and a number of individuals allegedly involved with distributors of cocaine for Maurtua in the Ketchum/Sun Valley, Idaho area. DEA source information identifies Jorge Maurtua as a supplier of cocaine in the Ketchum/Sun Valley, Idaho area. Jorge Maurtua's trafficking operation in Idaho allegedly utilizes female couriers to take money from the United States to be deposited in Panamanian banks. William Jeppesen associates with Jorge Maurtua and allegedly became involved in cocaine trafficking after meeting Jorge Maurtua's mother. Jeppesen met the Maurtua family when he served as a Peace Corps volunteer in Peru in the early 1970's. The DEA source states that the cocaine Jeppesen and Maurtua import into Idaho is supplied by a syndicate managed by Jorge Maurtua's mother, Maria Theresa Maurtua, who currently resides in Peru. The DEA source's reliability is unknown. IRS Special Agent Greg Gleason, however, conducted an independent investigation regarding the names of couriers provided by the source. This investigation substantiated both the existence and residences of the two couriers. The historical data regarding Jorge Maurtua's mother in Peru were verified by Agent Joseph Rosen in San Diego.

Agent Walker's affidavit reported the results of pen register coverage of Jorge Maurtua's residence in Ketchum, Idaho. Pen register coverage identified eight hundred forty-one calls from Maurtua's residence between December 20, 1984, through January 1, 1985. These conversations included calls to five individuals who are flagged by agents as alleged cocaine dealers or smugglers.

The Walker affidavit cites the names of six new individuals intercepted by electronic surveillance pursuant to Order H. They are Fred Samango, Henry Jones, Lorie

Lavie, Timothy James Ditty, Bob Prite and Kevin Davis.

Agent Walker turns to the conversations described in Application H to discuss the allegedly criminal use of the residential phone at Luciernaga Court. Fernando Maurtua used that phone on an almost daily basis to further narcotics transactions. Maurtua then left for Ketchum, Idaho to visit his brother Jorge, on December 20, 1984. In Maurtua's absence, Javier Laos occupied the Luciernaga Court apartment. He also continually utilized the telephone number there to transact the narcotics business of Fernando Maurtua. Meanwhile, agents intercepted Maurtua on incoming calls to the Luciernaga Court and Camino Del Mar telephones. Maurtua spoke with Javier Laos and Charles Jones about the status of the proceeds derived from the sale of cocaine being collected for him. Agent Walker provides a sample of the telephone calls intercepted on the Luciernaga Court line which involve Maurtua and Laos. Three calls comprise only a part of the total of one hundred twenty-eight narcotics-related telephone conversations made over the residential telephone during November 28, 1984 and on December 27, 1984.

On December 1, 1984 at 12:02 p.m., Fernando Maurtua placed an outgoing call to Alex Sarda. Maurtua told Sarda that he was waiting for a couple of "mules." Sarda wanted to know if any money had arrived. Maurtua said no; he had not yet located his mule. Sarda then stated his mule would wait around for approximately one more week. Agent Walker explained that "mules" is a code term employed by narcotic traffickers signifying couriers who transport narcotics or money across the United States borders and throughout the United States.

On December 5, 1984 at 7:27 a.m., Maurtua asked Ledgard what he should do with the "return." Ledgard advised Maurtua to keep "it" in California for him. Maurtua reported that he had had good luck, "a big four." Ledgard stated that he was "preparing a shipment which was a little com-

plicated regarding the checks." Maurtua replied that "there was no problem with that." Ledgard then stated he was sending "10" and they would be there before Maurtua's arrival in Florida. Agent Walker believes that this narcotics-related conversation referred to the retention of narcotics proceeds by Maurtua on behalf of Ledgard and to the shipment of ten kilograms of cocaine from Ledgard to Maurtua. At 1:45 p.m. that afternoon, Maurtua conversed with an unknown male who suspected that he felt he was being followed since he kept seeing the same three cars and drivers. The unknown male and Maurtua conversed again at 3:28 p.m. The man no longer felt he was being followed. Maurtua advised him to keep driving but "by all means not to take the 'clothing' out." Agent Walker opines that the word "clothing" represents cocaine in code language. On that day, FBI agents conducted a physical surveillance of the rental car being utilized by Fernando Maurtua. They observed the car leaving the Luciernaga Court residence with an unknown male in the driver's seat and with Javier Laos in the passenger's seat. The physical surveillance continued until the 1:45 p.m. call, described above, was intercepted. The surveillance team was notified by radio that the subjects of the surveillance may have spotted them. They discontinued the surveillance.

On December 9, 1984 at 5:20 p.m., Maurtua conversed with an unknown male who advised him that his "mule couldn't go until 5:00 o'clock tomorrow." The man then stated that "the other mule was doing everything possible to get everything together for today or tomorrow."

The affidavit describes three conversations on December 11, 1984. The first, at 9:14 a.m., was a discussion between Maurtua and Ledgard. Ledgard wanted to know if Maurtua "wanted to work," and stated he was expecting "20" today or tomorrow. In the second, at 9:37 a.m., Ledgard asked if Maurtua remembered "the woman's mule, the bald one." Ledgard had been advised that "there was a sur-

plus" and that "the mule was ready." In the third conversation, at 5:27 p.m., Maurtua spoke with Javier Laos. Laos reported that an unnamed individual "could not get the money together right now." Maurtua cautioned Laos "not to talk to him like that over the telephone." Maurtua then told Laos that he needed him to go to "the Toque in L.A. tomorrow." Laos said that he would "leave early in the morning and be there before mid day." Maurtua advised Laos to rent a hotel room but not to call him from there.

Maurtua and Ledgard had two narcotics-related conversations on December 12, 1984. They discussed possible "deals" in each conversation. Maurtua and Alex Sarda spoke on December 12, with Sarda reporting that "he had a pair of mules guarding 'it' for him until 11:00 p.m." Maurtua told Sarda that he would be right up there and that they would meet.

Agent Walker's affidavit provides a sample of the calls involving Javier Laos' efforts to collect narcotics proceeds for Maurtua. Javier Laos used the telephone at Luciernaga Court on an almost daily basis after Fernando Maurtua departed for Ketchum, Idaho on December 19, 1984. On December 21, 1984, Laos attempted to call Fernando Maurtua in Ketchum, Idaho. Maurtua wanted to know if Laos "was calling from the outside" and Laos told him that he was not. Maurtua advised Laos to call him back "from the outside." Maurtua told him that "it was the last time" that Laos should call him from inside the residence. At 8:35 p.m. that same day Charles Jones told Laos in a phone call that he had taken three powders while they were speaking. Jones also referred to a "package" and to something he had given Laos the previous night.

On December 24, 1984 at 7:54 p.m., Laos called Miguel (LNU), previously identified as a collector for Laos and Maurtua, in San Francisco, California. Miguel stated that he had "not been able to get ahold" of an unidentified third party yet. Miguel advised Laos that this party was "still trying to get all the money together" that eve-

ning. Laos would call Miguel back at 9:30 p.m. Miguel stated that that would be O.K.; he would let him "know something by then."

On December 25, 1984, Laos and Charles Jones spoke by phone and discussed their "mules." On December 27, 1984, Laos spoke with Alex Sarda. Sarda reported that they were still waiting for his "legs" to report in and that he would call Laos back later.

On November 30, 1984 at 6:56 p.m., Maurtua spoke on his Luciernaga Court telephone line with Kevin Davis. They talked about Maurtua's brother Jorge and discussed playing "real tennis" together. It is Agent Walker's belief that the expression "real tennis" is a code reference to narcotics transactions. On December 19, 1984 at 10:24 a.m., Fernando Maurtua spoke with Timothy James Ditty and agreed to meet each other in Anaheim, California. Ditty has been previously identified as a drug customer of Fernando Maurtua. Agent Walker tallies that Ditty has been intercepted in narcotics-related conversations at least five times since the inception of electronic surveillance at the Luciernaga Court and Camino Del Mar phones.

A pen register has been maintained on the Luciernaga Court line even though interception of the phone line ceased on December 28, 1984. From December 28, 1984 to January 13, 1985, two hundred forty-five outgoing calls were placed on that telephone. The calls break down geographically as follows. Six of ten calls to Miami, Florida were made to Jose Antonio Ledgard's residence at 2131 Secoffe Street. San Francisco was called twice, at a telephone number previously used to contact Miguel (LNU). Four calls were made to Peru. Six calls were made to "Conceptual Artists." Thirty-six calls were made to a number registered to Miriam Lavie, 1124 Eureka, No. 40, San Diego, California. Agent Walker notes that a Lorie Lavie was the registered owner of firearms found at the residence of Michael Diebert, who was arrested by federal authorities on narcotics

charges in San Diego in approximately October, 1984. An unverified source named Lorie Lavie to the DEA as a drug distributor for an individual named Frank Jackson. Jackson was identified previously in this investigation as a major narcotics wholesaler. One telephone call was placed to Henry Jones, the brother of Carlos Jones, an active co-conspirator of Fernando Maurtua and Tony Ledgard. Fifteen telephone conversations were recorded to World Communications, the employer of Henry Jones. Two phone calls were made to a phone registered to Thomas Richard Pool. One was made to a phone at which Alex Sarda had previously received telephone calls.

Agent Walker states that pen register coverage was also maintained from January 13 to January 17, 1985. Two hundred fifteen telephone calls had been made on the Luciernaga Court line in that time. Four of seven calls to the Miami, Florida area went to Ledgard's residence at 2131 Secoffe Street. Four calls were made to "Conceptual Artists." Twenty-six calls were made to the previously discussed number registered to Miriam Lavie. Twenty-two calls were made to a number previously used by Augustin Fernando Maurtua and identified by Leslie (LNU) as her father's telephone number. Agent Walker understood Leslie to be Fernando Maurtua's current live-in girlfriend. Four calls were placed to a number at World Communications.

Between January 21 and January 24, 1985, fourteen calls were placed to (619) 438–3702. That number was the newly assigned telephone number for Fernando Maurtua at Estrella De Mar.

Agent Walker establishes the basis for his request to install a microphone at Luciernaga Court. Since the Luciernaga Court address was first identified, at least five principal members in the cocaine distribution conspiracy have occupied it. This group includes either first-line conspiracy members or their girlfriends. Physical surveillance confirms that the occupants of Luciernaga Court engage in a continuing large scale distribution operation. They use a telephone at the residence and the residence itself to effect meetings concerning distribution of cocaine. Meetings involving Carlos Roberto Cordero, Jorge Maurtua, Michael Sullivan, Alex Sarda, Lawrence Zoanich, Carlos Jones, Tony Bazo, Kathy Davis and other individuals as yet unknown were in the past planned to occur at that address. Agent Walker describes in his affidavit these individuals' narcotics trafficking histories.

The grand scale of the groups' distribution activities undoubtedly requires frequent business decisions on the part of Maurtua, Ledgard, Cordero and Laos. Agent Walker believes that this need to communicate and to direct the activities of the organization results in daily conversations relating to importation and distribution of cocaine at the residence.

Luciernaga Court residents have been subject to nearly continuous physical and electronic surveillance since this investigation began. While surveillance failed to identify a legitimate source of income, place of employment, or a San Diego business office, it did, however, link Fernando Maurtua and Jose Antonio Ledgard to an unfurnished apartment located at 2348 La Costa Avenue, Carlsbad, California. Fernando Maurtua maintained this place as a "stash pad" until December 15, 1984. When the one month lease for this apartment expired, Customs agents brought a dog trained to detect cocaine to the apartment. The dog's reaction strongly indicated the presence of cocaine in the interior of the apartment. In addition, the dog positively reacted to a vacuum cleaner bag found in the apartment, indicating that the bag contained cocaine remnants. Agent Walker uses this evidence and the lack of any evidence of legitimate source of income or employment for Maurtua, Ledgard, Laos and Cordero, to conclude that they engage in a large-scale enterprise to import and distribute cocaine. Agent Walker calls attention to the many narcotics-related phone conversations intercepted by the Luciernaga Court wiretap described in this and previous applications. He feels that those con-

versations also demonstrate probable cause that Maurtua and Ledgard use that residence as a meeting place with Cordero, Jorge Maurtua, Sullivan, Sarda, Zuanich, Jones, Bazo, Davis and other individuals to import and distribute cocaine in the San Diego area. The FBI surveillance squads have observed at various times all of these people entering the premises. Agent Walker repeats numerous conversations intercepted on the Luciernaga Court wiretap between November 1 and November 7, 1984, and includes those regarding Halley's undercover buy, Omar's involvement with Maurtua and Ledgard, and Sullivan's restricted purchasing power.

Agent Walker notes that from October through December 1984, FBI surveillances identified a number of individuals arriving and departing from the Luciernaga Court apartment. In conjunction with intercepted conversations, these observations lead Walker to believe that Maurtua and Ledgard utilized the premises at Luciernaga Court to conduct extensive meetings and negotiations. Agent Walker provides examples of these conversations. On November 30, 1984 at 2:46 p.m., Bobby (LNU) asked if he could see Fernando Maurtua. Maurtua said he would not be able to see Bobby until Monday or Tuesday. He was going to Miami on December 15, 1984. Bobby then stated that he was looking for "donies." Maurtua stated that was "O.K." and that he would give the individual a call. Bobby encouraged Maurtua to "work real hard on that." Maurtua replied, "Right now there is no 'trampa.' " Bobby then told Maurtua that he would "come by" Maurtua's residence that evening. On December 8, 1984 at 8:56 a.m., Maurtua had a telephone conversation with an unknown male who advised him to stay at home because he would "come down to see [Maurtua] about 10;00 o'clock." The unknown male stated that he had something for Maurtua that he knew Maurtua would like.

The FBI's physical surveillances at the Luciernaga Court residence substantiate their assumption that cocaine transactions engineered by Maurtua are primarily con-ducted from his residence, and what they have already learned about the operation through intercepted phone conversations. Agent Walker's affidavit cites twenty-three instances where agents observed Maurtua, Laos, Ledgard, and vehicles associated with Sullivan, Ledgard, and Laos at the Luciernaga Court residence.

Agent Walker's affidavit also describes an incident in which Sullivan conducted a narcotics transaction at the Luciernaga Court residence. Agent Walker notes that pen register coverage from December 29, 1984 until January 13, 1985 identified six calls from the Luciernaga Court residence to "Conceptual Artists" and one call from the Luciernaga residence to Thomas Pool. Even though Pool distributes cocaine for Sullivan, Agent Walker believes he is unknown to Tony Ledgard. Agent Walker further believes that while Sullivan was at the Luciernaga Court residence, he telephoned Thomas Pool regarding distribution of cocaine he purchased from Tony Ledgard.

The second phone Application J seeks permission to wiretap is located on Camino Del Mar at the residence of Charles Jones and Carlos Roberto Cordero. Agent Walker's affidavit describes Cordero's involvement in the distribution hierarchy. Agent Walker notes that in a two-week period of interception pursuant to Order E, Roberto Cordero moved in with Tony Ledgard at Luciernaga Court and used the phone there to communicate with other members of the conspiracy. After Ledgard moved to Florida and Maurtua returned to take over the use of the telephone number at Luciernaga Court, Roberto Cordero moved to Camino Del Mar and began to use that phone. When interception pursuant to Order H commenced, Roberto Cordero had apparently returned to Peru, but was scheduled to return in January, 1985. Prior to his return, Charles Jones extensively used the telephone and residence at Camino Del Mar. Agents intercepted one hundred twenty-eight telephone calls in furtherance of narcotics transactions at the Camino Del Mar apartment pursuant to Order H. On

December 29, 1984, Jones left for Peru to visit his relatives for the Christmas holidays. Customs agents overheard Jones state in the San Diego Airport that he intended to return from Peru at the end of January, 1985. Prior to his leaving, Jones contacted Pacific Bell to disconnect his telephone service until that time. On January 24, 1985, Customs officials observed Carlos Jones enter the United States at Los Angeles International Airport. On January 25, 1985, Pacific Bell advised the FBI that it had initiated telephone service with a new phone number for Charles Jones at the Camino Del Mar apartment. Agent Walker reviews pen register information gathered for the telephone at Camino Del Mar from the period commencing January 24, 1985. That phone was used to call Luciernaga Court four times, Estrella De Mar four times, and the residence of Raul Cabada two times. Agent Walker summarizes eighteen narcotics-related calls which were intercepted pursuant to Application H on the Camino Del Mar apartment line.

On December 11, 1984 at 4:54 p.m., Charles Jones conversed with his brother Henry. Henry Jones asked if Charles could bring him "one." Charles said, "No there isn't any yet." Henry stated, "It was just a show, nothing else." Charles Jones then told Henry that he could "come by and show a sample." Henry asked for a price. Charles Jones deferred until later because he "couldn't talk on the phone." On December 16, 1984 at 8:48 p.m., Alex Sarda phoned Charles Jones at the Camino Del Mar apartment. Sarda advised Jones to call him from a public telephone and to provide a telephone number where he could be called. Sarda asked Jones if he had "a single" and Charles said yes. At 9:01 p.m. that same evening, Maurtua called Charles Jones and stated that he was calling long distance. Jones asked Maurtua if he should go up on Monday or Tuesday. Maurtua said to advise Alex Sarda to have everything ready. Charles Jones then stated that he would take care of it and that Alex would be down in an hour and a half. Agent Walker interpreted this last phone call as an instruction to Jones to go to Los Angeles or somewhere north of San Diego to pick up a narcotics shipment.

On December 19, 1984 at 9:33 a.m., Maurtua phoned Charles Jones and asked if Jones had heard from Alex Sarda. Jones stated that he had talked with him yesterday and everything was "O.K." Jones said that he had a "box" here with a little guitar for Maurtua. Maurtua stated that he would come by later. Jones then stated that Alex Sarda had a key. Later that day Maurtua and Charles Jones spoke again. Jones stated that he had attempted to locate Alex Sarda without success. Sarda had a conversation with Charles Jones and advised Jones to tell Fernando Maurtua that everything was "O.K." Sarda stated that the "leg" had a problem getting a plane reservation so he had not arrived yet.

On December 20, 1984 Raul phoned Charles Jones and indicated that he had not come down to visit Jones because he was not sure if he could find Alex Sarda there. Charles Jones then stated that he was going to Lima, Peru for a month. Raul indicated that he would like to come down and visit for a few hours and asked Jones if any of "those things" belonging to the doctor was still available. Jones stated no. Forty minutes later Maurtua phoned Jones at the Camino Del Mar apartment. Jones stated that "Barbon" called and that everything was O.K. Maurtua asked if the "Barbon" had finished. Jones replied that the "Barbon" had completed three-fourths of it. Maurtua stated that as a penalty for being late, he would have to pay "one and one-half points more for the two."

On December 22, 1984 at 4:39 p.m., Maurtua phoned Jones and asked about Javier Laos. Jones stated that Laos was still at Maurtua's house and that the bearded one had finished his "work." Jones indicated that he was just waiting for a call. Maurtua told Jones to have Javier Laos call Tony Ledgard but to make sure that he "calls from outside of the residence." At 7:57 p.m. that day, Laos phoned Charles Jones. Laos reported that he was coming over and Jones advised him to wait ten minutes because some of his

"patas" were coming over. Agent Walker asserts that the term "patas" refers to mules or couriers that transport both narcotics and narcotics proceeds.

Agent Walker summarizes four calls on December 24, 1984. At 10:03 a.m., Javier Laos used Jones' phone and attempted to telephone Bob Prite at a number in San Francisco. While dialing the number, Laos was heard stating, "Puta, he better have my money because he dies." At 10:15 a.m., Laos spoke with Prite. Laos asked if Prite "was complete." Prite stated no, but that he had "10" and would have the rest in a couple of weeks. Prite stated that he didn't have it all because he couldn't get a loan from the bank. Laos then told Prite that a friend of his, Mike, would come to get it. At 10:44 a.m. Laos, using Jones' phone, called Miguel (LNU), aka Mike, and stated that he needed Miguel to meet with someone. Laos then gave Miguel Bob Prite's two phone numbers.

On December 27, 1984, Maurtua phoned Jones and Javier Laos. Maurtua wanted to know if Alex Sarda and Tim (LNU) "had reported." Laos stated that Sarda was coming over at 3:00 o'clock and "bringing everything," but that Tim had not yet "reported." Maurtua advised Laos to call Tim right away.

The third telephone line Application J seeks to intercept is located at 1935–C Estrella De Mar, Carlsbad, California. Maurtua has rented this apartment on a short-term basis until March 15, 1985. Agent Walker describes Maurtua's narcotics-related activities to date and notes that in all of his residences, Maurtua use the telephone to further narcotics transactions. Agent Walker believes that this apartment may be used both as a residence and a "stash pad." Conversations intercepted pursuant to Order G disclosed that Maurtua had also rented an apartment at 2348 La Costa Avenue, in Carlsbad. Maurtua obtained that apartment to store cocaine. Maurtua, Ledgard and Cordero had access to it. Agent Walker includes a synopsis of conversations discussed in other applications in which Maurtua asked Cordero to "bring the apartment key back." Agents surveilling the La Costa Avenue stash pad observed Maurtua entering the La Costa Avenue apartment complex, remaining a short period of time, and leaving carrying a package. Agent Walker also reiterates the canine sniff conducted in the La Costa Avenue apartment.

A private citizen advised the FBI that Maurtua contractually agreed to move into the apartment at 1935–C Estrella De Mar on January 21, 1985. The source advised that Maurtua wished to keep and pay for the telephone number located in that apartment, subscribed to by the owner of the apartments. On January 28, 1985, FBI agents Joseph H. Rosen and Christine O'Connell, in a pretext situation, met an unknown female believed to be Leslie (LNU) outside the Estrella De Mar apartments. The female stated that she lived at 1935–C Estrella with an unidentified male and that she had just moved in. She stated that the male individual, who had rented the apartment, had just moved in three days ago. Agent Rosen advised Agent Walker that Leslie (LNU) is the same individual who accompanied Fernando Maurtua to Sun Valley, Idaho, in December 1984, when Fernando stayed at Jorge Maurtua's residence. On January 28, 1985, Leslie (LNU) was intercepted pursuant to the wiretap authorized in Order I in Ketchum, Idaho. Leslie told an unknown male that she was staying at telephone number 438–3702, which is the number of Fernando Maurtua's apartment.

Surveillance of the Estrella De Mar apartments disclosed the following. On January 25, 1985, agents observed a blue Chevrolet Suburban belonging to Jose Antonio Ledgard leave the Luciernaga Court residence and proceed west on Alga Avenue. The vehicle turned south and proceeded to Fernando Maurtua's residence at 1935–C Estrella De Mar. On January 2, 1985, the blue BMW belonging to Javier Laos arrived at Luciernaga Court. It left there and arrived at 1935–C Estrella De Mar. On January 30, 1985, agents observed the same blue BMW and a previous-

ly-described Toyota automobile at the 1935–C Estrella De Mar apartments. On February 4, 1985, an FBI agent saw Fernando Maurtua walk from the parking lot area into his apartment at 1935–C Estrella De Mar. About forty minutes later, agents saw Michael Sullivan park his Mercedes Benz in the parking lot near the Estrella De Mar apartment, get out of his vehicle and eventually enter Maurtua's apartment. At 2:57 p.m., Sullivan left this apartment carrying a blue and white gym bag. Sullivan placed this bag in the trunk of his car and drove away from the area.

Agent Walker's affidavit includes pen register analysis of the phone subscribed to at 1935–C Estrella De Mar. Three times on January 21, 1985, Luciernaga Court called Maurtua's new number. Since Fernando Maurtua took possession of the apartment through February 4, 1985, calls registered between the two apartments on at least a daily basis. The volume of calls disclosed a pattern of use for the new number. Some of these calls were made when physical surveillance placed Fernando Maurtua inside the apartment. Agent Walker notes that Fernando Maurtua has been the subject of extensive electronic surveillance since September 1984. Based on his experience, Agent Walker asserts that Maurtua uses his phone to conduct narcotics activity and rarely uses the phone otherwise.

Agent Walker opines that Maurtua utilized the apartment in 1935–C Estrella De Mar as a residence and a place to store, to package, and to distribute cocaine. Other members of the cartel—including Tony Ledgard, Roberto Cordero, Alex Sarda, Michael Sullivan—appear to have access to the apartment. Agent Walker believes that these people will meet at this location and that their conversations during these meetings will concern the conspiracy to distribute cocaine. He also believes that these individuals will use the phone at the residence in furtherance of the conspiracy.

In his statement regarding the need for interception and exhaustion of investigative techniques, Walker alerts the reviewing judge to all previous applications for electronic surveillance in this case. Agent Walker reiterates that Maurtua and Ledgard hold key positions in an international drug smuggling cartel and that prior electronic surveillance shows that Maurtua's and Ledgard's positions allow them to arrange large cocaine transactions between Jose Omar Orozco's organization and Fernando Maurtua's. Electronic surveillance discloses that while both Ledgard and Maurtua travel extensively in support of their cocaine dealings, the use of the telephone is the principal method by which they most frequently accomplish their goals. The international scope of the operation and the great geographical separations between its members make use of the telephone sensible. Ledgard and Maurtua use both public telephones and residential phones. Conversations initiated from residential phones proved at times more guarded than those initiated from pay phones. Agent Walker notes, however, that agents relatively easily understood even these guarded conversations because they have been intercepted for a long time. The sheer number of telephone calls that must be made, the differences in time zones in which the various participants operate, and the unexpected problems they cannot anticipate, cause each major participant to rely upon contacts through the telephone.

Agent Walker asserts there is a very real need for microphone coverage of conversations in the Luciernaga Court residence of Jose Antonio Ledgard and the apartment just rented by Fernando Maurtua. To date, the intercepted telephone conversations of the Peruvians and Colombians have revealed that they use their telephones in a very guarded manner to conduct cocaine transactions. Continued surveillance has failed to ascertain the existence of a San Diego office for Ledgard or Maurtua from which they can conduct any type of legal or illegal business. Consequently, Agent Walker infers that the Maurtua/Ledgard cocaine operation centers at the Luciernaga Court residence. He recites the observed comings and goings of all the people involved in the con-

spiracy from this address. In addition, he notes that that residence has been used for a minimum of four months as a focal residence from which hundreds of telephone conversations furthering narcotics transactions have been conducted. Despite the frequency of the calls, Maurtua repeatedly cautions individuals not to say much on the telephone. Agent Walker feels the microphone coverage would provide the essential link in the investigation to fully expand and clarify the roles of the conspirators, to locate and identify the methods by which the cocaine is smuggled into the country, and to identify the method by which millions of dollars of narcotics proceeds are being laundered. The increasing reference to "mules" gives clear evidence, in Walker's opinion, that this investigation is coming closer to revealing the answers to the smuggling and money laundering questions. Agent Walker believes that within the freedom of their residence and stash pad the conspirators talk freely about the methods they use to smuggle the narcotics and to dispose of their assets.

Agent Walker notes that while the cooperation of informants like Timothy Halley has been helpful, it is highly unlikely that Halley or any other source would be placed in a position where he or she could meet individuals higher up in the organization or become privy to the secret operations of the cartel.

FBI agents in the Miami, Boise, San Diego, and Los Angeles, offices have conducted hours of physical surveillance on residences and businesses involved in this drug conspiracy. To date, these efforts have not indicated that surveillances, in themselves, would be sufficient to lead to evidence which would sustain a prosecution of members of this group. Physical surveillance of the Luciernaga Court residence is further complicated by the fact that it is located at the extreme end of a cul-de-sac, thereby increasing the chance that physical surveillance may be detected by the subjects of the investigation.

Agent Walker recounts information provided to him by DEA, Customs and FBI agents, regarding the sophistication and impenetrability of Peruvian and Colombian cocaine smuggling cartels in the United States. These groups, often composed of blood family members, are characterized by strict rules of silence. They are also known for their propensity for violence. As was cited in previous applications, it is this violence that ensures that if one of the members of the organization is apprehended, he or she will not cooperate with law enforcement officials. Agent Walker notes that the fact that many of these persons have family and property in Peru undoubtedly intensifies this fear of reprisal. As stated in prior applications, Walker believes it is unlikely that Tony Ledgard or Fernando Maurtua, if indicted, would be willing to cooperate against those higher in the organization.

Agent Walker believes that a pattern has developed which indicates that Ledgard, Maurtua, and others feel relatively safe in receiving incoming telephone calls at ten telephone numbers identifiable with them as long as these calls are made from public telephones. He notes that use of dial number recorders placed, pursuant to court orders, on Cordero's and Ledgard's phones, confirm that Ledgard, Maurtua, and Cordero use these numbers to contact other members of the conspiracy. These dial number recorders, however, do not identify the persons making the incoming calls to these numbers. Agent Walker notes that intercepted conversations involving Maurtua and Ledgard disclose that they use public telephones to call other members of the conspiracy. Yet, they receive at their homes telephone calls in which drugs are discussed if those calls originate from public telephones. Due to this pattern of intercepted conversations, Walker believes that the more important conversations conducted over these lines are those which are incoming and therefore not identifiable by use of dial number recorders.

*Application K*

FBI Special Agent Roderick L. Beverly's affidavit supports Application K. Application K seeks authorization to wiretap the

phone subscribed to by Jose Ledgard at 2131 Secoffe Street, Miami, Florida.

Agent Beverly provides an analysis of the investigation to date. FBI agents believe that Jose Antonio Ledgard serves an integral role in an international cocaine smuggling organization that distributes cocaine from Colombia and Peru to various areas of the United States. Intercepted conversations indicate that Ledgard maintains residences in Carlsbad, California, and in Miami, Florida, and travels between the two to support his cocaine-distributing activities. Agent Beverly believes that Augustin Fernando Maurtua plays a subordinate role to Ledgard's. Augustin Maurtua lives in Carlsbad, California at the residence formerly occupied by Ledgard and his wife, Madonna. Finally, Jose Omar Orozco who resides in Los Angeles, California, and who controls significant amounts of the cocaine coming into the western United States, precedes Ledgard and Maurtua in the organization's hierarchy. The cocaine distributed by this operation originates in Peru and Colombia, where blood relatives of Fernando Maurtua, Omar Orozco and Tony Ledgard reside. Just how the cocaine enters the United States remains unclear but Agent Beverly feels that the Peruvians and Colombians have joined forces to create an international cartel for importing and distributing cocaine. In addition documents recovered from the organization indicate that it may be exporting cocaine proceeds in the amount of $3,000,000 per month. Agents believe that Tony and Donna Ledgard presently live at 2131 Secoffe Street, Miami, Florida. Even though Ledgard lives a great distance from the West Coast of the United States, he continues to be a key participant in the Orozco organization. Agent Beverly believed that Ledgard currently uses the phone at Secoffe Street to communicate with other members of the Orozco organization, including Gonzalo Ledgard, his brother, and Hernando Carrillo. Agent Beverly believes that Donna Ledgard participates knowledgeably and willingly in her husband Tony's activities and that she also uses her phone to conduct cocaine transactions. Agent Beverly notes that physical surveillance and conversations intercepted to previous wiretap orders have disclosed that Fernando Maurtua and Tony Ledgard are Michael Sullivan's principal cocaine suppliers. Sullivan operates a sizeable cocaine distribution organization centered in San Diego.

Agent Beverly begins with conversations intercepted pursuant to Order C to describe the progress of the investigation. He notes that conversations intercepted pursuant to Order D made it apparent that Fernando Maurtua supplies Sullivan's operation with cocaine. Agent Beverly also describes Sullivan's financial troubles with Fernando. Sullivan fronted to Ken Clarke seven kilos of cocaine which he did not pay for. On a daily basis in the period encompassed by Order D, Michael Sullivan spoke to Fernando Maurtua from either his residence or business telephones. These conversations usually concerned Sullivan's attempts to placate Fernando by demonstrating his efforts to raise money. Agent Beverly provides eleven specific examples of the type of conversations in which Mike Sullivan and Fernando Maurtua engaged. Each of those conversations has been related in previous wiretap applications. In the time period in which Order D was effective, additional electronic and physical surveillance disclosed that 6827 Luciernaga Court, Carlsbad, California was being principally occupied by Jose Antonio Ledgard, Donna Ledgard and Fernando Maurtua. Agents used a Hertz Corporation rental vehicle registered to him to positively identify Maurtua. Agents compared surveillance photos with Maurtua's driver's license photo to make a positive identification.

The DEA checked its records once Fernando Maurtua and Jose Antonio Ledgard were positively identified. On August 24, 1984, the DEA advised the FBI that Augustin Fernando Maurtua is a member of the Maurtua family, a family long involved in cocaine trafficking in Peru. Several members were arrested there for cocaine trafficking. Records obtained from Dade County, Florida indicate that Jose Antonio

Ledgard was arrested on October 20, 1980, in Miami, Florida, for possession of one kilogram of cocaine. After motions to suppress evidence were granted in the case, charges of possession of cocaine and trafficking of drugs were later dismissed. The DEA also advised that on January 27, 1982, Peruvian fugitive Jorge Augustin Maurtua and Patricia Maurtua were interviewed at Los Angeles International Airport where they met arriving passenger Jose Antonio Ledgard on a flight from Peru. Jorge Augustin Maurtua and Jose Antonio Ledgard advised agents that they sought to start a check-cashing service in Miami. It was also then determined that Patricia Maurtua is the wife of Augustin Fernando Maurtua. DEA and Customs agency information indicates that a blood relative of the Maurtua family named Carlos Alberto Maurtua currently serves as the Peruvian consul assigned to the Peruvian Consulate in San Francisco, California. Information from a court-authorized pen register compiled on August 14, 1984 and from subpoenaed toll records discloses the Luciernaga Court phone is used to call locations throughout the United States and Lima, Peru. Agent Beverly's affidavit lists the calls linked to the Maurtua family, including calls to Jorge Miguel Maurtua in Ketchum, to Jose Antonio Ledgard in Miami, to Jorge Miguel Maurtua and Maria Theresa Maurtua in Lima, and to Jorge Miguel Maurtua in Haleiwa, Hawaii.

Interceptions pursuant to Order E indicate that from September 5, 1984 Tony Ledgard had replaced Fernando Maurtua as the Orozco/Maurtua family representative in San Diego. Like Maurtua, Ledgard refused to front Michael Sullivan cocaine since Sullivan still owed the Orozco family an unspecified amount of money. In early September Ledgard spoke over the Luciernaga Court line with Spanish-speaking individuals staying at the La Jolla Shores Hotel in La Jolla, California. Agent Beverly's affidavit details conversations intercepted pursuant to electronic surveillance and describes the FBI and DEA's physical surveillance of drug-related activities and the cocaine purchase executed at South Coast

Plaza Shopping Center on September 9, 1984. (Beverly's description of this activity is identical to that presented in Application G and discussed in this decision at pages 77 through 78.) On September 10, 1984, agents observed Ledgard meeting with five other Latin males, one of whom was Roberto Cordero, at the Chart House Restaurant in Coronado, California.

Four conversations intercepted on September 11, 1984, all of which were set forth in prior applications, are included in this affidavit. One of those conversations, occurring at 5:40 p.m., included a discussion between Tony and Donna Ledgard, who was calling from Miami. Tony told Donna Ledgard that he "had to stick around to settle things with Mike Sullivan" and get "a little aggressive," because Sullivan was late in paying. The affidavit highlights conversations intercepted on September 13, 15, and 16, 1984. Three of these conversations involve Ledgard and Raul (LNU). On September 15, Raul (LNU) and Ledgard discussed that they were "getting screwed" in that they had to wait for some people "to do what they were supposed to do." Raul said that those who were causing the problem had not responded and that "was not good." They had a second conversation in Spanish. Raul reported to Ledgard that he had talked to the guy and said "I give you twenty-four hours, if not, you're screwed." The following day Ledgard and Raul pondered in Spanish whether they should give the guy "a couple more days." They agreed, "to give the guy until Tuesday." Ledgard said that Raul "was being put in a bad position by the guy's not calling." Raul told Ledgard he was going to tell the guy, "listen, if it's not ready in twenty-four hours, you're not going to be around."

Interceptions pursuant to Order E allowed agents to discover that Ledgard spoke with Hernando Carrillo about real estate investments. Ledgard, moreover, sent Carrillo an unspecified amount of cash to invest in real estate. Ledgard explained to Carrillo that he was collecting some debts. Ledgard told Carrillo Michael Sulli-

van owed him money and Ledgard wanted to help Sullivan get a loan against the equity in Sullivan's factory. If Sullivan got the loan he would give the money to Ledgard. Ledgard said that he had been after Sullivan every day about this. Carrillo told Ledgard that he had to "keep the pressure on him" or he will "think that you're not for real." Carrillo said that Sullivan's company was about to go public on the New York Stock Exchange; Ledgard would send Carrillo all the information. Carrillo said that he would arrange for Miguel Cano to help in the financing. Ledgard could count on Carrillo to handle this matter. Agent Beverly surmises that Hernando Carrillo is fully aware that cocaine sales represent the source of Tony Ledgard's income and that his debt-collection efforts derive from past sales of cocaine. Nevertheless, Carrillo willingly participates in Ledgard's efforts to invest the proceeds of his cocaine dealings. In conversations intercepted on September 17, 1984, Ledgard and Carrillo discussed the loss of $10,000, which Ledgard had sent Carrillo stapled inside of a "girlie magazine." In a conversation intercepted on September 28, 1984, Carrillo offered to help Ledgard with financing, banking or anything else, "no questions asked." Carrillo discussed splitting the rent on a duplex apartment between himself, Tony and Gonzalo Ledgard. Prior conversations between Carrillo and Tony Ledgard have disclosed Tony Ledgard's desire to include his brother, Gonzalo, in their dealings. Investigations completed by the Miami division of the FBI show that Tony Ledgard maintains a non-published phone number at Hernando Carrillo's South Dixie Highway office. A five-minute drive separates Tony's residence on Secoffe Street from his office which is clearly marked at its entrance, "Hernando Carrillo, Urbanist and Architect." Both Ledgard's and Carrillo's names appear on the phone bill for the non-published number. Toll information shows that this phone number is used to call both the countries of Peru and Colombia.

On a daily basis pursuant to Order E, agents intercepted conversations between Michael Sullivan and Tony Ledgard concerning the money that Sullivan owed Ledgard and Fernando Maurtua. Agent Beverly summarizes their September 26, 1984, conversation (previously described in this opinion at page 1269), in which Ledgard threatened Sullivan that he was going to have to "learn the hard way." Sullivan warned that no one should come "muscle him." Ledgard responded that someone "is going to fuck with your life."

Beverly notes that in mid-October Ledgard left the Luciernaga Court address and joined his wife, Donna, in Florida. Beverly then provides an extensive synopsis of the calls made between October 16 and November 13, 1984, (all of these conversations were previously detailed in Applications H, I, and J and are previously referenced in this opinion). Generally, these conversations demonstrate the involvement of Cordero, Lawrence Zuanich, Jorge Miguel Maurtua, Omar Orozco, Raul Cabada, and Gonzalo Ledgard in the conspiracy. They also concern Tim Halley's cooperation and undercover buy, the $219,000 cash seizure at Los Angeles International Airport, and evidence derived from the Orozco trash cover and ledger.

Agent Beverly details what interceptions pursuant to Order H have evidenced. Since November 28, 1984, Fernando Maurtua called on a daily basis other members of the distribution network, including Ledgard, Robert Cordero, Javier Laos, Alex Sarda and Jorge Maurtua, from the Luciernaga Court phone line. Although Ledgard's principal address is now located on Secoffe Street, he continues to direct the action of Fernando Maurtua in regard to his relationship with Omar Orozco's Los Angeles operation. On November 30, 1984 at 4:55 p.m., Tony Ledgard called Maurtua at the Luciernaga Court residence. Tony said that several days ago his brother-in-law had died from taking "too much of something to calm him down." They also discussed Fernando's Miami visit on December 15, 1984, and plans to go to Mexico. Tony asked Fernando for Lawrence Zua-

nich's telephone number. He directed Fernando to make an appointment with Mike Sullivan to tell him to "pay up." Tony asked Fernando if "he did good" with Alfred. Fernando told Tony that he was going "to take a little" and "keep trying." Tony instructed Fernando to do what he was going to do with Fercho and with what was left over for him. Tony told Fernando that Fernando's brother had called him from Canada and that Tony had just closed on another house the day before. On December 5 at 7:27 a.m., Ledgard called Maurtua at the Luciernaga Court residence. Ledgard asked about "the man in Canada" and learned that "he was already back and that he wanted to talk" to Ledgard. Fernando asked what Tony wanted to do with the "return" and Tony told him to keep it there for him. Tony told Fernando that he was preparing him a shipment of "10" which Fernando would receive prior to coming to Miami on December 14 to attend the christening of Tony's daughter. The FBI determined that based on the operator's request for payment, the call was made from a pay telephone, location unknown. On December 11, 1984 at 9:14 a.m., Tony Ledgard called Fernando Maurtua and asked if Fernando wanted to "work." Fernando answered yes. Tony directed Fernando to call the "office" because they were expecting "20" today or tomorrow. Tony told Fernando that he would "work" now or "wait til he got back" from Miami. Tony said "they no longer owed what they owed." Tony could ask for three. Tony said that it was "from the last time that Fernando saw Juan." Fernando told Tony that he would go to Los Angeles the next morning. At 9:37 a.m. Tony called Maurtua again. Tony told Fernando that "a pata" (courier) had "a surplus" and was ready if Fernando "had a half left." Fernando told Tony that he was going to do things calmly, little by little. At 5:27 p.m. Maurtua called Javier Laos. Javier told Fernando that "the guy couldn't get the money together right then." Fernando admonished Javier "not to talk like that over the phone." Javier told Fernando that he needed a week. Fernando replied

that he needed Javier to go to the "toque" (stash) in Los Angeles the next day. Javier said he would leave early the next morning and would be there before midday. Fernando told Javier that he needed to see him there, no matter what. He further directed Javier to rent a hotel but not to call him from there. At 8:19 p.m. that evening Alberto Franco-Posada left a recorded message at Luciernaga Court. He asked Fernando to call him and added that his sister wanted "to go out with him." Agent Beverly believes that this last statement was a coded way to tell Fernando that things were ready for him in Los Angeles. Agent Beverly describes Franco-Posada, aka Fercho, as an upper echelon member of the Orozco organization who lives in the Los Angeles, California area. The following day at 7:44 a.m., Tony Ledgard called Maurtua at the Luciernaga Court residence. Tony told Fernando to go and see Juan whenever he wanted. Fernando asked about Fercho and Tony told Fernando that the other guy was not ready yet. Fernando told Tony that "they" had told him that they were ready. Tony said that he had to "decide something with Omar in a little bit" and that he was seeing a friend there who "needed plenty." Tony added that he would "see what his friend wanted and where and when [Tony] was going to take them from." At 8:04 a.m., Ledgard phoned Maurtua again at Luciernaga Court. Ledgard told Fernando that he was "trying to do the deal that they had been bothering him with for a month" and that Carlos had not come up with "anything yet." Tony said that because he was coming to Miami, he would not have "to take out so much right away from the other side." Fernando told Tony that "everything was ready and under key" and Tony told Fernando to go ahead—the guy should send him a couple of checks by Western Union. Fernando reported that he was "14 short." Tony said "that was no problem."

On December 12, 1984 at 9:26 a.m., Alex Sarda called Maurtua at Luciernaga Court. Alex told Fernando that he had a small delay and that he would be ready about

12:30. Alex added that he "had a pair of 'patas' (couriers) guarding it for him last night until 11:30 p.m." Fernando told Alex that he was going to leave for up there and that they would meet. Alex said he would leave a message on Fernando's answering machine where to meet. At 12:50 p.m. that same day, Javier Laos left a recorded message at Luciernaga Court reporting car trouble in Burbank, California, and that he would call him later from "over there." At 2:26 p.m., Javier Laos left a recorded message at Luciernaga Court telling Fernando that he was at the Holiday Inn on Sunset Boulevard, Room 4202. On December 12, 1984, FBI agents from the San Diego Division followed Fernando Maurtua from his residence in Carlsbad to the vicinity of Sunset Boulevard in Los Angeles, California.

In a previously recounted conversation occurring on December 22, 1984 at 4:39 p.m. between Charles Jones and Fernando Maurtua, Fernando told Charles to have Javier go to a pay phone and call Tony at his home. Charles needed to clarify "which Tony." Fernando told Charles "Donna's Tony." Charles told Fernando that he thought he was ready for the "serenade." Fernando then told Charles to have Laos call Tony because that was where the "serenade" was. Fernando told Charles that he had been waiting "for that for awhile." That evening at 7:57 p.m., Javier Laos called Jones at the Camino Del Mar residence. Javier told Charles that he was going over there. Charles asked Javier to give him about ten minutes because he had some "patas" coming over. Charles asked if Javier had called Tony, and Javier told Charles that he did. Agent Beverly surmises that Laos did indeed call Tony Ledgard at his Miami residence on that day. Pen register information discloses that the phone at Secoffe Street was used on two occasions on December 22, 1984 to call the number subscribed to by John Camacho. The telephonic activity recorded for this date computes with activity levels recorded on other dates in which surveillance or intercepted conversations have placed Tony Ledgard at his Miami residence. Because telephone calls were made to the number of John Camacho and because the telephonic activity levels were consistent with Ledgard's being present, Agent Beverly feels that Laos did in fact call Ledgard.

Agent Beverly relies on the following information to support his belief that probable cause exists to wiretap Ledgard's residential phone located at 2131 Secoffe Street. On August 29, 1984, FBI agents examined subpoenaed long distance toll records for the telephone at Luciernaga Court. Luciernaga Court users phoned the number assigned to 2131 Secoffe Street twenty-four times between February 6, and June 28, 1984. Agents also learned that Jose Ledgard subscribes to this non-published number at Secoffe Street.

Agent Beverly underscores two conversations intercepted pursuant to previously-authorized wiretaps. In the first, on September 11, 1984 at 5:40 p.m., Tony Ledgard told his wife that he was going to get "a little aggressive" with Mike Sullivan, who was late in paying. In the second, on October 1, 1984 at 4:57 p.m., Mike Sullivan called from a Conceptual Artist's phone to the Secoffe Street residence leaving a message with Ledgard's mother-in-law. He attempted to locate Ledgard concerning payment of a drug debt.

FBI Special Agent Judith A. Hix of Miami completed some investigative work there. Jose and Madonna Ledgard purchased for $215,000 the 2131 Secoffe Street residence in January of 1984. The Florida utility company lists Madonna Ledgard as the subscriber at this address. Agent Hix conducted physical surveillance at the Secoffe Street address. She observed a Latin male and believes him to be the same man who appears in surveillance photographs taken in San Diego. He was identified to be Jose Antonio Ledgard. Agent Hix has also observed a white van bearing Florida license plates parked at Secoffe Street. Agent Beverly believes that agents observed the same vehicle on September 10, 1984 at Luciernaga Court.

On November 1, 1984, agents placed a pen register on the Secoffe Street tele-

phone line. The number was used to call various numbers throughout the United States, including the telephone numbers of four individuals previously intercepted over the Luciernaga Court phone. On November 29, 1984 and on two occasions on December 22, 1984, the Secoffe Street telephone was used to contact a number subscribed to by John Camacho. Between November 27 through January 9, the Secoffe Street telephone was used on seventeen occasions to contact a telephone number in Miami subscribed to by Hernando Carrillo. The Secoffe Street telephone was used to contact the Luciernaga Court residence as follows: Two occasions on January 6, 1985; six occasions on January 8, 1985; one occasion on January 9, 1985; four occasions on January 10, 1985; four occasions on January 11, 1985; two occasions on January 12, 1985; two occasions on January 13, 1985; six occasions on January 14, 1985; nineteen occasions on January 15, 1985; four occasions on January 16, 1985; two occasions on January 17, 1985; five occasions on January 18, 1985; three occasions on January 19, 1985; four occasions on January 21, 1985; one occasion on January 22, 1985; and two occasions on January 23, 1985. The phone was used to contact the number in Ketchum, Idaho used by Jorge Miguel Maurtua on one occasion on January 26, 1985, on two occasions on January 27, 1985, and on two occasions on January 29, 1985.

From November 25, through December 13, 1984, the Secoffe Street residential phone was used about five times a day to contact another Miami number, subscribed to by Susan Raab. Special Agent Judith Hix advises that Tony Ledgard's brother, Gonzalo Ledgard, and his wife, Susan Raab, live in a condominium directly across the street from his brother Tony and his wife Donna Ledgard. From December 13, 1984 through January 28, 1985, the Secoffe Street residential phone was used to call Gonzalo Ledgard's home with the following frequency: four occasions on December 14; six occasions on December 15; two occasions on December 17; four occasions each on December 23, December 24 and December 26; two occasions on January 9, 1985;

three occasions on January 11, 1985; one occasion on January 12, 1985; two occasions on January 13, 1985; two occasions on January 14, 1985; two occasions on January 15, 1985; two occasions on January 16, 1985; three occasions on January 17, 1985; three occasions on January 18, 1985; two occasions on January 19, 1985; three occasions on January 20, 1985; two occasions on January 21, 1985; one occasion on January 24, 1985; three occasions on January 25, 1985; one occasion on January 26, 1985; and one occasion on January 28, 1985.

Agent Beverly believes that this level of telephonic activity indicates a degree of involvement between Tony and Gonzalo Ledgard. Normally, he argues, two brothers who live next door to each other would undoubtedly see each other daily, and use the phone less frequently. Agent Hix's criminal records check discloses that on April 22, 1984 officers of the Metro-Dade Police Department arrested Gonzalo Ricardo Ledgard and charged him with possession with intent to distribute and trafficking in cocaine. Both charges were later dismissed. Agent Beverly notes that conversations intercepted over the Luciernaga Court line as early as August 10, 1984 indicate that Tony Ledgard maintained frequent contact with his brother Gonzalo. Agent Hix observed Tony Ledgard and Gonzalo Ledgard as well as vehicles registered to them at various hours of the day at their respective residences. Physical and electronic surveillance conducted by FBI agents in the Miami office fails to disclose any employment or legitimate business associated with Jose Antonio Ledgard and Gonzalo Ledgard. Agent Hix informed Agent Beverly that the Miami office of the Southern Bell Telephone Company was served with a subpoena requesting toll records for the Secoffe Street residence approximately one month ago. Toll records for this number have been received and are being presently analyzed.

In his assessment of the need for interception and the exhaustion of investigative techniques, Agent Beverly provides the fol-

lowing information. The facts have shown that Tony Ledgard occupies a key position in an international drug smuggling cartel that consists of Peruvians and Colombians who are bringing large amounts of cocaine into the United States. Electronic surveillance conducted to date shows that Tony Ledgard's position in this organization allows him to arrange large cocaine transactions between the Orozco organization and Fernando Maurtua, even though he is currently residing thousands of miles away. Agent Beverly remarks that Ledgard travels extensively in support of his cocaine dealings, though electronic surveillance discloses that his most often-used method of accomplishing his goals is by telephone. Beverly believes the most compelling reason why Ledgard and others involved in the conspiracy must rely on the telephone is the international nature of their operation and the great distance by which its members are geographically separated. Tony Ledgard frequently uses public telephones to make cocaine-related calls pursuant to court order, however, Ledgard has been routinely intercepted using the telephone subscribed to by his wife or other members of their conspiracy to discuss drug transactions. These conversations were at times somewhat more guarded than those made over pay telephones; however, they are relatively easy to understand due to the length of time these individuals have been intercepted. The principal reasons why Ledgard and others must rely on certain established residence and business telephones are due to the international nature of the Orozco organization and the necessity for daily contact between its numerous members. The sheer number of telephone calls that must be made, the differences in time zones in which the various participants operate, and the problems they cannot anticipate make it imperative for each major participant to have and use a telephone.

Agent Beverly notes that electronic surveillance conducted to date has enabled agents to develop evidence against Tony Ledgard, Donna Ledgard, Fernando Maurtua, Gonzalo Ledgard, Hernando Carrillo, Jorge Maurtua, and others in the operation, but the exact scope and extent of the operation remains unclear. The question of how cocaine is being smuggled into the United States and who directs this activity still remains unanswered. It is clear from Tony Ledgard's conversation with Fernando Maurtua that although Ledgard resides in Miami, Florida, he is able to arrange multi-kilogram shipments of cocaine which Maurtua receives by way of Los Angeles. Agent Beverly believes that, taking into account Ledgard's apparent level of activity in the Orozco organization, Ledgard resides in Miami, for some specific reason other than a personal preference for that geographic area. Electronic surveillance would undoubtedly identify members of the Orozco organization with job responsibilities in the Miami area and would help to define how Ledgard's actions in Miami complement the West Coast operation. Intercepted conversations detailed in his affidavit also disclose that on more than one occasion, Tony Ledgard sent money to Hernando Carrillo for the purpose of buying real estate. On several other occasions, Ledgard mentioned purchasing property or closing on property. Electronic surveillance would certainly lead to the identification of Ledgard's property, which agents believe was purchased with cocaine proceeds.

Tim Halley's cooperation has provided information clarifying the roles and level of involvement of those persons with whom Halley had contact in the operation. Agent Beverly notes, however, that Halley has met neither Oscar Medina nor Omar Orozco, and it is highly unlikely that such a meeting would ever take place. Both Maurtua and Tony Ledgard have refused to meet with individuals unknown to them during discussions concerning cocaine, and Maurtua's conversations with Halley have been short and to the point. Beverly feels that it is highly unlikely that Halley will be able to obtain direct evidence against anyone in the operation higher than Maurtua.

FBI agents in the Miami office have conducted hours of physical surveillance on

Tony and Donna Ledgard's residence in Miami, and on the office of Hernando Carrillo, where Ledgard subscribes to a non-published phone number equipped with an answering machine. Agent Beverly notes that these efforts to date have not lead to sufficient evidence to sustain a prosecution of members of this group. Physical surveillance of the Ledgard residence is complicated by the fact that the residence of Gonzalo Ledgard is located directly in front of it on the opposite side of Secoffe Street, thereby increasing the risk that the subjects of the physical surveillance would detect it.

Beverly describes the hours of physical surveillance conducted by DEA and Customs in Los Angeles of the group headed by Omar Orozco. He notes that they have also engaged in a systematic trash cover at certain residences in an attempt to gain evidence against the Orozco group. To date, their efforts have not been sufficient to lead to evidence which would sustain a prosecution of members of this group. These investigative efforts have only succeeded in seizing large amounts of cash, in violation of U.S. currency laws, from various members of the group while they tried to leave the country. He notes that efforts are currently underway in Los Angeles to institute electronic surveillance on certain members of the Orozco group who reside there.

DEA, FBI, and Customs agents have advised Beverly that Peruvian and Colombian cocaine smuggling cartels are the most sophisticated and difficult to penetrate of any such groups operating in the United States. These groups are often composed of blood family members who are characterized by their propensity for violence in enforcing their strict rules of silence. It is this violence that ensures that if one of the members of the organization is apprehended, he or she will not cooperate with law enforcement officials. Agent Beverly notes that the fact that these persons have family and property in Peru would undoubtedly discourage them from supplying information for fear of reprisals in Peru. For these reasons, he believes it is unlikely that Ledgard or Fernando Maurtua, if indicted, would be willing to cooperate against those higher in the organization. If a federal grand jury investigation was convened it is unlikely that immunity grants would result in testimony which would lead to successful prosecution of anyone higher in the operation than Tony Ledgard or Fernando Maurtua.

Finally, Beverly notes that the use of pen registers at the two Miami telephones subscribed to by Ledgard have been helpful in confirming that Tony Ledgard uses these numbers to contact other members of the conspiracy. Agent Beverly remarks upon the shortcomings of pen registers and notes that they do not provide information as to the identity of persons making incoming calls to these numbers. Intercepted conversations in which Tony Ledgard has been a participant disclose that Ledgard, on numerous occasions, has used a public telephone to call other members of the conspiracy at telephone numbers which were identifiable and belonging to some members of the conspiracy. Conversely Ledgard has received telephone calls over the telephone subscribed to by Donna Ledgard, in which drugs were discussed, which were made by other members of the conspiracy using public telephones. This pattern indicates to Agent Beverly that Ledgard and others feel relatively safe in receiving incoming telephone calls at telephone numbers identifiable with them as long as these calls are made from public telephones. Due to this pattern of intercepted conversations, it is Beverly's belief that the more important conversations conducted over these lines are those which are incoming and therefore not identifiable by the use of a pen register.

## DISCUSSION

I. *Defendants' Motion to Suppress for Violation of 18 U.S.C. § 2518(1)(c)*

Defendants challenge the sufficiency of each application, alleging the government failed to adequately include in each a statement of the efficacy of normal investiga-

tive techniques. 18 U.S.C. § 2518(1)(c) requires each application for an order authorizing interception of wire or oral communications to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[2] 18 U.S.C. § 2518(3)(c) authorizes a judge to enter an order authorizing or approving interception if the judge determines "on the basis of facts submitted by the applicant" that normal investigative procedures were futile *or* that such procedures appear to be unlikely to succeed *or* that such procedures would be too dangerous.

Defendants press this motion most vigorously, and the government opposes it in like fashion. Defendants allege the applications' insufficiency on two grounds. First, defendants as a group disagree with the affiant/agents' conclusions in each application that other investigative tools were unsuccessful or were unlikely to succeed. Second, a fewer number of defendants assert that certain applications did not include an individualized statement presenting the proven, or anticipated, lack of success of other investigative procedures as to each target.

The specificity and import of defendants' numerous challenges based on § 2518(1)(c) compel the court to set forth an extensive synopsis of the facts contained in the approximately 800 pages of the eleven applications (*see* page 7 through 157 of this decision) and provide individual analysis of the adequacy of each application. Before the court embarks upon its analysis of the applications and the affidavits included in support thereof, it is necessary to review some fundamental points regarding the necessity requirement. Courts have determined that § 2518(1)(c) was not enacted to force the government to exhaust all other

investigative procedures before resorting to a request to wiretap. *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir.1985); *United States v. Bailey*, 607 F.2d 237, 242 (9th Cir.1979) *cert. denied*, 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980); *United States v. Feldman*, 535 F.2d 1175, 1178 (9th Cir.1976); *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir.), *cert. denied* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975). On the other hand, electronic surveillance may not be routinely used as the first step in a criminal investigation. *See United States v. Giordano*, 416 U.S. 505, 514, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974); *United States v. Bailey*, 607 F.2d at 241. Section 2518(1)(c) serves to insure that electronic surveillance is not used in situations where traditional investigative techniques would suffice to expose the crime. *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir.1981); *United States v. Santarpio*, 560 F.2d 448, 452 (1st Cir.), *cert. denied*, 434 U.S. 984, 98 S.Ct. 609, 54 L.Ed.2d 478 (1977).

█ In its evaluation of the success of other investigative procedures, the government need not show that ordinary investigative procedures have been completely unsuccessful; the application must only demonstrate that the investigation has reached a stage where further use of ordinary procedures cannot reasonably be required. *United States v. Spagnuolo*, 549 F.2d 705, 710 n. 1 (9th Cir.1977).

█ Applications must not be read or reviewed for statutory compliance in a vacuum. Congress intended the government's showing of necessity to be "tested in a practical and common-sense fashion." S.Rep. No. 1097, 90th Cong.2d Sess., *reprinted in* 1968 U.S.Code Cong. & Ad. News 2112, 2190 (hereinafter referred to as "S.Rep. No. 1097); *United States v. Brown*, 761 F.2d at 1275; *United States v.*

---

**2.** This requirement is usually referred to as the necessity requirement. *United States v. Brown,*

761 F.2d 1272, 1275 (9th Cir.1985).

*Bailey,* 607 F.2d at 241; *In Re DeMonte,* 674 F.2d 1169, 1172 (7th Cir.1982); *United States v. Shipp,* 578 F.Supp. 980, 989 (S.D. N.Y.1984).

■ Finally, compliance with § 2518(1)(c) should be evaluated by viewing each affidavit in support of an electronic surveillance application as a whole. *United States v. Kail,* 612 F.2d 443, 447 (9th Cir.1979); *United States v. Martinez,* 588 F.2d 1227, 1231 (9th Cir.1978).

The challenges to each affidavit will be considered separately, by affidavit. Where a particular challenge is directed at more than one affidavit, it is so noted.

### Application A

Augustin Fernando Maurtua and Jorge Maurtua on behalf of themselves and all other defendants [3] challenge specific comments and conclusions contained in Agent Smith's affidavit, submitted in support of Application A. Many of defendants' challenges to the affidavit contained in this application and all others are based upon information or opinion set forth in the declaration of Stephen M. Swanson. Swanson is an ex-DEA agent and his declaration is submitted to refute agents' statements in the affidavits.

Agent Smith listed as one of the consequences of the wiretap the possible arrest of Jessie and John Alessio, Jr. should they come to the United States. The Maurtuas argue that apprehension of suspects is not a proper purpose for which to seek a wiretap. They also argue that the affidavit contained no discussion of normal investigative techniques employed to ascertain the entry of either Jessie or Alessio into the United States. The Maurtuas also contend that the FBI had a chance to apprehend Jessie when Robertson informed Agent Smith that Jessie had phoned him and left a phone number in San Francisco at which he could be reached. They also claim that there were other crimes, witnessed by Claude Phillips and Fred Robertson, for which Jessie could have been prosecuted. Defendants refer to a report provided to them in discovery which states that in mid-January, 1984, Knight told Robertson that he and Jessie and Allie were willing to deal with him. Defendants allege that this information demonstrates that the hierarchy of the drug organization could have been penetrated without the use of electronic surveillance and that Smith's conclusion that electronic surveillance was necessary was therefore refuted.

■ Defendants mischaracterize Agent Smith's comment regarding apprehension of Jessie and Alessio, Jr. Agent Smith's affidavit states that he seeks electronic surveillance of Kulbusauskas' home and telephone to obtain direct evidence against Jessie and Alessio, Jr. that would

---

**3.** The court acknowledges defendants' laudable efforts to pool their resources and accepts all briefs submitted by the Maurtuas, as representatives for all defendants, as filed on behalf of all defendants. Hereinafter, arguments proffered by the Maurtuas should be presumed to be made by all defendants. Where similar arguments are made by the Maurtuas as well as other defendants, they will be referred to generally as defendants' motions.

By permitting this group pleading process, the court is not ignoring the standing issue. All defendants must prove that they are an "aggrieved ·person" within the meaning of 18 U.S.C. § 2518(10)(a). Each defendant must do so as to each of the eleven intercept orders by establishing that they were a party to an intercepted conversation or that the intercepted conversation occurred on their premises. *United States v. Jabara,* 618 F.2d 1319, 1326 (9th Cir.), *cert.*

*denied,* 446 U.S. 987, 100 S.Ct. 2973, 64 L.Ed.2d 845 (1980). Co-conspirators and co-defendants have been accorded no special standing. *Alderman v. United States,* 394 U.S. 165, 172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). Each defendant presently before the court does not have standing to press this motion as to each intercept application and order. In this case, the court required each defendant pursuing any of the motions discussed herein to file a motion to join containing a statement regarding standing. At the hearing on November 6, 1985, the court granted all motions to join after review of each defendant's standing statement. The court therefore finds that each defendant has standing to press this motion in accordance with its ruling on the motions to join.

result in successful prosecution of them because the evidence collected to date is circumstantial. Though he notes that electronic surveillance might also tip off investigators should Jessie or Alessio, Jr. return to the United States, that is not the *purpose* for requesting the wiretap. Inclusion of this statement, even if it were an improper purpose for wiretapping, does not render infirm the government's statement regarding necessity. Investigation of narcotics offenses is a proper purpose for which to seek electronic surveillance that may provide evidence of such crimes. 18 U.S.C. § 2516(1)(e). Investigation of narcotics offenses committed by Jessie, Alessio, Jr., Knight and Kulbusauskas were the major objectives to be achieved by electronic surveillance. In any event, the court is satisfied that all reasons proffered by Agent Smith for obtaining electronic surveillance of wire and oral communications emanating from Kulbusauskas' home were legitimate.

■ With respect to defendants' other claims, the court preliminarily notes that defendants' statements concerning the possibility of prosecuting the targets for other crimes and the viability of other investigative methods are based on Stephen Swanson's opinion. Though Swanson's conclusions and opinions have been afforded careful consideration by the court, the court acknowledges that they are offered in hindsight, employing the "retrospectoscope" with its distorting lens, and without a complete knowledge of all the factors that went into the investigating agents' assessments of the case. Swanson's suggestions that the FBI missed a chance to nab Jessie in San Francisco or that Jessie's and Allie's organization could have been infiltrated through undercover work are really exercises in second-guessing the FBI. Post factum suggestions as to how an investigation might have been handled are entitled to little weight in analysis of statutory compliance with § 2518(1)(c). *See United States v. Martinez*, 588 F.2d at 1232 (necessity must be shown to exist at the time

application is made; it is irrelevant that hindsight shows that purpose of wiretap not achieved); *United States v. Feldman*, 535 F.2d at 1178 (even though defendant suggests ways in which surveillance and infiltration might have worked she is not entitled to second-guess FBI by suggesting alternatives reasonably discarded as not feasible by those conducting investigation); *United States v. Webster*, 734 F.2d 1048, 1055 (5th Cir.1984) (fact that counsel on appeal could list conceivable techniques for investigation is not dispositive; court will not invalidate a wiretap order because defense lawyers are able to suggest post factum some investigative technique that might have been used but was not); *see also United States v. Hyde*, 574 F.2d 856, 867 (5th Cir.1978). Judge Enright was apprised of the facts upon which Swanson's opinions were based and took those into consideration when reviewing Agent Smith's statement of the efficacy of alternative investigative measures. That Swanson would have conducted an investigation differently does not now make insufficient what was otherwise sufficient compliance with § 2518(1)(c).

■ In light of all the factors presented in Application A, Agent Smith's conclusion that other investigative methods—including controlled purchases of narcotics by Robertson through Knight—would not succeed was reasonable. Agent Smith's contention that he did not have evidence to support a prosecution of Jessie or Alessio, Jr. was also reasonable.

■ Focusing on the investigation of Kulbusauskas, defendants take issue with Agent Smith's statement that the FBI was not in a position to provide thousands of dollars to Robertson to purchase cocaine from Kulbusauskas through Knight. Defendants request this court to take judicial notice of the fact that FBI has at its disposal money to make such controlled purchases. In his or her review of a wiretap application, the district judge can properly

consider the government's available resources in determining whether § 2518(1)(c) has been complied with. *United States v. Spagnuolo*, 549 F.2d at 711. Cost-effectiveness of investigative procedures in light of available resources is also properly considered. *United States v. Ippolito*, 774 F.2d at 1486.

Defendants also attack Agent Smith's conclusion that electronic surveillance is needed because, among other things, Kulbusauskas has indicated to Knight that he has the capacity to confirm whether a person is a law enforcement officer. Swanson asserts that the government has the ability to create false records and that creation of a false record for Agent Smith so that he could continue his undercover work would have been the appropriate investigative procedure. Defendants, again relying on Swanson's declaration, suggest that surveillance of Kulbusauskas' residence should have been conducted more frequently. They opine that when agents knew that Knight was to meet Kulbusauskas to pick up cocaine that Kulbusauskas' residence should have been heavily surveilled in order to detect couriers who could then be followed to Kulbusauskas' stash pad. Defendants also suggest that the investigation was in its nascency when this application was sought and that electronic surveillance was sought too soon.

■■■ Defendants' arguments are essentially Monday-morning quarterbacking which seem to unreasonably flirt with risk of detection of the investigation. Under the circumstances presented in his affidavit, it was wholly reasonable for Judge Enright to accept Agent Smith's appraisal that the investigative procedures attempted to date had limited or no success. Attempts to get the Robertsons or Agent Smith in contact with Kulbusauskas to make a direct purchase from Kulbusauskas had proven unsuccessful. Kulbusauskas was believed to have the capacity to confirm that Smith was an agent and the facts do not suggest that the government was aware by what means he could do this in

order to countervail it. Kulbusauskas also appeared to follow a firm rule of refusing to meet with strangers from which it could be inferred that infiltration by an outsider would be no more successful any time in the future. He did not keep contraband at his residence, counterbalancing the effectiveness of search warrants. Agents are not required to resort to measures that will clearly be unproductive. *United States v. Terry*, 702 F.2d 299, 310 (2d Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). Nor is it necessary the government completely exhaust all possible investigative techniques. See discussion *supra* at 1507. Defendants' isolated attacks on individual parts of the overall investigative plan do not demonstrate insufficiency in the government's necessity showing.

■■■ Finally, defendants take issue with Agent Smith's assertion that electronic surveillance was needed to gather evidence sufficient to sustain a prosecution against Kulbusauskas and Knight. They base this argument on Swanson's speculation that the government already had in its possession strong evidence of crimes for which the targets could have been prosecuted. Under the circumstances presented in his affidavit, Smith's assessment of the prosecutability of the targets was not unreasonable.

■■■ The court finds that Agent Smith set forth an adequate factual history of all facets of the investigation to enable Judge Enright to determine, independently of Agent Smith's assertions, that ordinary investigative techniques employing a normal amount of resources had failed to make the case within a reasonable period of time and might have compromised the investigation. *United States v. Spagnuolo*, 549 F.2d at 710.

### Application B

Defendant Whitney challenges Agent Smith's conclusion in this application that

electronic surveillance was needed to develop prosecutable cases against Jackson's coconspirators. Whitney postulates that the government alluded to a large narcotics conspiracy in the application in order to qualify this case for electronic surveillance when the government had no basis in fact to suggest that the conspiracy was any more complicated than the limited distribution chain beginning with Jackson and ending with Knight. Whitney also calls into question whether the government ought to be allowed to seek wiretaps when the objective for a tap is to detect a greater number of conspirators than has already been detected. Whitney theorizes that the government will always be able to secure a wiretap if it is permitted to use as an objective for electronic surveillance the detection of unnamed, and as yet unknown, co-conspirators.

 Whitney's claim that the government misused the application process is unfounded based on the facts of this case. Whitney presents no evidence, and the facts contained in Agent Smith's affidavit do not support the conclusion, that the government manufactured the existence of a large narcotics conspiracy so that agents could seek electronic surveillance that would have otherwise been denied them. Electronic surveillance may be permissably employed against certain members of a criminal organization even though concrete evidence against other members has already been gathered. *See e.g. United States v. Bailey*, 607 F.2d at 242 (necessity showing sufficient where normal investigative techniques failed to reveal source or details of distribution of narcotics even though prosecutable case had been made against some of the organization's members); *United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir.1984) (necessity requirement met where conventional surveillance and confidential informants had revealed Newman's involvement but not his sources or the extent of conspiracy); *United States v. Johnson*, 645 F.2d at 867 (identification of all members of conspiracy and precise nature and scope of illegal activity is proper purpose for which to seek electronic surveillance). In the instant case, it could be logically inferred from the pound quantity of cocaine that had been supplied to Kulbusauskas by Jackson that Jackson was a supplier who, in turn, had to be supplied by someone else. Whitney's claim that the government created a spectre of unnamed coconspirators ignores two important points with respect to this case. First, Application B was not submitted for the sole purpose of ferreting out unnamed coconspirators. Second, judicial review of an application to determine if the probable cause and necessity requirements of § 2518(1) had been met would expose any bad faith fabrication of a large conspiracy.

 The Maurtuas assert that the electronic surveillance was the initial investigative tool used against Jackson. They attack individually two of Agent Smith's conclusions. They challenge Agent Smith's statement that Jackson had to be dealing in quantities of cocaine significantly in excess of the one pound supplied to Kulbusauskas. They also assert that Agent Smith's conclusion that Jackson was Kulbusauskas' source of cocaine was faulty and not grounded on the facts as they had developed in the investigation through that date.

Defendants are correct that electronic surveillance was the initial investigative tool used against Jackson. However, Agent Smith's affidavit sets forth numerous reasons why other investigative procedures appeared unlikely to succeed.[4] At the time Application B was prepared, the FBI did not have access to informants that knew Jackson nor was there any indication that Knight knew Jackson. Jackson's home was difficult to physically surveil because it was located on a dead end street. Witness interviews or grand jury subpoenas would likely have tipped off Jackson that he was under investigation. Agent

---

**4.** Section 2518(1)(c) is written in the disjunctive; it is sufficiently complied with if the government demonstrates the futility of other investigative procedures.

Smith's characterization of Jackson as a multi-pound supplier is not unreasonable in light of Smith's experience, the experience of other agents involved in the case, and the information derived from the earlier wiretap of Kulbusauskas' home. Judge Enright could properly take those factors into consideration when determining whether the application made a complete statement regarding necessity.

### Application C

■ The Maurtuas object to the inclusion in this application of the affidavits submitted in support of Applications A and B. The court finds no error in this procedure. Reference to and incorporation of information contained in earlier applications is proper as long as that information is presented in conjunction with more recent information. Accord, *United States v. Santora,* 600 F.2d 1317, 1322 (9th Cir. 1979).

■ Dodson argues that Agent Leight's discussion of the need for electronic surveillance was insufficient because Agent Leight described his law enforcement experience in conclusory terms. Agent Leight states in his affidavit that he has been employed as a Special Agent of the FBI for more than two years and has participated in investigations involving organized crime and narcotics. Although the affiant/agent's experience level, as well as experience levels of other agents' who make investigative decisions in the case, is important, the review process for a Title III application is structured so that a district judge can determine, independently of an agent's assertions with respect to his or other agents' experiences, that the requirements of § 2518 have been satisfied. *United States v. Spagnuolo,* 549 F.2d at 710. Defendant provides no authority, nor can this court find any, that suggests that an affidavit by an individual who describes his or her experience as Agent Leight did here, would render an otherwise proper affidavit insufficient. *See United States v. Harvey,* 560 F.Supp. 1040, 1056–57 (S.D.Fla.1982) (rejecting allegation that agent/affiant's lack

of experience in drug-related investigations renders agent's evaluation of alternative procedures insufficient).

■ Whitney and Dodson assert that Agent Leight's affidavit failed to show that normal investigative techniques had been employed to investigate Whitney's involvement and that it fails to discuss specifically why such techniques would be likely to fail in an investigation of Whitney. Whitney highlights the fact that "Rick's" (Whitney) involvement in the case is mentioned infrequently in Agent Leight's affidavit. He correctly notes that no extensive physical surveillance was conducted of him nor did the government endeavor to use informants, grand jury investigation, witness interviews, search warrants or consensual monitoring in its investigation of him. Additionally, Whitney argues that Agent Leight failed to discuss why continued monitoring of Jackson's phone would not have as successfully met the objectives for wiretapping the phone that Whitney used.

Whitney directs the court's attention to *United States v. Santora,* 600 F.2d 1317, 1321–22 (9th Cir.1979) and argues that his situation is identical to that of Santora's co-conspirators. In *Santora* the initial application seeking electronic surveillance of Santora was found to satisfy the requirements of § 2518(1)(c). However, the court found that an insufficient showing was made as to Santora's co-conspirators whose conversations the government sought to monitor in order to discover those individuals' complicity in the scheme involving Santora. The court noted that the affidavit failed to recite specific efforts made by federal agents to investigate the co-conspirators' activities. Reference to an affidavit incorporated into an application for a wiretap conducted earlier in the investigation also failed to provide supplemental information that would have demonstrated compliance with § 2518(1)(c); that application discussed the difficulties of infiltrating a different faction of the conspiracy. The affidavit also failed to make any showing that normal investigative techniques would

be unlikely to uncover the activities of any of the other alleged coconspirators.

The showing made as to Whitney in Agent Leight's affidavit is distinguishable from that made as to the co-conspirators in *Santora*. Even though Agent Leight's discussion of attempts to investigate Whitney using alternate investigative procedures is wan, the court finds that Application C presented *de minimus* compliance with the statutory requirement. The court agrees with Whitney's conclusion that there is insufficient discussion in the Agent Leight's affidavit of the failure or success of alternate investigative procedures as· to him. However, a minimal showing that other investigative procedures reasonably appear to be unlikely to succeed in a further investigation of Whitney's involvement in this conspiracy has been made. Whitney has been identified as a cocaine source of, and as affiliated with, Frank Jackson. A pen register was placed on his phone which provided information of limited utility to agents. The pen register indicated that four calls were made from the telephone at Whitney's residence to a telephone at Jackson's residence, supporting agents' belief that the "Rick" participating in intercepted drug-related conversations with Jackson was Whitney. Yet the pen register did not provide information regarding the content of those calls.

It would have been preferable for Agent Leight's affidavit to discuss separately his reasons for concluding that other normal investigative procedures appear unlikely to succeed against Whitney. However, failure to include a separate analysis does not, of itself, invalidate the information presented in the affidavit. Agent Leight concludes that physical surveillance would not assist in gathering conclusive evidence of criminal activity as to Jackson, Kerr *and Rick* (Whitney) (emphasis added). Based on his experience, Agent Leight concludes that physical surveillance does not provide information exchanged during meetings between co-conspirators although it may confirm the occurrence of such meetings. Agent Leight also comments that execution of search warrants would not have provided sufficient evidence to determine the full scope of the criminal activities of the targets, including Rick Whitney. Relying on his law enforcement experience and the experience of others investigating the case, Agent Leight believes that the conspirators *in this case*, of which Rick is one, do not maintain sufficient records which would, if recovered in a search, elucidate the scope of the conspiracy or identify the individuals involved in it. Agent Leight also feels that the investigation would be compromised if search warrants were executed. Agent Leight also discusses the inefficacy of subpeonaing witnesses to give grand jury testimony. Though the court does not encourage the clustering of the discussion of necessity as to all targets, the practice does not, in this instance, detract from the minimal compliance with § 2518(1)(c). "(A) particularized need for wiretaps may be established as to several principals and their telephones, depending upon the circumstances alleged, not only by a minutia of detail discretely directed, but by persuasive facts pertaining in common to all of the principals and their telephones." *United States v. Baker*, 589 F.2d 1008, 1012 (9th Cir.1979). *See United States v. Kail*, 612 F.2d at 447 (Although affidavit was not as detailed with respect to one co-conspirator when compared with its description of others, affidavit read as whole established futility of using normal investigative procedures for all principals). Judge Thompson, viewing the application as a whole, had before him sufficient historical data about the investigation, sufficient explanation of the evidence derived from earlier electronic surveillance and sufficient discussion of the inefficacy of normal investigative procedures (though some statements were boilerplate) to determine that a complete statement in compliance with § 2518(1)(c) had been made.

Kerr propounds an argument identical to Whitney's. He provides a list of investigative methods that had not been tried against him to demonstrate the insufficiency of the necessity showing. The focus on compliance with this statutory section in

Kerr's case, as it was in Whitney's, must be on the discussion of why it appears unlikely that such procedures would succeed in achieving the objectives of the investigation. The factors discussed as to Whitney are those that were reviewed by Agent Leight with respect to Kerr. For the reasons discussed above, the court finds, based on all the information in the application and the development of the investigation of Kerr at that point in time, that requirements of § 2518(1)(c) had been satisfied. That most of discussion of the inefficacy of these investigative means is identical with respect to Kerr and Whitney does not affect the necessity showing in light of the similarity of their positions in the conspiracy.

## Application D

Michael Sullivan, Tina Sullivan and Davis argue that this application is comprised of bald, conclusory statements thereby rendering insufficient the necessity showing. Michael Sullivan attacks specific statements of Agent Walker's in the application. Sullivan challenges Walker's conclusion that an organization as sophisticated as Sullivan's could not be stopped by the use of conventional techniques. Sullivan postulates that another agent in a similar position might determine that infiltration of the organization by an informant would be as successful as electronic surveillance. He argues that the affidavit should, and does not, explain the reasons why electronic surveillance is the only way to obtain information regarding his alleged sources and his expenditure of illegally derived profits.

■■■ Sullivan's challenges controvert Ninth Circuit law. "What is required is a showing that in the particular investigation normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time." *United States v. Spagnuolo*, 549 F.2d at 710. Agent Walker sufficiently explained why other investigative methods, including undercover infiltration of the organization, would not achieve the objectives of the investigation. Agent Walker

discusses the difficulty in orchestrating undercover buys of narcotics from Sullivan because Sullivan deals only with persons he trusts. Agent Walker bases his conclusions on thirteen years' experience with the FBI. The facts set forth in Agent Walker's affidavit clearly demonstrate that Sullivan is concerned with detection of his operation by law enforcement; he had developed tactics to avoid detection, including the use of paging devices and pay telephones to convey drug-related messages. Because Sullivan is a major supplier, much money would be required to buy from Sullivan cocaine in the quantities that he distributes, even if an undercover buy could be made. These factors, along with the many others provided by Agent Walker comprise a statement that sufficiently complies with § 2518(1)(c).

■■■ Sullivan suggests that Agent Walker's statement regarding his paranoia with law enforcement detection was unfounded. The court disagrees. Agent Walker's conclusion that Sullivan had great concern for police detection is supported by the facts. Sullivan also challenges Agent Walker's statement regarding the need for undercover agents to demonstrate to drug targets' satisfaction that they use cocaine to prove that they are not "narcs". *See United States v. Alonso*, 740 F.2d 862, 869 (11th Cir.1984) (consumption of cocaine by defendants strengthen their trust in one another). The court finds that Agent Walker's statement, based on his many years as an investigator, is properly included in his affidavit.

In sum, Sullivan's challenges to this affidavit are limited to attack of specific statements. Viewing Agent Walker's affidavit in its entirety, the court finds that it satisfied the requirements of § 2518(1)(c) and demonstrated that alternative investigative techniques would not succeed in identifying the persons supplied by and supplying Sullivan's cocaine distribution organization and the manner in which Sullivan utilized his illegally derived profits.

▮ The Maurtuas and Barsotti allege that this application, which incorporates the affidavits filed in support of prior applications, contains no new reasons or bases for electronic surveillance other than those presented in the earlier applications. The court disagrees with defendants' characterization of the contents of Application D. Though it does reference and incorporate prior applications, it contains summaries of multitudinous intercepted conversations, discussion of the status of the investigation to date, and alternative investigative procedures employed to date. This application is not rendered insufficient for purposes of § 2518(1)(c) because it incorporates and relies on information provided in other applications. See discussion supra at page 167.

▮ Slater argues that no showing was made in any affidavit regarding the necessity for electronic surveillance against him and that specifically, no mention was made of any investigative techniques used against him. Initially the court notes that Slater is not mentioned in the first three applications, A, B and C. It appears the FBI was not aware of Slater's involvement until he was intercepted on the wiretap of Frank Jackson's telephone authorized by Order C. However, Slater's comment is applicable to Application D in which he is named as one of the anticipated interceptees over the wiretap of Jackson's phone. The law is clear that when more than one wiretap is requested, the government bears the burden of demonstrating the necessity for electronic surveillance for each of the lines (or locations) and targets requested to be electronically surveilled. *United States v. Abascal,* 564 F.2d 821, 826 (9th Cir.1977), *cert. denied,* 435 U.S. 942, 98 S.Ct. 1521, 55 L.Ed.2d 538 (1978); *United States v. Santora,* 600 F.2d 1317, 1321 (9th Cir.1979). Yet, Application D does not claim that Slater was a target, nor did it request that his phone be wiretapped. Slater provides no authority for the proposition that necessity be demonstrated for all potential interceptees, nor does this court read the statute to impose such a requirement. The court finds that the government was not required to make a necessity showing as to Slater and his motion to suppress on those grounds is denied.

### Application E

▮ Challenges to this application based on the necessity requirement focus on the need to wiretap Tom Pool's telephone. Pool argues that the affidavit contains absolutely no discussion of the efficacy of alternative procedures to investigate him. This court has scrupulously reviewed Application E and finds that a minimal statement meeting the requirement of § 2518(1)(c) is supplied within. Electronic surveillance is sought to clarify Pool's role in Sullivan's organization and to determine if Pool controls a faction of Sullivan's organization. That Pool may control a subsidiary of Sullivan's organization is suggested by his reference to Lonnie's being in his "flow" of cocaine. Agent Walker remarks that electronic surveillance is the only way to determine the identity of others in Pool's "flow." Electronic surveillance is also sought to assist in identifying other sources of Sullivan's cocaine and Pool's assets derived from his involvement in cocaine distribution.

Agent Walker's affidavit includes a general statement that conventional investigative techniques, including search warrants, grand jury investigation, and witness interviews are not realistic investigative approaches in this case. Agent Walker opines that the enormity of and international nature of the conspiracy render worthless such investigative methods. Agent Walker also incorporates comments regarding the inefficacy of other traditional investigative techniques from all applications submitted prior to this one. If the court were to limit its review of Agent Walker's affidavit for compliance with § 2518(1)(c) to his terse comments in this application alone, satisfaction of the statutory requirements is minimal indeed. When Agent Walker's affidavit and the incorporated preceding applications are taken as a whole, however, the court finds that a sufficient statement as to why other investiga-

tive procedures have been tried and have met with limited success has been made.

The facts contained within Agent Walker's affidavit demonstrate that Pool is a member of Sullivan's organization, although his role in the organization has not been clarified. Therefore, Walker's comments about the Sullivan organization in both Applications D and E are applicable to Pool. Pool had been earlier intercepted in conversations with Sullivan (and others) which were clearly drug-related. His conversation with Sullivan on August 3, 1984 indicates that he too utilizes the pager-system. Pool obviously enjoys a position of trust with Sullivan as evidenced in the August 10, 1984 conversation in which Sullivan spoke freely with him of his situation with Ken Clarke and its effect on his relationship with Maurtua.

Pool notes that at the time Application E was submitted, the government already knew what he looked like, what vehicle he used, and that he had had daily narcotics-related conversations with Kerr which had clarified his role in the organization. However, Pool's comments also demonstrate the futility of other investigative means in that the information regarding his disposal of narcotics proceeds and his role with respect to Sullivan had not yet surfaced in the investigation, although other information had.

 Pool's argument that a wiretap of his phone was unnecessary because the government could have gotten the information that it sought with respect to him through electronic surveillance of Sullivan's home and office does not weaken the government's assertion that normal investigative techniques would not have been fruitful. Electronic surveillance of other targets' communications is not a "normal investigative technique" for purposes of § 2518 which would preclude electronic surveillance of Pool's own telephone.

In sum, Agent Walker's comments contained in Application E regarding the sophistication of Sullivan's organization, its elusiveness with respect to ordinary surveillance techniques, and its extensive structure, among others, satisfy the necessity requirement.

### Application F

 The Maurtuas' arguments regarding this application are not persuasive. The Maurtuas' assertion that § 2518(1)(c) was not complied with in this application is accompanied by a list of other investigative techniques that Agent Walker did not state were tried or even discussed in the investigation of Timothy Halley. Defendants' assertions that the necessity requirement was not met are unfounded. Agent Walker discusses Halley's role as comptroller for the Sullivan organization. He notes that up to that date physical surveillance had been extensively utilized in the case but that attempts to follow Halley had met with limited success. Additionally, Agent Walker states that the FBI had insufficient manpower to cover all the meetings that Halley and other members of the multi-faceted operation attend. The facts demonstrate that Halley used Sullivan's pager system, that Sullivan was secretive about the location of any stash houses used and that rental cars were used to avoid detection. Agent Walker's affidavit comports with the requirements of § 2518(1)(c).

### Application G

 The Maurtuas assert that the FBI was not diligent in investigating Nick, Sullivan's associate that discussed with him the possible homicide of a drug associate. The Maurtuas suggest that after the unsuccessful attempt to gather more information about Nick by approaching personnel at his answering service, the FBI should have tried a different approach. Once again, the attack on one discrete parcel of the necessity showing does not render the application insufficient.

Addressing the merits of the Maurtuas' argument, the court can think of few other methods that, with the paucity of information available to the FBI, would have assisted in uncovering Nick's identity. No facts were presented that suggest that

Nick came to the FBI's attention in any way other than through the Sullivan wiretap. Agents are not required to resort to measures that will clearly be unproductive. *United States v. Terry,* 702 F.2d at 310. More importantly, identification of Nick was but one tangential objective of the FBI's request for this electronic surveillance. Agent Walker's statements satisfied the necessity requirement. The international nature of the conspiracy, the organization's reliance on the telephone to communicate information, the improbability of "turning" a key member of the organization to provide information against the others, along with many other facts cited by Agent Walker, demonstrate compliance with § 2518(1)(c).

### Application H

■ The Maurtuas argue that the great length of this investigation and the sheer number of electronic surveillance applications that have already been sought by the government verify their theory (also proffered earlier by Whitney in Application B) that the government intentionally escalated the scope of the conspiracy, without reasonable basis for doing so, in order to continue electronic surveillance when it was no longer needed. They argue that electronic surveillance was no longer needed because the government had already met all of its initial investigative objectives. The court disagrees with defendants' analysis of the progress of the investigation. The government did not manufacture the expansion of the investigation. Each interception prior to that sought by this application provided evidence of yet more persons in the distribution chain. The length of the investigation was the direct result of the continued success of the electronic surveillance in uncovering the higher-ups in the distribution chain, bringing agents, ever closer to the cocaine source. The court finds that the reasons for continued electronic surveillance proffered in this application were valid and that necessity for continued electronic surveillance as to all the targets was sufficiently demonstrated.

### Application I

■ The Maurtuas present only one argument particular to this application that has not been raised with respect to earlier applications. They challenge Agent Sinclair's conclusion that electronic surveillance was necessary, arguing that the failure of the trash cover at Jorge Maurtua's residence to disclose any evidence of major narcotics trafficking demonstrated that there had been no evidence adduced prior to this wiretap application to justify this wiretap. The failure of the trash cover to disclose information regarding the organization's operation in the Ketchum/Sun Valley, Idaho area, however, is one of the many reasons presented in Agent Sinclair's affidavit why electronic surveillance is necessary. Agent Sinclair does a thorough job of describing physical surveillance conducted of Jorge Maurtua's residence, and its limitations, and the results of a pen register placed on the phone assigned to that residence. He discusses many of the factors presented in other applications concerning the characteristics of this organization, the improbability of convincing one of the leaders in the organization to cooperate and the inefficacy of other investigative methods including search warrants and grand jury subpoenas. He describes in detail the information gathered from informants thus far, and provides good reason why these informants are no longer useful in developing more information. The court finds that Agent Sinclair's affidavit sets forth a sufficient statement of the necessity for electronic surveillance of Jorge Maurtua's residence.

### Application J

■ The Maurtuas proffer many of the same arguments presented for Application H in their attack of this application. They once again focus on specific conclusions made by the affiant, Agent Walker. The only new argument raised as in this application is defendants' challenge to Agent Walker's assertion in support of his request for microphone coverage of the apartment at 1935–C Estrella De Mar that

people speak more freely in their homes than on their telephones. Agent Walker's conclusion is a reasonable one, properly included in the application, which in this court's opinion, sufficiently demonstrates the necessity for electronic surveillance of all targets.

### Application K

■ The majority of the Maurtuas' allegations that a statement of the necessity for electronic surveillance was not sufficiently presented in this application have been asserted with respect to previous applications and do not warrant further discussion. However, defendants raise one new issue with respect to this application. 18 U.S.C. § 2518(1)(e) requires each application to contain a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application. Defendants point out that this application fails to mention the authorization of Orders A, B and J and the applications requesting those orders. The government represents that the omission of that information was an accidental clerical error. The court has not been presented with any evidence to the contrary and finds that the accidental noncompliance with § 2518(1)(e) does not vitiate the sufficiency of this application in meeting the statutory requirements, including the necessity requirement.

## II. *Defendants' Request for a Franks Hearing Re: § 2518(1)(c) Issues*

Defendants assert that they are entitled to an evidentiary hearing to adduce further evidence regarding the government's representations in wiretap applications, and Judge Thompson's and Judge Enright's probable cause and necessity findings, as required in 18 U.S.C. § 2518(1)(c). In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1977), the Supreme Court held that a defendant is entitled to an evidentiary hearing upon a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, is included by an affiant in a warrant affidavit. If the reviewing court determines that the allegedly false statement is necessary to the finding of probable cause, a hearing is required. Despite this, if there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. *Id.* at 172, 98 S.Ct. at 2685. While the *Franks* decision only concerned the inclusion of false material in an affidavit, the Ninth Circuit has recognized that the *Franks* logic should extend to instances where the government's affiant deliberately or in bad faith omits a material fact. *See United States v. Ippolito*, 774 F.2d at 1486–87 n. 1; *United States v. Brooklier*, 685 F.2d 1208, 1221 (9th Cir. 1982), *cert. denied*, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983). *See also United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.), *cert. denied*, 444 U.S. 981, 100 S.Ct. 484, 62 L.Ed.2d 408 (1979); *United States v. Tufaro*, 593 F.Supp. 476, 485 (S.D.N.Y.1983), *aff'd*, 762 F.2d 991 (2d Cir. 1985); *United States v. Dorfman*, 542 F.Supp. 345, 367 (N.D.Ill.1982), *aff'd*, 690 F.2d 1217 (7th Cir.1982), *rev'd*, 690 F.2d 1230 (7th Cir.1982).

■ The majority of defendants' comments address the various affiants' statements regarding the need for electronic surveillance and the viability of alternative investigative means. Along with the probable cause determination that is required of a judge issuing an intercept order, a determination that normal investigative procedures have been tried and have failed or that such procedures reasonably appear to be unlikely to succeed or are too dangerous if tried must be made. 18 U.S.C. § 2518(3)(c). Although the *Franks* decision concerned a search warrant affidavit, the *Franks* standard has been extended to affidavits accompanying electronic surveillance applications. *E.g., United States v. Ippolito*, 774 F.2d at 1484–87; *United States v. Licavoli*, 604 F.2d 613, 621 (9th Cir.1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1979). *See also United States v. Shipp*, 578 F.Supp. 980, 987 (S.D.N.Y.1984); *United States v. Tufa-*

*ro*, 593 F.Supp. 476, 485–87 (S.D.N.Y.1983). The *Franks* decision focused on the probable cause determination by the judge issuing the search warrant, but there is no reason why the *Franks* analysis should not be applied to the judge's necessity determination in the electronic surveillance context. *United States v. Ippolito*, 774 F.2d at 1485.[5]

■ Defendants allege that the affidavits accompanying applications for electronic surveillance omitted material facts and contained material falsehoods. Their allegations about material falsehoods center primarily on the government's representations concerning the efficacy of normal investigative procedures in Affidavit A. As an offer of proof that the statements in the applications contain falsehoods, defendants proffer the affidavit of Stephen M. Swanson, a retired DEA agent who had been with that Agency for 16½ years. Swanson dissects the representations made by Agent Smith in his affidavit attached to Application A. He challenges Smith's particular assessments of the history of and potential success of investigative procedures, including conventional surveillance of Kulbusauskas' residence, infiltration by an undercover agent, pen register and toll record information, and search warrants.

Swanson's declaration provides an *opinion*, and presents no factual discrepancies regarding the efficacy of investigative procedures, in much the same fashion that Agent Smith's affidavit presents his assessment or opinion. The court finds that Smith's affidavit does not contain material *falsehoods*. There is no suggestion that government agents did not attempt some other investigative procedure when Agent Smith asserts that they did, nor is there a suggestion that the information upon which Agent Smith relied to make his necessity determination was fabricated. Based on his past experiences as an agent, Swanson merely takes issue with Smith's conclusions regarding specific investigative procedures. Even though Swanson may have hypothetically structured an investigation differently or recommended prosecution of certain suspects at an earlier point this is not proof of falsehood on the part of another agent. Accordingly, the court finds that defendants have not made a sufficient showing that Smith's affidavit contained material falsehoods.

■ Defendants also allege that omissions material to the assessment of success of normal investigative procedures in Applications A and E warrant a *Franks* hearing. Their allegations regarding omissions focus primarily on the date upon which suspects Augustin Fernando Maurtua and Frank Len Jackson were positively identified. Relying on Agent Charles B. Walker's affidavit of October 21, 1985 (submitted to this court as Exhibit 2 to the government's opposition),[6] defendants allege that pen register information revealed Frank Jackson's identity to the government agents. Defendants assert that this information was material to Judge Enright's finding of necessity in Order A, and infer that he may have denied the request for electronic surveillance had he been apprised of this information. Reviewing the objectives for electronic surveillance and the discussion of the viability of alternative

---

5. Of course, in the case of an omission, the analysis must be altered to a determination of whether the additional information was material to the judge's finding that normal investigative procedures have been unsuccessful or are unlikely to succeed or are too dangerous under the circumstances.

6. The court does not rely on Agent Walker's October 21, 1985 affidavit to supplement the government's showing of necessity for the electronic surveillance. Such showing must be made within the four corners of the affidavit.

In accordance with this principle, the court does not rely on Agent Walker's affidavit to elucidate the knowledge in the government's hands at the time the application was made; if such information was not contained in the original application presented to Judge Thompson, it is not for this court to consider in reviewing the probable cause and necessity determinations. However, the court does consider this information to the extent that it is relied upon by defendants, as part of their offer of proof to demonstrate material falsehood or omission.

investigative means enumerated in Application A, it is clear that Frank Jackson's identity would have been an immaterial consideration. Application A sets forth the government's design to locate Kulbusauskas' stash house and uncover his trafficking network, which appeared impossible to do under conditions present at that time because he had relatively insulated himself by refusing to deal with strangers and refusing to make direct exchanges of cash for cocaine. Positive identification of one of the many persons that Kulbusauskas conversed with would not have achieved *ab initio* any of the government's proposed objectives, nor would it have provided information sufficient to suggest that other investigative procedures would suddenly become effective.

 Defendants make a similar suggestion with respect to the government's knowledge regarding Augustin Fernando Maurtua's identity. Specifically, defendants allege that the government knew the full name of the person they referred to in Application E as "Fernando LNU," [7] but omitted information regarding that knowledge from the affidavit accompanying Application E. They argue that agents were dilatory in pursuing further positive identification of Fernando. However, information contained in Application E demonstrates that this was not a material omission. Judge Thompson was apprised that Fernando had been intercepted on Michael Sullivan's phone and that he used the phone subscribed to by Donna Ledgard. Furthermore, Judge Thompson was aware of Fernando's role as one of Michael Sullivan's cocaine sources. Thorough description was made in Application E of Fernando's connection to an international distribution network and to the use of Hertz rental cars, telephone pagers, and evasive driving tactics to elude detection. The application does not focus as much on the government's desire to identify Fernando as it does on the need to identify his sources and to further catalogue and specify his method of transporting cocaine. To that end,

knowledge of Fernando's precise identity is not material to Judge Thompson's determination of the necessity for electronic surveillance. Knowledge of Fernando's complete name might have provided the FBI with a clue by which to search for Fernando's criminal dossier, if he had one, but it would not have provided the information needed to facilitate *this* investigation. The FBI had already uncovered Fernando's association with Miami and Peru, and with the Ledgards. Agents had observed him and attempted to surveil him. Knowledge of his full name would bring them no closer to their goals or to the information that could only be retrieved (due to the way this organization operates) through electronic surveillance. Furthermore, there was no indication that once Fernando was positively identified that all of the investigative goals could all suddenly be achieved.

 Finally, defendants argue that they are entitled to an evidentiary hearing because the government failed to report to Judge Enright its unsuccessful attempts to physically surveil targets of this investigation. Agent Walker's October 21, 1985 affidavit describes unsuccessful attempts to physically surveil Kulbusauskas' residence on numerous occasions between December 14, 1983 and February 3, 1984. The court does not find this information to be a material omission. If anything, its existence bolsters the government's position that electronic surveillance was the only method of investigation that could successfully uncover information of Kulbusauskas' cocaine dealings.

Defendants have failed to demonstrate the use of any false information or the occurrence of any material omissions in the applications used to secure wiretaps. Accordingly, the court finds that a *Franks* hearing is not required.

### III. *Motion to Suppress for Lack of Probable Cause*

Davis, Tina Sullivan, Slater, Whitney and Kerr argue that the evidence obtained

---

**7.** "LNU" is an acronymn for the phrase "last name unknown."

through electronic surveillance should be suppressed because the orders authorizing electronic surveillance, as well as the orders authorizing extension of electronic surveillance were invalid due to lack of probable cause.[8] 18 U.S.C. § 2518(3) provides, in pertinent part:

Upon such application the judge may enter an ex parte order (authorizing electronic surveillance) ... if the judge determines on the basis of the facts submitted by the applicant that—

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; ...

(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

The court must consider two issues with respect to this motion. First, the government asserts that the Supreme Court's holding in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), applies to the instant motion and that the court need not engage in a review of Judge Enright's and Judge Thompson's probable cause determinations. Thus, the court is faced with the task of determining whether the good faith exception extends to the review of the applications in this case. Second, if *Leon* does not preempt the probable cause determination, this court must consider whether the applications support Judge Enright's and Judge Thompson's probable cause determinations in Orders A through K.

A. *Applicability of the Good Faith Exception*

 The government urges this court to apply the modification to the exclusionary rule established in *United States v. Leon.* In *Leon,* the Court held that the exclusionary rule should not apply where officers are acting in an objective good faith belief that they are conducting a search pursuant to a valid warrant. *Id.* The government argues that the procedures followed by agents to obtain intercept orders for wiretaps are similarly grounded in a good faith belief as to their validity, and therefore the principles of *Leon* should be extended to review of wiretap applications. In support of its position the government notes that a wiretap application is subject to extensive review, first by the agent/affiant, then by an Assistant U.S. Attorney, followed by the Attorney General or his authorized representative

---

**8.** Whitney makes a tangentially related argument. He asserts that the government has not complied with the requirement of 18 U.S.C. § 2518(1)(d) which provides in pertinent part:

If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has first been obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter.

Whitney admits that each application sets forth a request that surveillance not automatically terminate when the types of communications described therein have first been obtained and that electronic surveillance continue to the attainment of the authorized objective. However, he asserts that review of the affidavits and applications does not provide a recitation of the facts establishing probable cause to believe that additional communications of the same type will occur thereafter. Whitney cites no authority for his implicit assertion that such information must be separately set forth. The court sees no reason why the judge reviewing the application can not look to the facts establishing probable cause that criminal communications will be intercepted in order to determine whether there is probable cause to believe that additional communications will occur thereafter. In the instant case, Judge Thompson expressly found that probable cause for more extended interception had been demonstrated. This court has thoroughly reviewed the applications, and finds that probable cause to believe that additional communications would be intercepted has been established in the accompanying affidavits for all the wiretaps on which Whitney was intercepted.

and finally, by a District Judge. This review, the government argues, leaves no question as to an agent's good faith reliance on the intercept order so that the exclusionary rule should not apply under these circumstances. Defendants oppose the application of the good faith exception to the court's review of the wiretap applications in this case.

This is an issue of first impression for this court. *Cf. United States v. Moore,* 513 F.2d 485, 494 n. 20 (D.C.Cir.1975) (in a pre-*Leon* probable cause assessment of a wiretap, the court held that it should look to the objective facts available to the police as a collective entity and *not* at the applicant's good faith belief in the quality of cause shown). The court agrees with the government's premise that a wiretap application is subject to rigorous departmental and judicial review. However, the court questions the applicability of the *Leon* good faith exception in the electronic surveillance context. *Leon* modifies the judicially-created exclusionary rule, developed to buttress the fourth amendment protection against unreasonable searches and seizures. Although courts have suppressed seizures of wire and oral communications by applying traditional fourth amendment and exclusionary rule analysis,[9] Congress has chosen to supplement the judicially fashioned exclusionary rule with a statutory remedy for unreasonable electronic surveillance. 18 U.S.C. § 2515 expressly states that evidence derived from wire or oral communications intercepted in violation of 18 U.S.C. § 2510 *et seq.* may not be used in any proceeding before any court. Congress has not in the wake of the *Leon* decision attempted to modify this remedy. Nor does the *Leon* decision suggest that the Supreme Court would attempt to create an exception to a statutorily-imposed remedy. Earlier, in *United States v. Donovan,*

429 U.S. 413, 433 n. 22, 97 S.Ct. 658, 670 n. 22, 50 L.Ed.2d 652 (1977), the Court observed that:

> the availability of the suppression remedy for these statutory, as opposed to constitutional, violations ... turns on the provisions of Title III rather than the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights.

(Citation omitted). In *Donovan,* the Court held that failure to serve two defendants with inventory notice did not require suppression of wiretap evidence as provided for in § 2518 because the statutory preconditions to judicial authorization had been satisfied. *Id.* at 436, 97 S.Ct. at 672. A probable cause determination by a judge is one of the statutory preconditions to which *Donovan* refers.

The court does not view the exclusionary rule and 18 U.S.C. § 2515 as providing interchangeable remedial sources. Accordingly, without congressional indication that the statutory suppression remedy should be limited by the good faith exception, the court declines the government's invitation to forego the probable cause analysis in this case on the basis that agents intercepted the communications in good faith reliance on the intercept orders.

**B.** *Defendants' Probable Cause Challenges*

 The seizure of communications pursuant to electronic surveillance must comply with fourth amendment requirements. *Berger v. New York,* 388 U.S. 41, 51, 87 S.Ct. 1873, 1879, 18 L.Ed.2d 1040 (1966). Courts have applied the standards used to evaluate probable cause for traditional search warrants to electronic surveillance applications. *See e.g., United States v. Brown,* 761 F.2d at 1275; *United States*

---

**9.** The legislative history suggests that § 2515, which imposes the suppression remedy for interception in violation of Title III requirements, "largely reflects existing law" and was not generally intended to "press the scope of the suppression remedy beyond present search and seizure law." S.Rep. No. 1097, at 2185. When Title III was enacted, the good faith exception to

the exclusionary rule did not exist. Additionally, the Senate Report characterizes § 2515 as integral part of the Title III "system of limitations to protect privacy." *Id.* Therefore, the court concludes that Congress did not intend to bind the § 2515 remedy to whatever the state of search and seizure law is at the time of the interception.

*v. Falcone,* 505 F.2d 478, 481 (3d Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 432 (1975); *United States v. Marcello,* 531 F.Supp. 1113 (C.D.Cal.1982). Thus, the order authorizing interception is sufficient if the underlying affidavit supports the conclusion that it is reasonable to seek evidence in the place indicated by the affidavit. *United States v. Hendershot,* 614 F.2d 648, 654 (9th Cir.1980). It is appropriate in this court's review of the probable cause set forth in the wiretap applications to apply the totality of the circumstances test established in *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *United States v. Camp,* 723 F.2d 741, 745 (9th Cir.1984). Thus, it is this court's task to review the issuing judges' determination that there was probable cause demonstrated in each application to believe that interception of the specified wire and oral communications would produce evidence of the crimes specified in the application.

 Slater makes a general contention that Application A is based on conclusions and speculation. Slater presents no specific examples of his allegations and the totality of the circumstances presented in the applications suggest otherwise. Knight's direct involvement in sales of cocaine to Vicki Robertson and undercover Agent Smith, pen register verification of calls between Knight and Kulbusauskas, and Knight's reference to Kulbusauskas in Fred Robertson's presence are among the facts that demonstrate probable cause to believe that Kulbusauskas' residential phone was being used in connection with narcotics offenses and that interception would produce evidence of such crimes.

Whitney asserts that Application C does not establish probable cause to believe that his residential phone would be used by Frank Jackson or him to commit narcotics offenses from June 6, 1984 through July 6, 1984. First, he asserts as a general proposition that there was no evidence of his consistent use of the phone to commit narcotics offenses. Second, Whitney observes that one month lapsed between the last

intercepted conversation that might arguably be classified as narcotics-related and the application for the wiretap. He argues that even though his past involvement in illegal activity has been demonstrated, any information relied upon by the government to establish that present illegal narcotics transactions would occur during the thirty day period discussed in application C is stale. Kerr makes a similar assertion. Kerr notes that forty-five days elapsed between the last interception of a phone call in which he was a participant and the date of the wiretap application. Kerr emphasizes that he was not intercepted during the last seventeen days of the preceding wiretap and that Agent Walker's affidavit in Application C only summarizes one call involving him and Jackson.

 Neither Whitney's nor Kerr's staleness claims support a finding that Judge Thompson erred in his probable cause determination in the context of this investigation. A more flexible approach may be adopted to staleness claims in cases involving large-scale criminal activities, as opposed to discrete, completed crimes. *United States v. Foster,* 711 F.2d 871, 878–79 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1983); *United States v. Huberts,* 637 F.2d 630, 638 (9th Cir.1980); *United States v. Bascaro,* 742 F.2d 1335, 1345–46 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1984). When criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause. *United States v. Domme,* 753 F.2d 950, 953 (11th Cir.1985). Application C, which incorporated by reference Applications A and B, described for the issuing judge protracted and large scale drug-trafficking. At this stage in the investigation, described in Application C, more than thirteen people were believed to be involved in the narcotics distribution chain. The frequency of the drug-related communications and the volume of transactions indicate that communications intercepted thus far did not relate only to discrete, completed narcotics rela-

tionships. The nature of previously intercepted conversations did not suggest that either Whitney or Jackson was only temporarily involved in narcotics trafficking. Whitney was a participant in three conversations with Jackson which directly relate to payment for or receipt of narcotics. In one conversation, Jackson told Whitney that he had $8,000. In another, Jackson promised to call Whitney when he got "it," and, in a third, Jackson requested "500" from Whitney for the following day. Furthermore, the pen register installed on the phone utilized by Whitney indicated that four phone calls were generated from his phone to Jackson's phone on May 24, 1984, thirteen days prior to the submission of application C, thus negating any suggestion that he had terminated his narcotics relationship with Jackson. In addition, Application C contained a summary of a call occurring on April 22, 1984 between Jackson and Kerr in which Jackson advised Kerr that he possessed some good quality cocaine, of the caliber of the "stuff he had around Christmas." Application C outlined at least a four-month supplier/purchaser relationship between Kerr and Jackson. Conversations intercepted toward the end of the period authorized in Order B indicated that Jackson continued to seek cocaine from his various sources, of which Kerr was one. Based on the totality of the circumstances, application C demonstrated probable cause to believe that the phone utilized by Whitney, and Kerr's residential phone, would be used in furtherance of narcotics violations.

■ Whitney also challenges application D, alleging that there is no probable cause to believe that Sullivan would use his phones in the future to conduct narcotics transactions because the evidence presented in that application suggests that Sullivan structured his transactions to avoid use of home or business phones. However, calls intercepted on earlier wiretaps demonstrate that Sullivan circumspectly used the phone in relation to narcotics transactions, utilizing coded language to make narcotics-related references. Previous calls have also indicated that Sullivan was wont to use both his home and his business, Conceptual Artists, as places to conduct his narcotics-related affairs.

■ Davis and Tina Sullivan make general claims that all the applications fail to demonstrate probable cause because they proffer hearsay and set forth numerous names and targets without factual support for the conclusions that these individuals would be intercepted on certain wires. They fail to substantiate their claims with specific references to the applications. The use of hearsay in the wiretap applications does not vitiate the probable cause demonstrated in them. Facts based on hearsay may properly be included in a wiretap application. The applications in this case made clear to the judge when facts were based on hearsay so the judge could take that fact into account. With respect to Davis' and Tina Sullivan's second contention, the court notes that no person was named as a potential interceptee unless they had been previously discovered participating in conversations intercepted pursuant to court order.

Slater's, Whitney's, Kerr's, Davis' and Tina Sullivan's motions are therefore denied.

## IV. *Whitney's Motion to Suppress for Violation of 18 U.S.C. § 2518(5)*

Alleging a violation of 18 U.S.C. § 2518(5), Whitney makes two arguments. First, Whitney argues that this particular statutory section was consistently violated throughout the investigation because the objectives set forth in each application were met shortly after interception pursuant to each order commenced, but in each instance, interception was never terminated early. Second, Whitney argues that the government abused the statutory provision for extensions of interception; he claims that when a thirty day period terminated and the objective set forth in the initial application had been clearly satisfied, the government disingenuously changed its investigative objective in order to continue wiretapping. Whitney substantiates his ar-

guments with the express statutory language of § 2518(5) which provides, in pertinent part:

No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof ... must terminate upon attainment of the authorized objective, or in any event thirty days.

The court disagrees with Whitney's initial premise that the government consistently continued to intercept communications beyond the point at which it had achieved the objectives set forth in the wiretap applications. Each order authorizes interception until communications revealing the following are intercepted: 1) the manner in which the targets of the wiretap participate in the violation of federal narcotics laws; 2) the scope and methods of operation of their illegal activities; 3) identities of their confederates; 4) their places of operation and 5) the nature of the conspiracy. Review of the agents' affidavits submitted in support of applications for authorization of wiretaps indicates that the scope of the conspiracy, and consequently the identities of and places of operation of newly discovered co-conspirators, were continuously exposed to be greater than initially estimated. Facts contained within the affidavits, primarily the contents of intercepted conversations, demonstrate that the expansion of the scope of the conspiracy was not artificially manufactured to maintain interception which would have been otherwise discontinued. In fact, interceptions of wire and oral communications occurring on phone lines or in residences and businesses associated with Ed Kulbusauskas, Frank Jackson, Thomas Pool, Michael Sullivan and others were discontinued at various points during the investigation because the objective of discovery of the nature, extent and members of the conspiracy as it related to the subgroups involving them had been achieved. In this instance, it is appropriate to give great deference to the issuing judges' determinations regarding achievement of the investigation's objectives.

The facts known to the court at this time refute Whitney's second suggestion that government agents disingenuously presented changed investigative objectives to the reviewing judges in order to continue interception. It is true that the targets of the investigation changed as the information derived from the wiretaps continued to expose the identities of persons closer to the cocaine source. However, the agent/affiants did not artificially or in bad faith propound to the issuing judges a structure of the organization not supported by the facts available to them at the time; their characterizations of the evidence and the nature of the organization known to them at the time each affidavit was executed were fair descriptions.

With respect to both of Whitney's arguments, the court notes that even though each period of interception provided the FBI with additional information regarding violations of narcotics laws and the extent of the conspiracy, receipt of such information did not foreclose the possibility that the intercepted communications would continue to provide pertinent information, bringing the FBI closer to the achievement of the objectives of the wiretaps. *See United States v. Newman*, 733 F.2d at 1400. (No violation of § 2518(5) when interception continued after search warrant executed on defendant's home provided evidence because residential search did not foreclose possibility that defendant would call or receive calls or visits from as yet

unidentified members of the conspiracy). Whitney's motion is denied.

### V. *Defendants' Motion To Dismiss the Indictment for Violation of 18 U.S.C. § 2517(5)*

#### A. *Applicability of § 2517(5)*

Whitney, Diebert and Wooten move to dismiss the indictment alleging that the government failed to comply with 18 U.S.C. § 2517(5) when it disclosed wiretap evidence to the grand jury that returned the indictment in this case. 18 U.S.C. § 2517(5) provides, in pertinent part:

> When an investigative or law enforcement officer, while engaged in intercepting wire or oral communications in the manner authorized herein, intercepts wire or oral communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge of competent jurisdiction where such judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.[10]

Diebert is named in Counts 1 and 181 of the superseding indictment and is charged with conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and use of a communication facility in the commission of a controlled substance offense, in violation of 21 U.S.C. § 843(b). Defendant Whitney is named in Counts 1, 54, 83, 89, 90, 96, 101, 106, and 124 of the superseding indictment and is charged with conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and eight counts of use of a communication facility in the commission of a controlled substance offense, in violation of 21 U.S.C. § 843(b). Defendant Wooten is named in Counts 1, 151, 157 and 260 and is charged with conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and two counts of use of a communication facility in the commission of a controlled substance offense, in violation of 21 U.S.C. § 843(b) and conspiracy to use extortionate means to collect extensions of credit, in violation of 18 U.S.C. §§ 371 and 894.

■ The key factor with respect to Diebert's and Whitney's motion is whether the offenses with which they are charged are "offenses other than those specified in the order of authorization" necessitating compliance with § 2517(5). The court finds that the charges contained in the indictment against both these defendants were specified in the authorization order and that no violation of § 2517(5) has occurred. The interceptions upon which the charges against Diebert are based were authorized in Order E. Order E authorized interceptions of wire communications concerning offenses in violation of 21 U.S.C. §§ 841(a)(1), 843(b) and 846. Those are the precise offenses with which Diebert is charged. The interceptions upon which the charges against Whitney are based were authorized in Order C. Order C authorized interceptions of wire communications con-

---

**10.** Section 2517(1) permits an investigative or law enforcement officer in the proper performance of official duties to disclose the contents of any intercepted wire or oral communication or any evidence derived therefrom to another investigative or law enforcement officer.

Section 2517(2) permits an investigative or law enforcement officer to use the contents of any intercepted wire or oral communication in the proper performance of official duties.

Section 2517(3) permits any person who has received information concerning a wire or oral communication intercepted in accordance with the provisions of Title III, or evidence derived therefrom, to disclose that information while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any state or political subdivision thereof.

Subsection 5 of this statute carves out an important exception to subsection 3. *United States v. Campagnuolo*, 556 F.2d 1209, 1213 (5th Cir.1977).

cerning offenses in violation of 21 U.S.C. §§ 841(a)(1), 843(b) and 846. Those are the precise offenses with which Whitney is charged.

Similarly, the court finds that three of the offenses with which Wooten is charged were specified in Order E, i.e. offenses in violation of 21 U.S.C. §§ 841(a)(1), 843(b) and 846. However, Wooten's assertions with respect to Count 260 require further analysis. The overt acts listed in Count 260 refer to conversations between Michael Sullivan and others (among them, Gary Wooten) intercepted on June 29, July 3, and August 14 & 15, 1984. These interceptions were made pursuant to Orders C and D. Neither order expressly authorizes interception of wire communications concerning offenses in violation of 18 U.S.C. §§ 371 and 894. Wooten argues that evidence presented to the grand jury in support of the extortion conspiracy count falls within the ambit of 2517(5) as an offense other than those specified in the authorization order. Furthermore, he argues that the government's failure to obtain a § 2517(5) order prior to the presentation of this evidence to the grand jury amounts to an express violation of § 2517(5) for which the only remedy is dismissal of the indictment.

The government offers two reasons why Wooten's motion should not be granted. First, the government notes that the conversations upon which Count 260 is based, are among those listed as overt acts in Count 1. The government suggests that § 2517(5) was not intended to prevent the use of the very same evidence supporting offenses for which interception was authorized and which were ultimately charged, in support of offenses which were not contemplated in the interception order. The government suggests a reading which would restrict § 2517(5)'s applicability to communications other than those properly intercepted for any one crime enumerated in an intercept order. Second, the govern-

ment argues that even if it did violate section 2517(5) by presenting to the grand jury intercepted conversations containing evidence of crimes that had not been listed in the intercept order, dismissal is not the appropriate remedy.

Section 2517(5) forms an integral part of the Title III scheme. *United States v. Aloi*, 449 F.Supp. 698, 720 (E.D.N.Y.1977). Section 2517(5) was enacted to protect individual privacy rights and to prevent circumvention of the particularity requirements and other safeguards developed for original applications pursuant to § 2518. *United States v. Marion*, 535 F.2d 697, 700–01 (2d Cir.1976); *United States v. Harvey*, 560 F.Supp. at 1065. When communications relating to offenses other than those specified in the intercept order are retrieved on wiretaps, § 2517(5) requires that a subsequent application be made to a judge for a determination as to the good faith of the original application prior to disclosure or use of the incidentally intercepted communications. *Id.* at 1064. The legislative history indicates the purpose and function of this requirement:

> Such subsequent application would include a showing that the original order was lawfully obtained, that it was sought in good faith and not as subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order.

S.Rep. No. 1097 at 2189. If such a requirement were not imposed, an applicant could easily name one crime, while evidence of another crime, for which the § 2518 prerequisites could not be satisfied, was the intended object of the surveillance. *United States v. Harvey*, 560 F.Supp. at 1064; *United States v. Campagnuolo*, 556 F.2d at 1213. Without this preventive measure, Title III orders could degenerate into the "electronic equivalent of a general search warrant." *United States v. Brodson*, 528 F.2d 214 (7th Cir.1975).[11]

---

11. One court has addressed the question of whether the problem of forum-shopping would arise if § 2517(5) were not strictly construed.

*See United States v. Smith,* 726 F.2d 852, 865 n. 3 (1st Cir.1984).

It is important to remember that there is nothing inherently wrong when a wiretap inci-

 Before this court contemplates the ultimate issue of whether the disclosure of the wiretap evidence relating to the extortion conspiracy charge against Wooten was the product of a subterfuge search or merely windfall evidence, it must initially decide whether the testimony presented to the grand jury that returned the superseding indictment should have been disclosed in accordance with § 2517(5). Preliminarily, this court must first determine whether testimony presented during grand jury proceedings is properly classified as "testimony (given) under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof." 18 U.S.C. § 2517(3). While the Ninth Circuit has not yet addressed the question of the applicability of § 2517(5) in the grand jury context, many other circuits have. Section 2517(5) has been expressly or impliedly applied to grand jury proceedings in many cases, and a survey of the case law reveals no case in which it has been expressly held inapplicable. *See e.g. United States v. Cardall,* 773 F.2d 1128 (10th Cir.1985); *United States v. Arnold,* 773 F.2d 823 (7th Cir.1985); *United States v. Watchmaker,* 761 F.2d 1459 (11th Cir.1985), *appeal filed; United States v. Smith,* 726 F.2d 852 (1st Cir. 1984); *United States v. McKinnon,* 721 F.2d 19 (1st Cir.1983); *United States v. Southard,* 700 F.2d 1 (1st Cir.1983); *United States v. Campagnuolo,* 556 F.2d 1209 (5th Cir.1977); *United States v. Marion,* 535 F.2d 697 (2nd Cir.1976); *United States v. Vento,* 533 F.2d 838 (3d Cir.1976); *United States v. Brodson,* 528 F.2d 214 (7th Cir.1975); *United States v. Harvey,* 560 F.Supp. 1040 (S.D.Fla.1982); *United States v. Aloi,* 449 F.Supp. 698 (E.D.N.Y.1977).[12]

The court finds that grand jury testimony comes within the ambit of § 2517(3). Grand jury testimony is given under sworn oath. Furthermore, it is illogical to exempt grand jury proceedings from the requirements or 2517(5). Federal grand juries are empaneled by federal judicial officers and they perform an important function in our justice system. Similar to that of lay persons on a petit jury, their task requires review of evidence that ought not to be considered without preliminary safeguarding of an individual's Fourth Amendment rights. Moreover, the Fifth Amendment provides that a person charged with a "capital or otherwise infamous crime" is entitled to a grand jury indictment before he may be held on the charges. The power to require a person to face and defend against criminal charges is not one that should be exercised with reliance on Title III evidence that has not been first reviewed by a judge for statutory compliance. Finally, on a practical note, § 2517(3) ought to apply to grand jury proceedings so that the purpose of § 2517(5) is fully realized. Subterfuge searches are more likely to occur where an investigatory agency is aware that judicial review for statutory compliance would come only before disclosure of evidence at trial. Indictment on charges based on evidence which would not pass muster under § 2518 might then be used as a bargaining chip in plea negotiations or to deprive a person of liberty while pending trial.

 Determination of the applicability of § 2517(5) to the extortion conspiracy count in the instant case necessitates analysis of the phrase "wire or oral communications relating to offenses other than those specified in the order of authorization". Some courts have held that the words "oth-

---

dentally yields evidence of a crime not specified in the intercept order and of another generic type of criminal activity. *United States v. Southard,* 700 F.2d 1, 29 (1st Cir.1983); *United States v. Johnson,* 539 F.2d 181, 188 (D.C.Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977). This principle is similar to the plain view doctrine; an officer has a legal right to listen to such evidence during a properly authorized, limited and supervised wiretap. *Id.*

**12.** The legislative history for § 2517(3) makes no mention of grand jury proceedings, although it does expressly refer to testimony at trial to establish guilt, to impeach or to refresh a witness' recollection. S.Rep. No. 1097 at 2188–89. On the other hand, the pertinent passage of the legislative history does not suggest that 2517(3) is limited to testimony at trial. Nor, for the reasons discussed *infra* does this court feel that such an interpretation is warranted.

er offenses" refer to all statutory violations different from those designated in the authorization order. *See e.g. United States v. Brodson,* 528 F.2d 214 (7th Cir. 1975); *United States v. Marion,* 535 F.2d 697 (2nd Cir.1976). Other courts have suggested that a reviewing court look for similarity between offenses listed in the initial authorization order and those alleged to be disclosed in violation of § 2517(5). *See United States v. Campagnuolo,* 556 F.2d at 1214 (mechanistic view of phrase "relating to offenses other than" discouraged); *United States v. Arnold,* 576 F.Supp. 304, 311 (N.D.Ill.1983) (court analyzed whether authorized and unauthorized offenses were sufficiently similar in nature to quell doubt about subterfuge or bad faith).[13] There is nothing in the statutory language however, to suggest that a similar offense exception should be created. The simplest and safest course is to seek specific judicial authorization pursuant to § 2517(5).

 In the instant case it is clear that §§ 371 and 894 violations were not specifically cited in the authorization orders. The court finds that the extortion conspiracy is an offense other than those listed in Judge Thompson's authorization order. Accordingly, the court finds that the government did not comply with the requirement that it obtain predisclosure authorization for evidence relating to the extortion conspiracy count against Wooten.

**B.** *The Appropriate Remedy for a § 2517(5) Violation*

 Wooten, suggests that dismissal of the indictment is the only appropriate remedy for a violation of 2517(5). In response, the government argues that no sanction should be imposed and that it should be permitted to seek a disclosure order *nunc pro tunc.*

Courts have taken three different approaches to the issue of the appropriate sanction for a § 2517(5) violation. The first and most drastic, applied in *United States v. Brodson,* is dismissal of the in-

---

13. At least two courts have held that where the authorization order *did not specify* any offense *by code or statute,* the question of whether there was sufficient similarity between the charges described in the authorization order and the "offenses" in question could be properly considered to determine whether § 2517(5) violation has occurred. *See United States v. Smith,* 726 F.2d at 855–56 (court reviewed similarity between state offense listed in authorization order and federal offense not cited therein); *United States v. Watchmaker,* 761 F.2d 1459, 1470–71 (11th Cir.1985). This inquiry is not appropriate in the instant case because the authorization order specifically referenced code sections. Explicit reference to statutory sections is not required in the application for an order authorizing interception. *See* 18 U.S.C. §§ 2518(1)(b) and 2518(4); *United States v. Smith,* 726 F.2d at 865. Yet, citation of statutory sections enhances the particularity of the application and authorization order. *United States v. Harvey,* 560 F.Supp. at 1093 n. 3.

Courts have also created what, for lack of better term, will be referred to as the "integral part" exception. A sibling of the "similar offense" exception, this exception applies in the rare case where a RICO violation is charged. In *United States v. Watchmaker,* the inclusion of predicate offenses in the authorization order persuaded the court not to find a violation of § 2517(5) even though the order did not contain the statutory citation for a RICO offense. 761

F.2d at 1468–71. *See also United States v. Sedovic,* 679 F.2d 1233, 1237 n. 4 (8th Cir.1982). In the instant case there is no such integral relationship between the extortion conspiracy offense in question and the narcotics offenses cited in the authorization order. Even though it might be argued that the extortion conspiracy is related to and a part of the much larger cocaine distribution conspiracy (charged in Count 1) and possibly the CCE charge against Sullivan (charged in Count 268), the strictures of § 2517(5) should not be relaxed in this instance. Only identity between the cited offenses and those not mentioned in the authorization order insures the review for probable cause and necessity contemplated by § 2517(5). For similar reasons, this court rejects the "implicit authorization rule," i.e. the practice of finding tacit approval of authorization to intercept evidence of offenses not expressly listed in the authorization order because the court has reviewed a request to renew a wiretap order that has already produced evidence of the offense not listed in the authorization order. *See United States v. Masciarelli,* 558 F.2d 1064, 1068–69 (2d Cir. 1977); *United States v. Harvey,* 560 F.Supp. at 1081 (and cases cited therein). It is not reasonable to assume that a judge reviewing a request for an extension of a wiretap order will search for evidence of crimes not specifically cited therein and determine whether they meet the requirements of § 2518(1), without a prosecution request to do so.

dictment. 528 F.2d 214. In *Brodson* the court urged strict construction of § 2517 and held that where the government did not seek a § 2517(5) disclosure order until after it had presented evidence to the grand jury, though before trial, dismissal of the indictment was the appropriate remedy. The *Brodson* court expressly rejected the government's suggestion that the only available remedy for a § 2517(5) violation was suppression of the conversations disclosed to the grand jury without a § 2517(5) order. *Cf. United States v. McKinnon*, 721 F.2d at 23 (where unauthorized disclosure of evidence involved cumulative evidence, proper remedy is suppression at trial of evidence not authorized). It should be noted, however, that the indictment in *Brodson* consisted of only one count charging an offense that had not been specified in the authorization order.

The second, less drastic, approach to the issue of sanctions for a § 2517(5) violation is to examine the government's behaviour and determine whether a subterfuge search has occurred or whether governmental bad faith is involved. *See United States v. Southard*, 700 F.2d at 31. Sanctions should be applied flexibly, with the statutory purpose in mind. *United States v. Watchmaker*, 761 F.2d at 1471; *United States v. Vento*, 533 F.2d at 856; *United States v. Aloi*, 449 F.Supp. at 721. Where no bad faith or subterfuge search occurred, dismissal of the indictment is not required.

The last approach views a § 2517(5) violation as a technical violation which does not require the severe sanction of dismissal. This approach rests on a distinction between illegal interception (which merits suppression) and improper disclosure. *United States v. Cardall*, 773 F.2d 1128 (10th Cir.1985). *See also United States v. Vento*, 533 F.2d 838, 855 (3d Cir.1976) (§ 2518(10) demonstrates that suppression of wiretap evidence should only be imposed if interception itself was in some way improper); *United States v. Southard*, 700 F.2d at 29 (failure to satisfy § 2715(5) is not violation of statutory section that directly and substantially implements congressional intent).

In the instant case, the court does not find that the original wiretap orders were sought in bad faith as a means to evade judicial review of § 2518 prerequisites for the extortion conspiracy. It is clearly demonstrated in the wiretap applications preceding Application E, and in Application E itself, that the government was vigorously investigating, and reaping plentiful evidence of, narcotics violations. Though the government has not promulgated the inadvertence of its discovery of the extortion conspiracy evidence, the court has conducted its own review of the applications and finds that they demonstrate that the conversations relating to the extortion conspiracy were clearly windfall evidence. Even under these circumstances, the court finds that the only appropriate remedy for the violation of § 2517(5) is dismissal of Count 260 as to defendant Wooten. A careful review of the case law does not suggest otherwise. Courts that have considered the issue of § 2517(5) violations have been careful to isolate for purposes of analysis only the counts based on improperly disclosed evidence. In all cases where courts have found express violations of § 2517(5), *counts* based on the improperly disclosed evidence were dismissed. In *Brodson*, the indictment was dismissed because it was comprised of the one and only count based upon improperly disclosed evidence. In *United States v. Marion*, the court dismissed the two (of three) counts in the indictment that were based on conversations that were disclosed to a grand jury without prior § 2517(5) approval. 535 F.2d at 704.

Dismissal of the indictment is not appropriate. The government followed proper procedures in obtaining interception orders. Bad faith, which might warrant a more punitive sanction, was not demonstrated in the instant case.

The government's contention that it should now be permitted to seek a § 2517(5) order *nunc pro tunc* to correct the violation is not supported by case law nor the statutory language. *United States*

v. *Watchmaker*, 761 F.2d at 1470 n. 6. Provision for a *nunc pro tunc* order would also defeat the statutory purpose.

### VI. *Jackson's Motion To Suppress for Violation of 18 U.S.C. § 2518(4)(d)*

 Jackson moves to suppress evidence, alleging that the government violated 18 U.S.C. § 2518(4)(d) in permitting members of law enforcement agencies other than the FBI to intercept communications in this case.[14] Orders A through K authorize Special Agents of the FBI to intercept communications. Jackson demonstrates, and the government does not dispute, that DEA and Border Patrol agents monitored interceptions at times during this investigation.

Each order authorizing or approving interception of wire or oral communications under Title III must specify the identity of the agency authorized to intercept the communications. 18 U.S.C. § 2518(4)(d). The government argues that assistance from other federal law enforcement agencies was necessary in this investigation due to its sheer size and the need to have Spanish linguists monitor conversations spoken in Spanish.[15]

The court finds that use of agents from agencies other than the FBI to *monitor* communications, under the FBI's direction is not a violation of Judge Enright's and Judge Thompson's orders authorizing interceptions requiring suppression of evidence. The legislative history indicates that the purpose for this provision is to fix accountability for the order's lawful and proper execution: "Subparagraph (d) requires that the order note the agency authorized to make the interception and the person who authorized the application so that responsibility will be fixed." S.Rep. No. 1097 at 2192. *Cf.* 18 U.S.C. § 2516(1) which provides for interception of wire or oral communications by the FBI or federal agency "having responsibility for the investigation of the offense." In the instant case, it is clear that responsibility was fixed with the FBI. Conversations were monitored in FBI facilities; FBI agents were in charge of sealing and preserving tapes and reporting daily the progress of the investigation to the prosecutor.

Although the issue of cross-agency monitoring between federal agencies is one of first impression, federal agents have been permitted to assist, without prior court approval, in the monitoring of wiretaps conducted by state agents. *United States v. Manfredi*, 488 F.2d 588, 601 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1973) (no violation of state or federal law where federal narcotics agents assist in monitoring interceptions pursuant to order assigning responsibility to state narcotics law enforcement officers). *Accord United States v. Bynum*, 763 F.2d 474, 476–77 (1st Cir.1985) (federal statute not violated where DEA solely responsible for conducting and monitoring wiretaps intercepts and state officers operating monitoring equipment were deputized U.S. Marshals under control and direction of DEA). In the case at hand, Spanish-speaking agents were needed to monitor the communications involving the Peruvian and Colombian targets. While the better practice would have been to seek prior court approval of the use of DEA and Border Pa-

---

14. Jackson does not specify whether he seeks suppression of all evidence derived from all orders authorizing interception or whether he seeks suppression of evidence derived from the specific interceptions monitored by agents affiliated with agencies other than the FBI. Although the latter seems to be the more appropriately tailored remedy, in light of this court's finding that suppression is not required, the court will not address this question.

15. The government also suggests that it was "natural, normal and desirable" for the FBI agents to request assistance from DEA agents because the DEA had been the source of much information about the individuals under investigation and had assisted the FBI in other capacities during the investigation. While cross-agency cooperation and sharing of federal resources are commendable, the ease with which judicial review and approval of joint monitoring can be obtained, along with the procedural precision demanded in Title III, suggest that cross-agency monitoring based only on cross-agency investigative cooperation not be viewed as the "normal" procedure.

trol agents as monitors, no statutory violation requiring suppression has occurred. Jackson has demonstrated no prejudice to himself and the spirit of the statutory requirement has been met.[16] Accordingly, the motion is denied.

## VII. *Defendants' Motion To Suppress for Violation of 18 U.S.C. 2516(1)*

Whitney, Diebert and Dodson move to suppress evidence derived from wiretaps on which calls to which they were a party were intercepted on the basis that the government failed in three respects to comply with 18 U.S.C. § 2516(1) which provides, in pertinent part:

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application to a federal judge of competent jurisdiction for, and such judge may grant in conformity with section 2518 of this chapter an order authorizing or approving the interception of wire or oral communications ...

### A. *Authorization of Applications J and K by Stephen Trott*

 Whitney and Diebert attack all wiretaps stemming from Applications J and K, they argue that the authorization from Stephen S. Trott, Assistant Attorney General of the Criminal Division, was infirm because the commencement of President Reagan's second term in office necessitated the reissuance of an administrative order by the Attorney General specially designating assistant attorneys general that may approve wiretap application authorizations. Preliminarily, the court finds that neither Whitney nor Diebert have standing to propound this challenge. Neither defendant was intercepted on the Miami or Florida wiretaps, which were the only wiretaps

conducted pursuant to authorizations disseminated after January 20, 1985, the first day of President Reagan's second term. However, defendants who do have standing to challenge wiretaps authorized by Orders J and K, among them Jose, Gonzalo and Madonna Ledgard, have joined Whitney and Diebert's motion and the court will therefore address the motion.

During President Carter's administration, Attorney General Benjamin Civiletti issued Order No. 931–81 which specially designated the Assistant Attorney General in charge of the Criminal Division, the Assistant Attorney General in charge of the Tax Division, the Assistant Attorney General in charge of the Office of Legal Counsel and the Assistant Attorney General in charge of the Antitrust Division to exercise the power conferred in him by 18 U.S.C. § 2516 to authorize wiretap appliations when he was not in the District of Columbia or otherwise not available to exercise the power. A short while after President Reagan assumed office, Attorney General William French Smith issued Order No. 934–81 adopting the designations listed in Order No. 931–81 and specially designating the Assistant Attorney General in charge of the Office for Improvement in the Administration of Justice to authorize wiretap applications in his absence from the District of Columbia or when he was otherwise not available. Pursuant to Order No. 934–81, Assistant Attorney General of the Criminal Division, Stephen S. Trott, authorized Applications J and K, after the commencement of President Reagan's second term.

 Defendants have raised an issue of first impression, however, the case law regarding the validity of authorizations where there has been a change in Attorney Generals within one presidential administration is applicable to this issue. When an

---

**16.** 18 U.S.C. § 2517(1) provides for inter-agency sharing of wire or oral communications and evidence derived therefrom if appropriate to the proper performance of official duties. There-

fore, Jackson can claim no prejudice in that other agencies were made privy to information regarding his alleged narcotics violations.

administrative official leaves office, orders enacted during his or her tenure in office remain in effect until revoked or altered by his or her successor. *United States v. Wyder*, 674 F.2d 224, 227 (4th Cir.) *cert. denied* 457 U.S. 1125, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982); *United States v. Messersmith*, 692 F.2d 1315, 1317 (11th Cir. 1982). Courts have specifically held that assistant attorney generals properly designated by attorneys general orders that have not been revoked or altered may authorize wiretap applications based on the authority vested in them from a former attorney general. *See United States v. Bynum*, 763 F.2d 474 (1st Cir.1985); *United States v. Kerr*, 711 F.2d 149, 151 (10th Cir.1983); *United States v. Terry*, 702 F.2d at 311; *United States v. Robinson*, 698 F.2d 448, 452 (D.C.Cir.1983); *United States v. Messersmith*, 692 F.2d at 1317; *United States v. Wyder*, 674 F.2d at 227.

■■■ The purpose of § 2516(1) is to limit the power to authorize wiretaps "to those responsive to the political process." *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). The purpose of limiting wiretap authorization to an official sensitive to the concerns of, and accountable, to the Chief Executive and the legislature is not defeated by one administrative official's reliance on the procedures imposed by a predecessor. Indeed, to require otherwise would impose an overwhelming and unnecessary burden on the administrative process. *United States v. Wyder*, 674 F.2d at 227.

The court does not agree with the suggestion that administrative officials operating during a president's second term would be less accountable to the President and the Congress if they did not go through the process of readopting their own administrative orders. In fact, to require readoption of administrative order demands an unwise expenditure of resources. The court finds that the beginning of second presidential term has as little, if not less, effect on political accountability as a change in the

Attorneys General. The letter nor the purpose of § 2516(1) has been contravened by Stephen Trott's authorization of Applications J and K.

**B. *Authorization of Applications C and D by Glen Archer***

Order No. 931–81 provides that "the Assistant Attorney General in charge of the Tax Division is authorized to exercise the power herein conferred only when the Assistant Attorney General in charge of the Criminal Division is not in the District of Columbia or is otherwise not available." Glen Archer, Assistant Attorney General in charge of the Tax Division, authorized Applications C and D. Whitney, Diebert and Dodson assert that the government has not adequately complied with Order No. 931–81 because it has not shown that Stephen Trott, the Assistant Attorney General of the Criminal Division was absent from the District of Columbia when Archer signed the authorization orders.

■■■ Authorization orders are presumed to be proper. *United States v. Jabara*, 618 F.2d at 1327; *United States v. Feldman*, 535 F.2d at 1180–81; *United States v. Turner*, 528 F.2d 143, 151 (9th Cir.) *cert. denied* 423 U.S. 996, 96 S.Ct. 426, 46 L.Ed.2d 371 (1975).

Defendants must make some affirmative showing that the application was not properly authorized to rebut this presumption. *United States v. Jabara*, 618 F.2d at 1327. In the instant case no such showing has been made; defendants have presented no evidence that Mr. Trott was in the District of Columbia at the time the applications were authorized nor have they even asserted that he was not unavailable. Therefore, the government does not bear the burden of proof establishing Mr. Trott's unavailability.

Although not required, the government submitted to the court a letter from Frederick D. Hess, Director of the Office of Enforcement Operations of the Criminal

Division stating that he had reviewed Mr. Trott's calendar and that it showed that Mr. Trott was not in the District of Columbia on the dates the applications were authorized. This letter establishes to the court's satisfaction that Mr. Trott was, in fact, unavailable to review and authorize applications C and D.

### C. Sufficiency of Application Review by Trott and Archer

■ In *United States v. Giordano*, the Supreme Court reasoned that "the mature judgment of a particular responsible Department of Justice Official is interposed as a critical precondition to any judicial order (authorizing wiretapping)" because Congress wished to insure that "the statutory authority be used with restraint and only where circumstances warrant surreptitious interception. 416 U.S. at 515–16, 94 S.Ct. at 1826–27. Whitney, Diebert and Dodson argue that the authorization memoranda for all the applications in this case illustrate the failure of both Trott and Archer to personally review the applications authorized by them. Each memorandum, addressed to Frederick Hess, begins with the statement, "This is with regard to your recommendation that I ... authorize an application ... authorizing the interception of wire (and oral) communications ..." From this, defendants deduce that neither Trott nor Archer interposed any mature judgment in the review of the applications, nor for that matter, that they did more than automatically approve the applications. Defendants argue that § 2516(1) requires the Department of Justice official authorized to approve wiretaps to do more than cursorily rubber stamp an application. They then assert that because Archer and Trott did no more than that in this case, the evidence derived from the wiretaps should therefore be dismissed.

The court finds fault with defendants' initial premise that the statement excerpted from the application authorizations leads to the conclusion that Trott and Archer merely signed off on the applications. That statement, even when taken out of context of the entire memorandum does not lead to the assumption that the application is not also carefully reviewed by the authorizing official. Assuming defendant's premise were true, the basis upon which, or the method by which, the proper officer gives authorization is not subject to judicial review for compliance with § 2516(1). *United States v. Turner*, 528 F.2d 143, 151 (9th Cir.1975). This court declines, as has the Ninth Circuit on earlier occasions, to look behind the authorizing signature of assistant attorney general to determine if the authorization resulted from actual review of the application. *See Id.* at 150–51; *United States v. Feldman*, 535 F.2d 1175, (9th Cir.1976). Accordingly, the court finds that the requirements of 18 U.S.C. § 2516(1) have been met and the motions to suppress are denied.

### VIII. Motion To Discover Information Regarding Compliance with Sealing Provisions

■ Jackson, Diebert and Whitney seek discovery of information demonstrating that the government complied with the sealing provisions of 18 U.S.C. § 2518(8)(a). The government has submitted (attached to their brief as Exhibit 8) FBI Agent Henry C. Brett's affidavit which describes the sealing and safeguarding procedures for the original tapes in this case. Agent Brett states that upon expiration of the court order or in the case of an early discontinuance for other reasons, the Assistant U.S. Attorney would contact the chambers of the issuing judge and make an appointment for the earliest possible date to have the accumulated tapes sealed. On the day of the appointment with the issuing judge, the FBI agents would take the tapes from locked file cabinets—where they were placed the morning following their creation and place them in storage boxes which were then sealed by the judge. The boxes containing the tapes were then returned to

the custody of the FBI for storage purposes. Agent Brett's affidavit seems to satisfy defendants' request for information at this time.

### IX. *Motion To Suppress For Violation of § 2518(8)(d)*

█ Whitney stated that he was last intercepted on a wiretap authorized by Order D, which terminated in August, 1984. Diebert states that he was last intercepted on a wiretap authorized by court order [17] in October, 1984. Slater does not specifically refer to the date of the last of his intercepted calls but does state that his last intercepted call would have been sometime prior to the termination of the wiretap authorized by Order D. All defendants received inventory notice dated May 28, 1985 [18] and argue that since statutory requirement for delivery of inventory notice within ninety days of the termination of the order has been violated, suppression of the wiretap evidence is mandated.

18 U.S.C. § 2518(8)(d) provides, in pertinent part:

Within a reasonable time but not later than 90 days after the filing of an application for an order of approval under Section 2518(7)(b) which is denied or the termination of the period of an order or extensions thereof, the issuing or denying judge shall cause to be served, on the persons named in the order or the application, and such other parties to intercepted communications as the judge may determine in his discretion that is in the interest of justice, an inventory which shall include notice of (1) the fact of the entry or the order of application; (2) the date of the entry and the period of authorized, approved or disapproved interception, or the denial of the application; and (3) the fact that during the period wire or oral communications were or were not intercepted ... On an *ex parte* showing of good cause to a judge of competent jurisdiction, the serving of the inventory required by this subsection may be postponed.

At the court's request, the government submitted *in camera* copies of the court orders granting extensions of the time period in which inventory notices were to be served in this case. The final order signed by Judge Thompson postponed the service of inventory notice to no later than June 21, 1985. The court finds that service of inventory notice to Whitney, Diebert and Slater prior to June 21, 1985 complies with the requirements of section 2518(8)(d).

█ Slater presents an additional argument which requires further analysis. Slater argues that the government knew that his conversations would not be intercepted after the termination of the wiretap authorized by Order D and that his alleged involvement in this conspiracy was limited to interaction with Frank Len Jackson. He therefore asserts that the government disingenuously chose to indict him and others in a massive conspiracy to circumvent the requirements of section 2518(8)(d). Slater further argues that the government has tacitly acknowledged that this case involves smaller conspiracies within a larger conspiracy and that such an admission demonstrates that he properly should have received notice when the investigation surrounding Frank Jackson terminated. In conclusion, Slater argues that investigation of the Jackson portion of the conspiracy terminated well before the end of investigation of the Orozco-Maurtua-Ledgard hierarchy of the conspiracy, and that he should have received inventory notice within ninety days of the termination of the Jackson investigation.

Slater is essentially asking this court to find bad faith in the government's charac-

---

17. The court can not discern from Diebert's moving papers whether he refers to Order E or F.

18. Slater acknowledges receipt of inventory notice on May 28, 1985, Whitney and Diebert allege that they were not served with notice of the interception until approximately June 1, 1985.

terization of the separate wiretaps in this case as relating to one large narcotics conspiracy and in its request to Judge Thompson for postponement of the service of inventory notice for all the wiretaps. While the court makes no finding at this time whether this case is properly pleaded as one conspiracy, the court disagrees with Slater's premise that under these circumstances, he should have received inventory notice ninety days after the termination of the wiretap conducted pursuant to Order D.

■■■■■ The court also disagrees with Slater's assertion that suppression is required if post-interception notice was not timely provided. Failure to comply fully with the provisions of 2518(8)(d) does not render unlawful an intercept order that in all other respects satisfies the statutory requirements. *United States v. Donovan,* 429 U.S. at 434, 97 S.Ct. at 671. A defendant must show prejudice before a motion to suppress will be granted on the ground of a failure to give post-termination notice. *United States v. Fury,* 554 F.2d 522, 528–29 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977); *United States v. Variano,* 550 F.2d 1330, 1336 (2d Cir.), *cert. denied,* 433 U.S. 912, 97 S.Ct. 2982, 53 L.Ed.2d 1097 (1977); *United States v. Principie,* 531 F.2d 1132, 1141 (2d Cir.1976), *cert. denied,* 430 U.S. 905, 97 S.Ct. 1173, 51 L.Ed.2d 581 (1977). Suppression should be required, however, when the statutory violation arose from a conscious decision by the federal authorities to violate the law and to prevent an individual or group of individuals from receiving the post-interception notice. *United States v. Harrigan,* 557 F.2d 879, 884 (1st Cir.1977). Slater has demonstrated no prejudice in the delivery to him of inventory notice some nine weeks following the unsealing of the indictment. The government represents that almost immediately after arraignment, all defendants in this case were given notice that most of the evidence against them was obtained from wiretaps. Although this does not satisfy the requirements of section 2518(8)(d), it does militate against any prejudice Slater might allege. Furthermore, Slater has not specified any prejudice incurred by him and it is unlikely that there is any. Trial dates in this case are set for two months hence and Slater will have had at least nine months from receipt of inventory notice to prepare for trial. Additionally, there is no evidence that the U.S. Attorney's and FBI's decision to request postponement of inventory notice was a conscious decision to violate the law or to deprive Slater and others of notice. *See generally, United States v. Martin,* 599 F.2d 880, 886 (9th Cir.1979) (government's innocent and immaterial misstatement in application for wiretap authorization does not entitle defendant to suppression). The court finds no bad faith in the government's characterization of this case to Judge Thompson as one case involving one conspiracy. Accordingly, Whitney's, Diebert's and Slater's motions to suppress are denied.

## X. Request for Evidentiary Hearing Re: Minimization

Various defendants move to suppress certain wiretap evidence and the fruits, alleging that the government failed to follow the statutorily required provision in Orders A through K that electronic surveillance shall be conducted so as to minimize "interception of communications not otherwise subject to interception under Title III." [19] 18 U.S.C. § 2518(5). Slater, Whitney, Diebert, Tina Sullivan, Davis, Mary Pool, and Jackson request an evidentiary hearing to provide them an opportunity to prove the government's failure to minimize intercepted conversations to which each was a party.

---

**19.** Each of the eleven orders in this case contain a provision that the interception of wire communications "shall be conducted in such a way as to minimize the interception of communica-tions not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code."

The government opposes defendants' request for an evidentiary hearing arguing that the court is not required to hold an evidentiary hearing on this issue and that the defendants have not made a sufficient showing to warrant a hearing.

■ The government has the burden of proof in the first instance to show that the minimization requirement was met. *United States v. Rizzo*, 491 F.2d 215, 217 n. 7 (2d Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974); *United States v. Harvey*, 560 F.Supp. at 1075; *United States v. Napolitano*, 552 F.Supp. 465, 476 (S.D.N.Y.1982). Compliance with the minimization requirement is demonstrated by a showing that agents' minimization efforts were reasonable under the circumstances. *Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1977). There is no single formula that can be applied to determine whether agents made reasonable efforts to minimize the seizure of unauthorized conversations while conducting the wiretaps. The reasonableness of their efforts will depend upon the facts and circumstances of each case. *Id.* at 140, 98 S.Ct. at 1724; *United States v. Manfredi*, 488 F.2d at 598–99.

■ The question of whether an evidentiary hearing on a motion to suppress is appropriate rests on the reasoned discretion of the district court. *United States v. Licavoli*, 604 F.2d at 613. The extent of inquiry to be permitted during a minimization hearing is also within the court's discretion. *United States v. Losing*, 560 F.2d 906, 909 n. 2 (8th Cir.1977), *cert. denied*, 434 U.S. 969, 98 S.Ct. 516, 54 L.Ed.2d 457 (1977), reaffirming, 539 F.2d 1174, 1183 (8th Cir.1976); *Mulligan v. United States*, 358 F.2d 604, 608 (8th Cir.1966). A survey of the case law provides no absolute rule as to when and to what extent an evidentiary hearing should be conducted in order to assist the court in its determination of the reasonableness of minimization efforts.

■ In the instant case, the government has submitted for the court's review the affidavit of FBI Special Agent Charles B. Walker. The government suggests that the information contained therein establishes a prima facie case of reasonable minimization. Agent Walker's affidavit describes the minimization briefings conducted by Assistant United States Attorney Maria Arroyo-Tabin for the agents monitoring the wiretaps, the FBI's daily review of contemporaneous logs made of the monitored conversations, and the method by which the judge who authorized the wiretap was informed of the minimization efforts. Agent Walker's affidavit contains a chart listing the number of calls that were either minimized in under two minutes or were too short to minimize, the number of calls minimized after two minutes and the number of "pertinent" calls. The affidavit contains a thorough description of the agents' operation of the monitoring equipment during interception, minimization, and periodic spot-checks, and the bases for characterizing calls as "pertinent." Agent Walkers' affidavit also describes the pattern of usage for some of the intercepted telephone lines and the conversation habits of frequent users of those lines. Attached as an exhibit to Walker's affidavit is the memorandum from Assistant United States Attorney Maria Arroyo-Tabin to agents participating in the electronic surveillance in this case which provides general guidelines and instructions for interception and minimization. The government also submits an affidavit by FBI Special Agent Judith Hix outlining the briefing conducted by the Assistant United States Attorney in Miami, Florida prior to the interception of the Miami phone subscribed to by Tony Ledgard. A copy of the written instructions provided to the agents in Miami is submitted as well. Finally, the government submits FBI Special Agent George Sinclair's affidavit outlining the verbal and written instructions given to Idaho FBI agents regarding minimization. A copy of the written instructions given to each monitoring agent is attached to his affidavit.

The court has carefully reviewed the affidavits and exhibits and finds that they do establish a *prima facie* case that the agents conducted reasonable minimization. *United States v. Santora*, 600 F.2d at 1320 (*prima facie* case of adequate minimization demonstrated without evidentiary hearing by submission of logs of intercepted conversations and agents' affidavit). The analysis, however, does not stop when the government meets its initial burden of proof; the court must then decide whether defendants have met their burden in establishing that agents failed to reasonably conduct minimization of the wiretaps. *United States v. Armocida*, 515 F.2d 29, 45 (3d Cir.1975), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). At this point the record is not sufficiently developed to enable the court to determine if defendants have proven a failure to minimize. Each defendant's argument must therefore be individually addressed. The requirements imposed in *United States v. Ledesma*, 499 F.2d 36, 39 (9th Cir.1974) and *United States v. Licavoli*, 604 F.2d at 613, that defendants' moving papers be sufficiently definite, specific, detailed and nonconjectural in raising contested issues that must be settled by way of evidentiary hearing is applicable in the minimization context. Thus, this court will not conduct a hearing where a defendant's allegations that the government failed to minimize are conclusory. However, the court is aware that defendant's burden is much greater than the government's in light of the fact that defendants must, in the instant case, sift through tapes of over 12,000 calls and attempt to make a showing without benefit of other pertinent information. The specificity of each defendant's initial showing will be evaluated with this handicap in mind.

■ Whitney submits his declaration and transcripts of specific conversations, in support of his argument that agents made no attempt to minimize innocent and noncriminal conversations. Whitney claims that agents demonstrated an unhealthy and voyeuristic interest in his love life and sought out, rather than minimized, conversations between him and his girlfriend. The court finds that Whitney has made a specific and detailed showing sufficient to warrant further submission of evidence to prove his allegation that agents failed to attempt to minimize calls regarding his recreational and love life.

■ Whitney and Diebert both argue that the agents failed to minimize the intercepted conversations in which they were both initially identified as potential members of the conspiracy. They were intercepted on authorized telephone lines but they were not named in the intercept order. Even though their allegation is specific and definite because they identify the exact calls allegedly not minimized, no hearing is required. Whitney and Diebert may, however, substantiate their claims by presenting transcripts and logs of those conversations.

■ Slater makes only general allegations that agents failed to minimize his conversations, but he does make a specific request for discovery of the five-day progress reports. Similarly, Dodson's allegation is general in nature. Slater and Dodson have not made a sufficient showing to warrant an evidentiary hearing on their challenges. With respect to Slater's request for discovery of progress reports, the court reaffirms its earlier decision denying this request. See Memorandum Decision and Order, Sept. 19, 1985.

■ Michael Sullivan and Davis were boyfriend and girlfriend throughout the interception of Michael Sullivan's telephone calls. Davis alleges agents did not minimize personal and intimate conversations in which she was involved. She requests an evidentiary hearing for two purposes. First, she wishes to present evidence regarding the instructions given to the monitoring agents to minimize these conversa-

tions. Second, she wishes to present for the court's review specific conversations that support her allegation. Davis has made a minimal showing to persuade the court to receive evidence regarding her allegations. Davis may submit copies of transcripts of conversations highlighting her arguments. She may also inquire at a hearing about what instructions, other than those set forth in Walker's affidavit, were given to agents regarding her specific calls with Michael Sullivan. She may also inquire whether instructions regarding the general topic of communications between boyfriends and girlfriends were issued.

■ During oral argument, Tina Sullivan asserted that a clear pattern of agents' failure to minimize was evidenced by their repeated interception of her calls to and from her grandmother. She argues that these calls were clearly not criminal in nature. Tina Sullivan may submit transcripts of those conversations and evidence regarding the frequency of interception of those calls as compared to all other calls.

■ Jackson attacks the government's presentation of its minimization statistics with his own detailed and specific analysis of the percentage of minimized and pertinent calls. During oral argument, Jackson requested leave of the court to present further statistical data. The court finds that Jackson has made a sufficient showing to warrant the submission of that evidence.

■ Mary Pool makes a specific and definite showing in her allegation that conversations with her husband, Tom Pool, and others were personal and noncriminal in nature. She submits a summary excerpted from logs to demonstrate that the government failed to minimize calls. Although an evidentiary hearing is not required, the court feels it would benefit from a complete submission of logs and transcripts of the calls that Mary Pool characterizes as personal, in order to prove her contention that there was a pattern of interception of innocent conversations.

Much of the evidence that defendants seek to present to the court can be submitted to the court by way of sworn affidavits. In the interest of judicial economy, the court encourages this practice. *United States v. Santora*, 609 F.2d at 1320 (sworn affidavit accompanied by submission of logs is sufficient evidence upon which to base a finding that adequate minimization had occurred); *United States v. Cirillo*, 499 F.2d 872, 880–81 (2d Cir.1974) (affidavits supplemented by logs and tapes sufficient to establish showing of compliance with statutory minimization directive). Of course, the government will be permitted to present evidence in response to defendants' submissions within a reasonable period of time.

## ORDER

Accordingly,

Defendants' motion to suppress evidence for violation of 18 U.S.C. § 2518(1)(c) is DENIED.

Defendants' request for an evidentiary hearing re: probable cause and necessity issues is DENIED.

Defendants' motion to suppress for lack of probable cause is DENIED.

Whitney's and Jackson's motion to suppress for violation of § 2518(5) is DENIED.

Wooten's motion to dismiss for violation of 18 U.S.C. § 2517(5) is GRANTED. Whitney's and Diebert's motion to suppress on the same grounds is DENIED.

Defendant Jackson's motion to suppress for violation of 18 U.S.C. § 2518(4)(d) is DENIED.

Defendants' motion to suppress for violation of 18 U.S.C. § 2516(1) is DENIED.

Defendants' motion to discover information regarding compliance with sealing provisions is GRANTED.

Defendants' motion to suppress for violation of 18 U.S.C. § 2518(8)(d) is DENIED.

Defendants' request for an evidentiary hearing re: minimization issues is GRANTED in part, DENIED in part.

IT IS SO ORDERED.